IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| HALEY PAINT COMPANY, *et al.* | * | |
| Plaintiffs | * | |
| | | Civil Action No.: RDB-10-0318 |
| v. | * | |
| E.I. Dupont De Nemours and Co., *et al.* | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### **MEMORANDUM OPINION**

On April 12, 2010, Plaintiffs Haley Paint Company and Isaac Industries, Inc. ("Plaintiffs"), filed a Consolidated Amended Complaint and initiated this class action lawsuit against Defendants E.I. Dupont De Nemours and Co. ("Dupont"), Huntsman International LLC ("Huntsman"), Kronos Worldwide Inc. ("Kronos"), and Millennium Inorganic Chemicals, Inc. ("Millennium") (collectively, "Defendants") alleging a conspiracy to fix the price of titanium dioxide in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs have filed this action on behalf of themselves and on behalf of a class consisting of all persons and entities who purchased titanium dioxide in the United States directly from one or more Defendants. Presently pending before this Court is Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint (ECF No. 84).[1] The Defendants have moved to dismiss on the ground that Plaintiffs have failed to state a claim for relief under *Bell Atlantic*

---

[1] A fifth Defendant, The National Titanium Dioxide Company Ltd. d/b/a/ Cristal ("Cristal"), is also a party to this action. Cristal is a foreign corporation domiciled in the Kingdom of Saudi Arabia, and has filed a separate Motion to Dismiss (ECF No. 86) for insufficient service of process and lack of personal jurisdiction. That motion will be addressed in a subsequent Opinion.

1

*Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Plaintiffs have filed a response in opposition to Defendants' motion (ECF No. 87). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendants' Motion to Dismiss (ECF No. 84) is DENIED.

## I.  Background

In ruling on a motion to dismiss, "[t]he factual allegations in the Plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

Plaintiffs' Consolidated Amended Complaint ("CAC") consists of 49 pages and 128 paragraphs. For the sake of clarity and brevity, only the most pertinent facts and allegations will be summarized here. Defendants are the leading suppliers of titanium dioxide in the world, and control approximately 70% of the global production capacity. CAC ¶ 1. Titanium dioxide, a dry chemical powder, is the "world's most widely used pigment for providing whiteness, brightness, and opacity . . . to many products, particularly paints and other coatings." *Id.* ¶ 33. Titanium dioxide has few competitive substitutes, and demand for it tends to be inelastic. *Id.* ¶ 35. Plaintiffs allege that, as a result of a declining market for titanium dioxide, Defendants conspired to fix, raise, maintain, and stabilize the price of titanium dioxide. *Id.* ¶ 2, 69. This conspiracy is alleged to have occurred between March 1, 2002, through the present (hereinafter referred to as the "Class Period"). *Id.* ¶ 21. During the Class Period, titanium dioxide prices increased, and Defendants earned billions of dollars in revenue. *Id.* ¶ 3, 1.

### A.  The Titanium Dioxide Market

As previously mentioned, Defendants are the market leaders in the production of titanium dioxide. The market is global in scope, with the majority of trade conducted internationally. *Id.*

¶ 49. The market for the chemical has high barriers to entry—it is estimated that a new plant would require $450-500 million and three to five years to build. *Id.* ¶ 43. As a result, the industry is highly centralized. *Id.* ¶ 42-48. Beginning in the early 1990s, prices for titanium dioxide began to decline for a variety of reasons, such as global overcapacity and customer consolidation. *Id.* ¶ 68. Prices increased in the late 1990s, but fell significantly in 2001. *Id.* Plaintiffs allege, that as a result of declining prices and declining demand, "Defendants were motivated to reach, and did reach, an agreement or understanding in or about early 2002 to increase prices and improve margins in the industry." *Id.* ¶ 69.

**B. Alleged Conspiracy To Fix Prices Of Titanium Dioxide**

On January 24, 2002, a titanium dioxide industry meeting took place in Finland. *Id.* ¶ 54. Shortly thereafter, and in spite of flat or declining demand for titanium dioxide, Defendants and their co-conspirators[2] announced price increases to be effective March 1, 2002. Further price increases were announced and implemented in the summer of 2002. *Id.* The following year, a titanium dioxide conference took place in Miami, Florida. That conference was attended by Defendants, and the former Vice President of Defendant Millennium specifically told attendees to expect further price increases. *Id.* ¶ 55. Numerous other meetings and conferences were held over the next several years, and those meetings neatly corresponded to titanium dioxide price increases during the Class Period. *Id.* ¶¶ 52, 56-61. Plaintiffs allege that it was at these

---

[2] Plaintiffs have named three co-conspirators in this case. The first, Lyondell Chemical Company sold its titanium dioxide business to Defendant Cristal in 2007. Lyondell's titanium dioxide business was the predecessor of Defendant Millennium. CAC ¶ 16. The second named co-conspirator, Tronox, Inc., filed for bankruptcy in January of 2009, and is precluded from being named as a defendant in this case. *Id.* ¶ 17. The third named co-conspirator is International Business Management Associates, and its President, James R. Fisher. Mr. Fisher is alleged to have been a "conduit of nonpublic, commercially-sensitive information concerning titanium dioxide between and among Defendants and their co-conspirators." *Id.* ¶ 18.

3

conferences where Defendants agreed and conspired to fix the price and supply and capacity of titanium dioxide. *Id.* ¶ 62.

In addition to conferences and trade meetings, Plaintiffs also allege that the conspiracy was furthered through industry publications and through conversations with industry consultants, customers, and others. *Id.* ¶ 51. "After having reached an unlawful agreement or understanding . . . , Defendants used consultants, customers, and others as conduits to signal or confirm intended pricing and other actions to each other." *Id.* These conversations and signals allowed Defendants to monitor the conspiracy and cut down on potential "cheating," whereby one participant could undercut the others by reducing their prices. *Id.* Plaintiffs also allege that Defendants privately discussed industry conditions and titanium dioxide pricing at dinner meetings before and after the various trade association and industry meetings. *Id.* ¶ 53. In short, Plaintiffs allege that Defendants had ample ability to conspire to fix the price and capacity of titanium dioxide.

## C.  Titanium Dioxide Pricing

In the face of declining demand, reduced costs, and increased production capacity, *see* ¶¶ 54, 69, 71, 74, 81-82, 84, 102, the price of titanium dioxide actually increased substantially during the Class Period. *Id.* ¶ 103. Plainitffs allege that Defendant Dupont, the titanium dioxide market leader, typically would announce a price increase which would be quickly followed by all other Defendants. *Id.* ¶¶ 67, 72-75, 77-78, 80, 82-101. Rather than labor to describe in detail every price increase chronicled by Plaintiffs in their complaint, this Court has reproduced a chart contained at paragraph 100 of the complaint which concisely tracks the numerous price increases announced and implemented by Defendants during the Class Period:

| Examples of Certain U.S. Titanium Dioxide Industry Price Increase Announcements by Effective Date in Cents per Pound | | | | | |
|---|---|---|---|---|---|
| Effective Date | Dupont | Millennium | Kronos | Tronox | Huntsman |
| 03/01/2002 | $0.05 | $0.05 |  | $0.05 | $0.05 |
| 07/01/2002 | $0.06 | $0.06 | $0.06 | $0.06 |  |
| 10/01/2003 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 06/15/2004 | $0.04 | $0.04 | $0.04 | $0.04 | $0.04 |
| 10/01/2004 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 07/01/2005 | $0.04 | $0.04 | $0.04 | $0.04 |  |
| 10/01/2005 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 01/01/2006 | $0.05 | $0.06 | $0.05 | $0.05 | $0.05 |
| 07/01/2007 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 10/15/2007 | $0.06 | $0.06 | $0.06 | $0.06 |  |
| 01/15/2008 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 06/15/2008 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 07/01/2008 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| Sept. 2008 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |

CAC ¶ 100.

While a few footnotes noting slightly different effective dates have not been reproduced above, the general gist of the chart makes clear the thrust of Plaintiffs allegations—that is—throughout the Class Period, Defendants announced and implemented numerous titanium dioxide price increases in lock-step fashion. Of crucial importance to Plaintiffs case is the fact that these price increases were implemented in the midst of market conditions, such as declining demand, decreasing manufacturing costs, and excess production capacity, that Plaintiffs allege are completely incompatible with across the board price increases among the market leaders of a product.

In addition to the price increases listed above, Defendants also announced and implemented numerous "energy surcharges," purportedly as a result of rising energy (oil) costs. Many of these price and energy surcharge announcements were made in September, 2008, at a time when oil prices had actually fallen from their record high levels. *Id.* ¶ 98.

Although the price increases were spaced out over five years, they increased in frequency in 2008. Plaintiffs allege that "over the course of approximately 14 weeks, from late May 2008 to early September 2008, Defendants and their co-conspirators announced three separate Titanium Dioxide price increases and at least two energy surcharges," and that these price increases were made amidst declining demand for titanium dioxide. *Id.* ¶ 99.

In light of the market conditions for titanium dioxide, Plaintiffs allege that the price increases implemented by Defendants cannot be explained as anything other than an illegal agreement to fix prices and supply of the chemical. In support of this contention, Plaintiffs draw an analogy to the period in the 1990s—where there is no price fixing conspiracy alleged—when industry overcapacity lead to lower prices and slim profit margins. *Id.* ¶ 102. Plaintiffs allege that the price increases were profitable for Defendants. The average price per ton of titanium dioxide increased nearly a third between 2002 and 2006, and Defendants increased their operating incomes and margins. *Id.* ¶ 103.

As a result of this alleged conspiracy, Plaintiffs contend that price competition in the sale of titanium dioxide by Defendants (who control approximately 70% of global production capacity) has been restrained, suppressed, and eliminated throughout the United States. *Id.* ¶ 104. Plaintiffs further allege that prices for titanium dioxide have been raised, fixed, maintained, and stabilized at artificial levels, and as a result, direct purchasers of titanium dioxide have been "deprived of the benefit of free and open competition in the purchase" of the chemical. *Id.*

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim

upon which relief can be granted; therefore, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

      A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Simmons v. United Mort. and Loan Inv., LLC*, __ F.3d __, 2011 WL 184356, at *10 (4th Cir. Jan. 21, 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, a court considering a motion to dismiss "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Well-pleaded factual allegations contained in the complaint are assumed to be true "even if [they are] doubtful in fact," but legal conclusions are not entitled to judicial deference. *See Twombly*, 550 U.S. at 570 (stating that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'") (citations omitted). Thus, even though Rule 8(a)(2) "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

      To survive a Rule 12(b)(6) motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Supreme Court has explained that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 129 S. Ct. at 1949. The plausibility standard requires that the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement."

*Twombly*, 550 U.S. at 556. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1937. Thus, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Id.*

### III. Analysis

Section 1 of the Sherman Act prohibits any "contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Here, Plaintiffs have alleged that Defendants have made such an agreement. The Supreme Court of the United States, in *Bell Atl. Corp. v. Twombly*, held that a plaintiff's Section 1 conspiracy complaint must include "enough factual matter (taken as true) to suggest that an agreement was made." 55 U.S. 544, 556 (2007). Defendants have moved to dismiss Plaintiffs' Consolidated Amended Complaint on the ground that it does not meet *Twombly's* pleading requirements.

The allegations and factual assertions in *Twombly* were relatively straightforward. The complaint in that case simply alleged that regional telephone companies were engaged in parallel behavior, and as a result, were not competing. The Court summarized the core allegations of the complaint as follows:

> In the absence of any meaningful competition between the [defendants] in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from [other carriers] within their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information and belief that [the defendants] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another.

*Id.* at 551. The Supreme Court found the complaint insufficient because it was based solely on an "allegation of parallel conduct and a bare assertion of conspiracy." *Id.* at 556. The Court noted that "allegations of parallel business conduct, taken alone, do not state a claim under § 1[,]" and that to survive a motion to dismiss, a plaintiff "must allege additional facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *Id.* at 552 (internal quotation marks and citation omitted). In making this ruling, the Court noted the differences in the pleading standards at the motion to dismiss stage compared with the standards utilized by courts at the motion for summary judgment stage. At the summary judgment stage "a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." *Id.* at 554. At the motion to dismiss stage, by contrast, the plaintiff's allegations need not rule out a defendant's explanations. Under this less onerous standard, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. Indeed, the Court specifically noted that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (internal quotation marks and citation omitted). In short, the Court did not establish a heightened pleading requirement for antitrust cases, *Id.* at 569 n.14, and Rule 8 requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2).

Unlike the complaint in *Twombly*, Plaintiffs in the present case have pleaded more than conclusory allegations of parallel conduct among Defendants, and their Consolidated Amended Complaint provides a sufficiently plausible case of price fixing so as to allow discovery to

proceed.[3]  While the crux of Plaintiffs complaint centers on parallel price increases implemented by Defendants, they allege enough factual allegations, or "plus factors"[4] to plausibly suggest an agreement in violation of the Sherman Act.

As detailed above, the Consolidated Amended Complaint alleges parallel price increases announced and implemented by Defendants, details of the titanium dioxide industry that facilitate collusion, market conditions favoring collusion, and opportunities to agree and collude

---

[3]  This Court does not make this determination lightly.  As the United States Court of Appeals for the Seventh Circuit recently noted: "*Twombly*, even more clearly than its successor, *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), is designed to spare defendants the expense of responding to bulky, burdensome discovery unless the complaint provides enough information to enable an inference that the suit has sufficient merit to warrant putting the defendant to the burden of responding to at least a limited discovery demand."  *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625 (7th Cir. 2010).  *See Twombly*, 550 U.S. at 558 ("The costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no likelihood that the plaintiffs can construct a claim from the events related in the complaint").  At the same time, "the Supreme Court has also recognized that Congress drafted the antitrust laws with the express purpose of encouraging private enforcement."  *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, __ F. Supp. 2d __, No. 09 C 7666, 2011 WL 462648, at *9 n.10 (N.D. Ill. Feb. 9, 2011) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).  "If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data."  *Id.*

[4]  In a footnote, the *Twombly* Court described various types of "parallel plus" evidence that a plaintiff could allege in order to transform innocuous parallel behavior to collusive parallel behavior:

> Commentators have offered several examples of parallel conduct allegations that would state a [Sherman Act] § 1 claim under this standard . . . [namely,] "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" . . . [;] "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement."  The parties in this case agree that 'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' would support a plausible inference of conspiracy.

550 U.S. at 557 n.4 (citations omitted).

in the form of trade association meetings and publications. This Court must view these allegations in their entirety, and not individually. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33 (D.D.C. 2008) (holding that in evaluating the plausibility of a § 1 Sherman Act claim, a court must view the complaint's allegations as a whole). Taken together, these allegations constitute a plausible, if not entirely probable, case for § 1 liability.

The lock-step price increases announced and implemented by Defendants, although not dispositive, is certainly probative of an illegal agreement to set prices. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) ("Parallel behavior of a sort anomalous in a competitive market is thus a symptom of price fixing, though standing alone it is not proof of it"). Moreover, the complaint plausibly alleges that, due to Defendants control over the global supply and manufacture of titanium dioxide, it would be easy for Defendants to monitor each other and structure agreements in violation of § 1. *See id.*

Plaintiffs allege that Defendants belonged to, and attended, various titanium dioxide industry meetings and conferences at which they exchanged price information for titanium dioxide. In the words of the Seventh Circuit, "this allegation identifies a practice, not illegal in itself, that facilitates price fixing that would be difficult for the authorities to detect." *Id.* at 628. Moreover, Plaintiffs have alleged that Defendants attended private dinners and meetings and discussed the titanium dioxide industry and pricing.

Of critical importance to the plausibility of Plaintiffs complaint is the fact that the various price increases implemented by Defendants occurred at a time when demand for titanium dioxide was dwindling, and manufacturing costs had decreased. Plaintiffs allege that in 2008, in the

midst of what has been termed the "great recession," demand for paint and other construction inputs decreased, yet at the same time, Defendants steadily increased prices.

While Defendants aptly note that many of the behaviors and actions alleged by Plaintiffs can be explained away as actual competitive (as opposed to collusive) behavior, this Court again notes that *Twombly* does not impose a probability requirement at this stage in the litigation. *Twombly*, 550 U.S. at 556.  Plaintiffs are not required to explain, or offer proof to contradict Defendants' competing explanations.  Here, Plaintiffs must only allege a conspiracy that is plausible.  After reviewing the totality of Plaintiffs' complaint, this Court concludes that they have met their burden.

## **CONCLUSION**

For the reasons stated above, Defendants' Motion to Dismiss is DENIED.

A separate Order follows.

Dated:    March 29, 2011

/s/_____
Richard D. Bennett
United States District Judge