1  Ben F. Pierce Gore (SBN 128515)
2  1871 The Alameda, Suite 425
   San Jose, CA 95126
3  Telephone: (408) 429-6506
   Fax: (408) 369-0752
4  pgore@prattattorneys.com

5  *Attorneys for Plaintiff*

6  (Additional counsel listed
   on signature page)

7

8

9

10

11

# Filed

MAR 15 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

*Fee paid*
*SI* (10)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

12

13  LOS GATOS MERCANTILE, INC. d/b/a
    LOS GATOS ACE HARDWARE, FRED
14  SWAIM, INC. d/b/a QUALITY AUTO
    PARTS, ACE HARDWARE OF SOUTH
15  WALTON, INC., LEXINGTON HOME
    CENTER, LLC, R.F. COLE, INC. d/b/a/
16  BREWERS PAINT CENTER,
    CUSIMANO CARSTAR COLLISION,
17  INC., and THE CARPETSHOPPE, INC.,
    on behalf of themselves and all others
18  similarly situated,

19                    Plaintiffs,

20  v.

21  E.I. DUPONT DE NEMOURS AND
    COMPANY, HUNTSMAN
22  INTERNATIONAL LLC, KRONOS
    WORLDWIDE, INC., and MILLENNIUM
23  INORGANIC CHEMICALS, INC.,

24                    Defendants.

Case No.

# CV13- 1180 HRL

**CLASS ACTION AND REPRESENTATIVE
ACTION**

**COMPLAINT FOR DAMAGES,
EQUITABLE AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

E-filing

25

26      Come now the Plaintiffs, Los Gatos Mercantile, Inc., d/b/a Los Gatos Ace Hardware, Fred

27  Swaim, Inc. d/b/a Quality Auto Parts, Ace Hardware of South Walton, Inc., Lexington Home

28  Center, LLC, R.F. Cole, Inc. d/b/a Brewers Paint Center, Cusimano Carstar Collision, Inc. and The

-1-

*Class Action Complaint*          **EXHIBIT A**

Carpet Shoppe, Inc., on behalf of themselves and all others similarly situated, and for their Class Action Complaint, state as follows:

## I.  INTRODUCTION

1.      Plaintiffs are indirect purchasers of Titanium Dioxide.  Plaintiffs bring this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of residents of jurisdictions which proscribe the Defendants' unlawful conduct, as described in this Class Action Complaint.  These jurisdictions include Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  Plaintiffs bring this lawsuit individually, and on behalf of all persons and entities who purchased Titanium Dioxide in the United States indirectly from one or more of the named Defendants, their agents and co-conspirators between March 1, 2002 and the present (sometimes the "Indirect Purchaser Plaintiffs").

2.      Defendants and their co-conspirators are the dominant suppliers of Titanium Dioxide in the United States.  They own and supply well over 90% of the United States' demand for Titanium Dioxide and dominate the United States marketplace for this product, a dry chemical powder, which is used in coatings such as paint, cosmetics, plastics and paper industries.  Defendants earn billions in revenues from the sale of Titanium Dioxide.

3.      Indirect Purchaser Plaintiffs allege that the named Defendants and other unnamed co-conspirators intentionally conspired and agreed to manipulate, fix, raise, maintain and stabilize the market and price at which Titanium Dioxide is sold in the United States.  The alleged conspiracy was hatched and implemented in the United States for the purpose of acting anticompetitively, resulting in the unconscionable, unfair and deceptive overcharging of the Indirect Purchaser Plaintiffs.

4.      Defendants' unlawful conspiracy was initiated, developed, and maintained by a course of anticompetitive conduct, including agreements, secret meetings and communication between Defendants for the purpose of artificially inflating the price of Titanium Dioxide and

1    allocating the United States marketplace. While in secret discussions, Defendants exchanged
2    commercially sensitive and proprietary information relating to the sales, production, supply,
3    inventory, marketing and pricing of Titanium Dioxide, as well as the raw materials necessary to
4    manufacture Titanium Dioxide itself. In order to perpetuate this unlawful conspiracy, Defendants
5    and their co-conspirators engaged in fraudulent and deceptive behavior to hide and conceal their
6    behavior from the Indirect Purchaser Plaintiffs.

7        5.    As a result of Defendants' fraudulent, deceptive, unconscionable, unfair and
8    anticompetitive behavior, the United States marketplace for Titanium Dioxide was controlled and
9    manipulated while prices for Titanium Dioxide were artificially inflated. Because Indirect
10   Purchaser Plaintiffs paid a price for Titanium Dioxide products that was higher than what would be
11   paid in a competitive marketplace, each suffered economic damages as a result of Defendants'
12   wrongdoing. Thus, Plaintiffs bring this lawsuit to recover actual and/or compensatory damages and
13   to enjoin Defendants and their co-conspirators from engaging in their unlawful and anticompetitive
14   behavior.

15              **II.    JURISDICTION AND VENUE**

16       6.    Indirect Purchaser Plaintiffs bring this state law class action to recover actual and/or
17   compensatory damages, double and treble damages as permitted, pre- and post-judgment interest,
18   costs, and attorneys' fees. Plaintiffs also seek nationwide injunctive relief. Plaintiffs seek damages
19   in excess of $5,000,000. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. §
20   26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the
21   Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages
22   pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain
23   restitution, recover damages, and secure other relief against Defendants for violation of those state
24   laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal
25   and state law. This Court has jurisdiction over the subject matter of this action pursuant to 28
26   U.S.C. § 1332(d).

27       7.    Venue and personal jurisdiction are proper in this judicial district pursuant to Section
28   12 of the Clayton Act (15 U.S.C. § 22). Personal jurisdiction is proper in this district as each

-3-

*Class Action Complaint*

defendant resides, is found, transacts business, or has an agent in the United States, including in this district.  Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and, because at least one of the Defendants resides in this judicial district, is licensed in or is conducting business in this judicial district, and because a substantial portion of the unlawful and anticompetitive conduct affecting interstate trade and commerce was engaged in and carried out by Defendants in this judicial district.

## III.   PARTIES

8.     Plaintiff Los Gatos Mercantile, Inc. d/b/a Los Gatos Ace Hardware ("Ace Los Gatos") is a California corporation with its principal place of business in Los Gatos, California. Plaintiff Ace Los Gatos is a paint retailer which, during the Class Period, regularly purchased for resale paint containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Ace Los Gatos has suffered overcharge loss due to unjustified increases in the price of this paint, as a result of the conspiracy described in this Complaint, including damages caused by the inability to pass on all such price increases.

9.     Plaintiff Fred Swaim, Inc. d/b/a Quality Auto Parts ("Quality") is an Arkansas corporation with its principal place of business in Benton, Saline County, Arkansas.  Plaintiff Quality is a paint retailer which, during the Class Period, regularly purchased for resale paint containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Quality has suffered overcharge loss due to unjustified increases in the price of this paint, as a result of the conspiracy described in this Complaint, including damages caused by the inability to pass on all such price increases.

10.     Plaintiff Ace Hardware of South Walton, Inc. ("Ace South Walton") is a Florida corporation with its principal place of business in Miramar Beach, Florida.  Plaintiff Ace South Walton is a paint retailer which, during the Class Period, regularly purchased for resale paint containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Ace South Walton has suffered overcharge loss due to unjustified increases in the price of this paint, as a result of the conspiracy described in this Complaint, including damages caused by the inability to pass on all such price increases.

*Class Action Complaint*

11.     Plaintiff Lexington Home Center, LLC ("Lexington") is a Mississippi corporation with its principal place of business in Lexington, Mississippi. Plaintiff Lexington is a paint retailer which, during the Class Period, regularly purchased for resale paint containing Titanium Dioxide manufactured by one or more of the Defendants. Plaintiff Lexington has suffered overcharge loss due to unjustified increases in the price of this paint, as a result of the conspiracy described in this Complaint, including damages caused by the inability to pass on all such price increases.

12.     Plaintiff R.F. Cole, Inc. d/b/a Brewers Paint Center ("Brewers") is a South Carolina corporation with its principal place of business in Charleston, South Carolina. Plaintiff Brewers is a paint retailer which, during the Class Period, regularly purchased for resale paint containing Titanium Dioxide manufactured by one or more of the Defendants. Plaintiff Brewers has suffered overcharge loss due to unjustified increases in the price of this paint, as a result of the conspiracy described in this Complaint, including damages caused by the inability to pass on all such price increases.

13.     Plaintiff Cusimano Carstar, Inc. ("Cusimano") is a New York corporation with its principal place of business in Falconer, New York. Plaintiff Cusimano is a paint retailer which, during the Class Period, regularly purchased for resale paint containing Titanium Dioxide manufactured by one or more of the Defendants. Plaintiff Cusimano has suffered overcharge loss due to unjustified increases in the price of this paint, as a result of the conspiracy described in this Complaint, including damages caused by the inability to pass on all such price increases.

14.     Plaintiff The Carpet Shoppe, Inc. ("Carpet Shoppe") is a Tennessee corporation with its principal place of business in Dickson, Tennessee. Plaintiff Carpet Shoppe is a paint retailer which, during the Class Period, regularly purchased for resale paint containing Titanium Dioxide manufactured by one or more of the Defendants. Plaintiff Carpet Shoppe has suffered overcharge loss due to unjustified increases in the price of this paint, as a result of the conspiracy described in this Complaint, including damages caused by the inability to pass on all such price increases.

15.     Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. During the Class Period, DuPont manufactured and sold Titanium Dioxide, which was indirectly purchased in the United

-5-

States and elsewhere through DuPont or through DuPont's predecessors, affiliates and/or subsidiaries. DuPont is the largest producer and supplier of Titanium Dioxide in the world, and it owns and controls approximately half of the Titanium Dioxide production capacity in North America. DuPont has U.S. manufacturing plants in Delaware, Florida, Mississippi and Tennessee. DuPont receives billions in revenues from the production of Titanium Dioxide used in coatings and colors of various products marketed and sold throughout the United States directly and through the Internet. These products were purchased by the Indirect Purchasers within all fifty (50) states.

16.     Defendant Huntsman International, LLC ("Huntsman") is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah. During the relevant times alleged herein, Huntsman manufactured and sold Titanium Dioxide in the United States, which was indirectly purchased in the United States, through Huntsman or through Huntsman's predecessors, affiliates, and/or subsidiaries, including Tioxide Americas, Inc., an indirect subsidiary of Huntsman and a direct subsidiary of Tioxide Group (a UK company), which is wholly-owned by Huntsman. Huntsman is the fourth largest Titanium Dioxide global producer and has annual sales in the billions of dollars.

17.     Defendant Kronos Worldwide, Inc. ("Kronos," formerly known as Kronos, Inc.) is a Delaware corporation with its principal executive offices in Dallas, Texas and its principal North American sales, marketing, and technical offices in Cranbury, New Jersey. Kronos and Huntsman (through a subsidiary, Huntsman Holding, LLC) jointly operate (50/50) a Titanium Dioxide manufacturing venture, Louisiana Pigment Company, L.P., in Lake Charles, Louisiana. During the relevant time periods alleged herein, Kronos manufactured and sold Titanium Dioxide, which was indirectly purchased in the United States through Kronos or through its predecessors, affiliates and/or subsidiaries. Kronos is the fifth largest global producer of Titanium Dioxide and has net sales over a billion dollars.

18.     Defendant Millennium Inorganic Chemicals, Inc. ("Millennium") is a Delaware corporation with its principal place of business in Hunt Valley, Maryland. During the relevant time periods alleged herein, Millennium manufactured and sold Titanium Dioxide, which was indirectly purchased in the United States. Together with its alter-ego and in a joint-venture, Millennium and

-6-

co-conspirator National Titanium Dioxide Company Limited (d/b/a Cristal, a Saudi Arabian corporation) are the second largest global producers of Titanium Dioxide and have combined sales of over a billion dollars. Prior to its acquisition by Cristal in 2007, Millenium comprised the Titanium Dioxide business of Lyondell Chemical Company. During the relevant times alleged herein, Millennium operated plants in Ashtabula, Ohio and Baltimore, Maryland.

## IV. AGENTS AND CO-CONSPIRATORS

19. Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Class Action Complaint.

20. Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of some of which are presently unknown to Plaintiffs, have participated as coconspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

21. Alleged co-conspirator Lyondell Chemical Company ("Lyondell") is a Delaware corporation with its principal place of business in Houston, Texas. During the relevant time periods alleged herein, Lyondell manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, and/or subsidiaries, including a wholly-owned subsidiary that is the predecessor of Defendant Millennium. Lyondell acquired its Titanium Dioxide business as part of its acquisition of Millennium Chemicals, Inc. in 2004. In 2005, Lyondell was the second-largest global producer of Titanium Dioxide and earned over a billion dollars in revenue. Lyondell sold its Titanium Dioxide business (the predecessor of Millennium) to Cristal in 2007. In January 2009, Lyondell and numerous affiliates filed voluntary bankruptcy petitions to restructure under Chapter 11 of the Bankruptcy Code.

22. Alleged co-conspirator Tronox Inc. ("Tronox") is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma. During the relevant time periods alleged herein, Tronox manufactured and sold Titanium Dioxide to indirect purchasers in the United States through itself or through its predecessors, affiliates, and/or subsidiaries. Tronox is the world's third

-7-

largest producer of Titanium Dioxide.  In 2006, Tronox earned hundreds of millions of dollars in net sales of Titanium Dioxide in the United States.  It owns plants in Hamilton, Mississippi and Savannah, Georgia.  Prior to becoming a publicly traded company in November 2005, Tronox was a wholly owned subsidiary of Kerr-McGee Corporation and was acquired by Anadarko Petroleum Corporation in 2006.  In January 2009, Tronox and certain of its subsidiaries filed voluntary petitions to restructure under Chapter 11 of the United States Bankruptcy Code.

23.    Alleged co-conspirator International Business Management Associates, Inc. ("IBMA") is a Delaware corporation, and its principal place of business is believed to be in Plainsboro, New Jersey.  Alleged co-conspirator James R. Fisher is the President and Chief Executive Officer of IBMA and has held this role at all relevant times.  IBMA is Mr. Fisher's alter ego.  Mr. Fisher has been a consultant to the Titanium Dioxide industry for many years, including before and during the relevant time periods alleged herein.  Prior to working as a consultant to the industry, he was employed by Defendant Kronos.  Mr. Fisher was a main actor and perpetuator of the sharing of nonpublic, commercially sensitive information concerning Titanium Dioxide between and among Defendants and their co-conspirators. He has also been an agent and co-conspirator of one or more Defendants.

24.    Whenever in this Class Action Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

25.    Defendants are liable for unlawful acts performed in furtherance of the alleged anticompetitive price-fixing conspiracy by companies acquired through mergers and acquisitions.

## V.    CLASS ACTION ALLEGATIONS

26.    Indirect Purchaser Plaintiffs bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following defined class (the "Nationwide Class"):

All persons and entities who purchased products containing Titanium

-8-

Dioxide manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates thereof, between March 1, 2002 and the present. Excluded from the Nationwide Class are Defendants, their co-conspirators, parent companies, predecessors, subsidiaries and affiliates, and all governmental entities.

Indirect Purchaser Plaintiffs bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following defined class (the "Damages Class"):

All persons and entities who lived in or purchased products in Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, or Wisconsin containing Titanium Dioxide manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates thereof, between March 1, 2002 and the present. Excluded from the Damages Class are Defendants, their co-conspirators, parent companies, predecessors, subsidiaries and affiliates, and all governmental entities.

The Damages Class and the Nationwide Class are collectively referred to as "Classes."

27. Indirect Purchaser Plaintiffs believe the approximate size of the Class to be in the hundreds of thousands and so geographically dispersed throughout the United States that joinder of all class members is impracticable.

28. Indirect Purchaser Plaintiffs' state law claims are typical of the claims of the Class and arise from the same anticompetitive conspiracy and unlawful conduct engaged in by Defendants and co-conspirators as alleged herein. The relief sought by the Indirect Purchaser Plaintiffs is common to the entire class.

29. Numerous questions of fact or law arise from Defendants' and their co-conspirators' anticompetitive conduct that are common to the class, including but not limited to:

    a. Whether Defendants and their co-conspirators combined or conspired to manipulate, raise, maintain, or stabilize prices of Titanium Dioxide sold in the United States.

    b. Whether Defendants and their co-conspirators shared

*Class Action Complaint*

nonpublic, proprietary information, allocated markets and customers, restricted the supply and output of Titanium Dioxide sold in the United States and/or committed unfair or anticompetitive conduct in furtherance of the alleged price-fixing conspiracy.

c.  Whether Defendants and their co-conspirators engaged in unfair, false, deceptive or unconscionable behavior.

d.  Whether Defendants and their co-conspirators conduct resulted in the price of Titanium Dioxide being sold at an artificially high and noncompetitive level.

e.  Whether Defendants and their co-conspirators were unjustly enriched by the sale of Titanium Dioxide at artificially high and non-competitive levels.

f.  Whether the Indirect Purchaser Plaintiffs and Class were injured by Defendants' and their co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members; and

g.  Whether the Indirect Purchaser Plaintiffs and the Nationwide Class are entitled to nationwide injunctive relief.

30.  The questions of fact or law common to the Class are overarching and predominate as a threshold matter over any individual questions affecting members of the classes.

31.  The Indirect Purchaser Plaintiffs will fairly and adequately represent the interests of the Class and have no interest that is in conflict or antagonistic to the Class.  Indirect Purchaser Plaintiffs have retained counsel that is competent and experienced in antitrust, class action, and complex litigation.

32.  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the class as a whole.

33.  A class action is procedurally superior to any alternatives for adjudicating the claims

-10-

*Class Action Complaint*

1   of the Indirect Purchaser Plaintiffs and members of the classes. The claims of the members of the

2   classes are small and can be consolidated into one lawsuit to decide the predominating issue of

3   liability. Permitting this lawsuit to proceed utilizing the class mechanism will eliminate multiple

4   litigation over the same common issues of fact and liability and the probability of and risk of

5   inconsistent decisions establishing varying standards of conduct for the Defendants. Maintenance

6   of the lawsuit as a class action will promote judicial economy, efficiency, and fairness to all parties

7   involved.

8                                    **VI.    TRADE AND COMMERCE**

9          34.    During the relevant time periods alleged in this Class Action Complaint, the

10   Defendants and co-conspirators engaged in anticompetitive and unlawful conduct and control of the

11   Titanium Dioxide market affecting trade and commerce throughout the fifty (50) states, including

12   this judicial district.

13                                   **VII.    FACTUAL ALLEGATIONS**

14   **A.     Background Regarding Titanium Dioxide**

15          35.    Titanium Dioxide is a dry chemical powder that is primarily used as a white

16   pigment. It is the world's most widely used pigment for whiteness, brightness and masking of

17   colors in paints and coatings purchased by Indirect Purchaser Plaintiffs and members of the classes.

18   Titanium Dioxide is consumed in 170 countries and is one of the most important inorganic

19   chemicals used in the production of goods. Titanium Dioxide is considered very valuable in

20   markets such as the United States, and its use in consumer goods increases the quality of life for

21   consumers, providing a life-style product that enhances their standard of living.

22          36.    Titanium Dioxide traps and reflects light better than almost any known substance.

23   The vast majority (90%) of Titanium Dioxide is consumed in the United States in the paint,

24   coatings, plastics, and paper industries. It is nonflammable and nontoxic and has replaced lead

25   compounds in residential paints. Although the primary function of Titanium Dioxide is to whiten

26   or brighten paint, paper, and plastic, the chemical is also used in synthetic fiber production and to

27   make inks, pharmaceutical coatings, toothpaste, sunscreen, cosmetics, food, rubber, ceramic, and

28   other products. Titanium Dioxide is a consumer safety choice.

*Class Action Complaint*

37.     There are no viable white pigment competitive substitutes for Titanium Dioxide in consumer products.  Because Titanium Dioxide's masking or opacifying ability is very unique, there is no technical substitute for the product.  Titanium Dioxide also has great resistance to other chemicals, to ultraviolet degradation and has very good heat stability.  Titanium Dioxide's artificially inflated and supra-competitive prices are achieved with no competitive white pigment substitute.  Even though the price is manipulated and unconscionably high, competitors have difficulty entering into and competing for use in consumer goods.  Thus, Indirect Purchasers have no alternative but to pay the unfairly fixed and maintained price set by Defendants.

38.     Titanium is the ninth most abundant element in the Earth's crust.  It is typically found along with iron in a mineral oxide called ilmenite and also in a less common ore called rutile.  The majority of titanium production is used to make Titanium Dioxide.  The Titanium Dioxide manufactured for commercial use is derived from the mining of ilmenite and rutile.  Manufacturers typically sell Titanium Dioxide in powder form after mining it and separating it from titanium ore.

39.     Titanium Dioxide is manufactured using two different processes, sulphate and chloride, which create two crystal forms, rutile and anatase.  The sulphate process uses concentrated sulfuric acid to extract Titanium Dioxide from ilmenite or titanium slag.  The chloride process uses petroleum coke to convert rutile to titanium tetrachloride, which is then converted into Titanium Dioxide through contact with superheated oxygen or air.

40.     Most Titanium Dioxide plants utilize the chloride manufacturing process because, among other advantages, it generates less waste.  Defendants and their co-conspirators operate most of the chloride process plants in the world.  Although both the sulphate and chloride processes create the rutile crystal form of Titanium Dioxide, only the sulphate process produces the anatase form, which is less durable than rutile.  Anatase is preferred in food, drug and cosmetic products.  The rutile form of Titanium Dioxide fulfills more than 80% of the world's requirements for Titanium Dioxide.  After Tronox's predecessor, Kerr-McGee, closed its sulphate process plant in 2004, only the chloride process has been used to produce Titanium Dioxide in the United States.

41.     Titanium Dioxide is a homogeneous commodity chemical that is sold in rutile and anatase grades worldwide.  Titanium Dioxide grades feature degrees of brightness and whiteness,

*Class Action Complaint*

and most are made by adjusting the size of the Titanium Dioxide particles. Most grades are sold in fine powder form, but a few are sold in other forms, including ultrafine powder, water slurry (aqueous solutions), and a coarse, nonpigmentary form (such as for use in glass and ceramic manufacturing).

**B.      The Titanium Dioxide Industry**

42.      Grades of Titanium Dioxide supplied by one producer are readily substituted for grades of Titanium Dioxide supplied by other producers. Accordingly, buyers make purchase decisions based largely, if not entirely, on price, which made it easier for Defendants and their co-conspirators to reach agreement on prices and to monitor each other's compliance with the agreements.

43.      All Defendants make and sell rutile grades of Titanium Dioxide, which comprise more than 80% of Titanium Dioxide sales, and which are sold primarily to United States customers in the paint, coatings, and plastic industries. All Defendants except for DuPont make and sell anatase grades. The rutile crystalline form of Titanium Dioxide has a higher refractive index and is more durable than anatase. Generally speaking, rutile grades are preferred for outdoor uses by customers in the coatings and plastics industries (the largest end-use applications for Titanium Dioxide), whereas anatase grades are preferred by customers in the food, drug, and cosmetic industries. Both rutile and anatase grades are sold to fine paper and paperboard customers in the paper industry for use as a filler and in coatings. Approximately 90-95% of Titanium Dioxide annual sales are made to customers in the coatings, plastics, and paper industries, and all Defendants sell grades of Titanium Dioxide to customers in these industries.

44.      During the relevant times alleged herein, Defendants and their co-conspirators dominated and controlled the Titanium Dioxide market in the United States. Defendants and their co-conspirators control well over 70% of the world's Titanium Dioxide capacity and the entire capacity in the United States. Because of this market domination, Defendants and their co-conspirators are able to engage in unfair and anticompetitive behavior, overcharging consumers of paints, cosmetics, and plastics in the United States.

45.      The Titanium Dioxide industry has high barriers to entry. For example, a new

-13-

Case 3:13-cv-01180-SI   Document 1   Filed 03/15/13   Page 14 of 72

1   "greenfield" one-hundred kilotons-per-year plant has been estimated to cost approximately $450-
2   $500 million and require a three to five year lead time to build.  The Defendants also have cost
3   advantages and proprietary technologies that effectively deter new entrants.  Such barriers are
4   conducive to a conspiracy because they protect existing suppliers from competition and maintain
5   the high concentration of the Titanium Dioxide industry.

6         46.     Titanium Dioxide producers, including Defendants, face similar costs.  Because the
7   Defendants face similar costs, their pricing preferences tend to be aligned.  This alignment and
8   unity of interest make it much easier for them to agree to and defend an agreement on price
9   increases, thus manipulating the Titanium Dioxide market capacity and expansion of supply.  The
10  manipulation of the production and supply further creates the opportunity for an unlawful uniform
11  conspiracy to artificially inflate the price charged for Titanium Dioxide, which is passed on to
12  consumers of products such as paint, cosmetics, and plastics.

13        47.     In and around 2005, allegedly to reduce the costs of importing Titanium Dioxide
14  manufactured abroad into North America, Defendant Huntsman purportedly reduced its sales (and,
15  presumably, its market share) in North America.  Nevertheless, the Defendants' domestic and
16  global market shares remained relatively stable during the relevant times alleged herein.  For
17  example, even though DuPont's Titanium Dioxide plant in DeLisle, Mississippi was shut down by
18  Hurricane Katrina in August 2005 and did not even begin a phased-in production until January
19  2006, DuPont's resulting market share decline in 2005 was recovered in 2006, even in the midst of
20  price increases and increasing demand for Titanium Dioxide in the United States.  Indeed, sales
21  volumes in DuPont's Coatings and Color Technologies segment (of which Titanium Dioxide sales
22  are a part) declined only 3% from 2004 to 2005, while sales revenues were up 3%.

23        48.     Because Titanium Dioxide is an essential (non-substitutable) element in the
24  production of consumer goods, demand for the product is inelastic:  *i.e.*, the loss in sales volume
25  from a Titanium Dioxide price increase is small relative to the magnitude of the price increase
26  itself.

27        49.     The Titanium Dioxide industry in the United States presents strong characteristics
28  favoring creation of an unlawful pricing cartel.  The industry is highly concentrated and involves

the sale of a homogenous commodity product, for which there is inelastic demand. Couple this inelastic demand with the industry's high barriers to entry, and the concomitant opportunity to collude, cooperate and conspire regarding the pricing for Titanium Dioxide supply and output is particularly likely. This is especially true given that the vast majority of the world's capacity for production of Titanium Dioxide is concentrated in these few Defendants. Indeed, the Defendants have taken advantage of this opportunity, adversely affecting Indirect Purchaser Plaintiffs and members of the classes.

50.     Titanium Dioxide market characteristics that indicate collusive behavior include coordinated price increase announcements, the existence of joint venture agreements among cartel members and static or declining demand over time, which incentivizes those in collusion to coordinate supply restraint or reduction and avoid downward price competition. Moreover, these factors make it easier for each Defendant to monitor one another's compliance with an agreement to artificially inflate or stabilize prices, putting each at a higher risk of retaliatory action and enforcement from those who might choose not to disrupt the unlawful agreement and restraint of trade.

51.     Industries such as the Titanium Dioxide industry, with few sellers facing similar costs, low substitutability, competition primarily based on price, and high barriers to entry are particularly susceptible to price collusion. Succinctly stated, the Titanium Dioxide industry bears all of the characteristics of a price-fixing cartel waiting to happen. This set the stage for an unlawful conspiracy to manipulate, fix, maintain and stabilize the price of Titanium Dioxide which began to impact industry pricing on or shortly before March 1, 2002.

**C.     Defendants' Unlawful Titanium Dioxide Price Fixing Conspiracy**

52.     The Defendants' joint ventures, transactions, deals and agreements afforded them opportunities to discuss pricing, capacity, cost, customer, and other nonpublic, commercially sensitive issues. Defendants engaged in such coordinated pricing activity before March 1, 2002 and thereafter to further their unlawful and ongoing concerted activity and conspiracy. In the absence of such a fixed agreement or understanding among Defendants, it would have been contrary to the independent economic self-interest of each Defendant to allow its competitors access to such

-15-

1    information.

2         53.    Defendants and their affiliates produce and sell raw materials to each other.  For

3    example, Defendant Kronos, Cristal and their affiliates sell raw materials, such as ilmenite ore, to

4    other Titanium Dioxide producers.  Defendants also engage in other business transactions with each

5    other, which have sometimes included sales of Titanium Dioxide between Defendants (as opposed

6    to selling the product to customers of another Defendant or co-conspirator).  Defendants Huntsman

7    and Kronos have the aforementioned 50/50 Titanium Dioxide manufacturing joint venture, and

8    Kronos and DuPont cross-license patents used to make certain Titanium Dioxide grades.  The

9    mutually beneficial nature of the business relations between Defendants provided not only the

10   opportunity to conspire, but also a financial incentive to do so.  The more that Defendants came to

11   deal with and rely on each other, the more incentivized they were to maintain market stability, to

12   agree on and support price increases and to avoid competing on price for the business of each

13   other's customers.  Defendants' meetings and communications worldwide during the relevant times

14   alleged herein fostered cooperation, eliminated competition, and permitted the unlawful price-

15   fixing conspiracy.

16        54.    Defendants' conspiracy to overcharge the Indirect Purchaser Plaintiffs and members

17   of the classes was monitored and policed by communications not only among Defendants

18   themselves, but also between Defendants and industry consultants, customers, and others.  For

19   example, beginning in May 2004, Defendants were able to monitor each other's conduct both in the

20   United States and worldwide through TZ Minerals International's *TiO2 Review*, a publication that,

21   during the relevant time period alleged herein, provided Defendants with detailed production,

22   pricing, capacity, raw material, and other information and statistics.  The July 2004 issue of this

23   publication included an article on industry price dynamics written by Robert Louw, Senior Vice

24   President of Huntsman.  (Upon leaving Huntsman, Mr. Louw joined TZ Minerals International as

25   its senior global pigment advisor in or around April 2005.)  Defendants were also able to monitor

26   whether price increases would be followed, or were followed, through conversations with

27   consultants, customers, and others, as well as through public sources like *Chemical Week*, the

28   *Chemical Market Reporter* (now ICIS), and Defendants' websites.  For example, in advance of the

*Class Action Complaint*

1   effective date of a price increase, Defendants routinely sent price increase announcement letters to

2   customers being served by other producers, conditioning the market to accept a price increase by

3   the effective date.   This conduct maximized the transparency in the market of Defendants'

4   collective willingness to increase prices and discouraged price competition or "cheating" on the

5   price increase.   After having reached an unlawful agreement or understanding as alleged herein,

6   Defendants used consultants, customers, and others as conduits to confirm intended pricing and

7   other actions with each other.

8        55.     Defendants' cooperative and collusive pricing and supply activities were furthered

9   during meetings and discussions that took place during (or around the time of) trade association

10   functions.   Defendants are all members of the American Chemistry Council's Titanium Dioxide

11   Panel.   Although the timing and frequency of the meetings of the Panel are not fixed, annual

12   American Chemistry Council meetings are held in June at the Greenbrier in White Sulfur Springs,

13   West Virginia, and these were attended by many Defendants.   Defendants are also members of the

14   Titanium Dioxide Manufacturers Association, which conducts annual and other meetings and is

15   associated with the European Chemical Industry Council (a/k/a "Cefic").   Defendants are also

16   members of the Titanium Dioxide Stewardship Council, which was formed as a U.S. industry trade

17   group focusing on safety, health and environmental issues.   Defendants also met and spoke with

18   each other at bi-annual (odd year) IntertechPira Titanium Dioxide Conferences, and at bi-annual

19   (even year) meetings and exhibitions of the Industrial Minerals International Congress, annual

20   meetings of the U.S.-based National Paint and Coatings Association, and other associations related

21   to their industry and customers.

22        56.     During the Class Period, when Defendants met and spoke with each other, they were

23   always in the process of trying to increase Titanium Dioxide prices.   Indeed, the facts reveal that

24   Defendants and coconspirators regularly and routinely met and spoke with each other *before* price

25   increase announcements; *during* the period of time after an industry increase had been announced

26   but before it became effective, and *after* the effective dates of price increases, when Defendants and

27   co-conspirators were in the process of implementing the increases for all of their customer

28   accounts.

-17-

*Class Action Complaint*

57.     Like their other business meetings, trade association functions provided Defendants with the opportunity to discuss prices and support for price increases, as well as capacity and cost issues. Plaintiffs allege that Defendants engaged in such private discussions with each other at dinner meetings before and during trade association and other business meetings. Defendants' contacts also fostered industry discipline in maintaining and effectively allocating customer positions and market shares. The numerous meetings and contacts (both bi-lateral and multi-lateral) between Defendants and co-conspirators typically coincided with simultaneous industry price increase announcements.

58.     For example, a meeting of the Titanium Dioxide Manufacturers Association took place in Finland on or around January 24, 2002. Immediately following this meeting and in spite of flat demand, decreasing raw material costs, and excess capacity in the industry, Defendants and their co-conspirators announced price increases worldwide, including in the U.S., to be effective March 1, 2002. Also, the annual Industrial Minerals International Congress Exhibition was held in Paris, France on April 21-24, 2002. At the time this exhibition was held in Paris, Defendants were still in the process of increasing prices to their customers globally, in part because the largest customers typically buy Titanium Dioxide under contracts that contain price protection clauses, which defer the effective date of an increase until several months after the increase's announcement. The March 2002 price increases also occurred right before the seasonal demand peak period of April to June. The increases were successful, and the Defendants increased prices again in and around July 2002. The Industrial Minerals International Congress Exhibition and other functions and trade shows like it during the Class Period that also took place when Defendants were increasing prices provided Defendants with the opportunity to affirm to each other their resolve to increase industry prices and, in fact, industry prices did increase during the Class Period.

59.     From February 3-5, 2003 a Titanium Dioxide Conference was held in Miami, Florida. It was attended by Defendants, including DuPont's Global Business Director (Ian Edwards, who gave the keynote address), as well as a former Vice President of Defendant Millennium (Bruce Zwicker), who told conference attendees to expect further price increases. Around the time of this conference, Defendants and their co-conspirators announced a $0.06 per

-18-

Case 3:13-cv-01180-SI   Document 1   Filed 03/15/13   Page 19 of 72

1   pound price increase for all grades except paper grades sold in North America.

2       60.     A few months later, while Defendants were still trying to increase prices to some

3   customers and shortly after DuPont and other Defendants announced a North American price

4   increase for paper grades (effective April 1, 2003), an Industrial Minerals International Congress

5   Exhibition was held in Montreal, Canada from April 6-9, 2003.

6       61.     At an Industrial Minerals International Congress conference in Barcelona, Spain

7   held in the last few days of March 2004, a Senior Vice President of Huntsman gave a presentation

8   about Titanium Dioxide industry prices and price dynamics.  It was a timely speech because

9   Defendants were in the process of increasing prices to customers at this time.  As described in

10  greater detail below, Defendants had announced Titanium Dioxide price increases in North

11  America that became effective March 15, 2004.

12      62.     From March 2-4, 2005, a Titanium Dioxide Conference was held in Cannes, France.

13  It was attended by Defendants, including Vice Presidents from Lyondell and DuPont (Sam

14  Severance), who gave keynote presentations.  As described below, Defendants had previously

15  increased prices, effective in January 2005, and also announced worldwide price increases within

16  weeks of this conference in March 2005 that became effective April 1, 2005. Indeed, around this

17  time, Defendants were announcing price increases every quarter.

18      63.     An Industrial Minerals International Congress Exhibition was held in San Francisco,

19  California from March 26-29, 2006.  Defendants, who likely attended the Exhibition, were in the

20  process of trying to increase prices at this time.

21      64.     An Intertech Titanium Dioxide Conference took place in Fort Lauderdale, Florida

22  from February 12-14, 2007.  It was attended by Defendants, including Vice Presidents from

23  Lyondell and DuPont.  Defendants were in the process of increasing prices at this time.

24      65.     An Industrial Minerals International Congress Exhibition was held in Athens,

25  Greece from March 30 - April 2, 2008.  Defendants, who were in the process of increasing prices at

26  this time, were registered to attend and are believed and alleged to have attended.

27      66.     In addition to prices, costs and customers, Defendants also discussed capacity issues

28  with each other.  Their discussions helped them reach an understanding of the need to restrain

-19-

*Class Action Complaint*

Titanium Dioxide capacity expansion, which restraint they knew would help stabilize prices and support price increases despite industry overcapacity. For example, the July 2004 issue of TZ Minerals International's *Ti02 Review* stated that the "decision to reduce capacity by both Huntsman Tioxide and Millennium will possibly impact on future price levels." Indeed, it did, as the industry announced price increases shortly thereafter to be effective in October 2004. Defendants monitored each other's capacity plans, including plant closures, "debottleneckings" and "brownfield" capacity expansion through the improvement of production efficiencies at existing facilities. Defendants were generally aware of each other's inventory levels and operating rates. Defendants understood that industry expansion needed to occur in a "disciplined" way, *i.e.*, in a manner that sought to eliminate—or at least minimize—the potentially negative pricing impact of capacity expansion. At times during the Class Period, Defendants wanted the industry to appear to be "tight" on product (regardless of whether demand was weak or strong), so that industry overcapacity never caused prices to decline like it did in the mid-1990s.

67.     At an investor conference in September 2005, Lyondell, which owned Millennium and had an estimated 19% of North American capacity at that time, made a presentation noting that there were minimal announced Titanium Dioxide industry capacity additions. The same presentation included a chart that showed annual industry operating rates and overcapacity. According to the chart, the industry operating rate averaged approximately 87% in the 2002-2005 period, a time when Defendants were announcing price increases nearly every quarter.

68.     Even when industry leader DuPont announced in November 2005 that it had an agreement with Chinese officials to build a massive 200,000 metric-ton-per-year Titanium Dioxide plant in China, Defendants were still able to increase prices, both in 2005 and in subsequent years, and even at times when demand and consumption were declining in the face of poor economic conditions *(e.g.*, as in 2007-2008). An industry analyst was quoted as saying in November 2005 that DuPont's new capacity would have no problem being absorbed by the market when it eventually came online because pigments would remain "tight" in the future.

69.     Defendants' discussions about capacity issues had their intended effect. None of the capacity increase announcements made during the Class Period, including increases planned by

DuPont to cover the industry's annual growth, decreased prices. For example, within weeks after DuPont's announcement of its intent to build an enormous plant in China, Defendants announced price increases in North America and worldwide. These price increases were a success.

70. During the Class Period, price increase announcements for sales in the United States or North America were typically in cents per pound for all grades of Titanium Dioxide sold to all customers for all end-use applications, effective on a particular date. Prices in the United States tended to set a benchmark for prices in other regions worldwide. Price increases in one region were used by Defendants to justify price increases in other regions. Indeed, industry price increases often occurred worldwide in that regional price increases were announced simultaneously or within a month or two of each other. For example, North American price increases typically occurred within a month or two of announcements of price increases in Europe, Asia and other regions.

71. Defendant DuPont, the world's largest supplier of Titanium Dioxide, which had the largest U.S. and world Titanium Dioxide market share, typically led industry price increases during the Class Period. Defendants routinely matched the amount and typically the effective date of each other's price increase announcements during the Class Period. Defendants also usually justified price increases on the same grounds, whether in written announcements or in discussions with customers.

72. During the 1990s, on account of factors including global overcapacity and customer consolidation, Titanium Dioxide prices trended downward, with the profitability of Titanium Dioxide manufacturers reaching an all-time low in 1996. Bayer and Rhone-Poulenc left the industry, selling their Titanium Dioxide businesses to Kerr-McGee (Tronox's predecessor) and Millennium, respectively. The Titanium Dioxide business of Imperial Chemical Industries also went up for sale, and it was eventually sold to Huntsman. Although industry consolidation and other factors helped industry prices and margins improve by the year 2000 from their 1996 lows, poor economic conditions (*e.g.*, those following the events of September 11, 2001), declining demand, and increased global customer purchasing power severely eroded prices in 2001. Demand in 2001 had even decreased to the point that Defendant Millennium idled one of its U.S. plants effective September 1, 2001, informing customers that they would not be impacted because other

plants could still supply them.  By the end of 2001, average U.S. prices of Titanium Dioxide purportedly had reached their lowest level in current dollars since 1991.

73. As a result of abysmal industry conditions in 2001, Defendants were motivated to reach, and did reach, an agreement or understanding in or around early 2002 to increase prices and improve margins in the industry.  These increases were announced and implemented despite flat demand, decreasing raw material costs, and excess capacity in the industry.  Defendants' agreement or understanding caused customers to pay higher prices for Titanium Dioxide during the Class Period than they would have paid in a competitive market.

74. Immediately following a meeting of the Titanium Dioxide Manufacturers Association in Finland on or around January 24, 2002, Defendants announced Titanium Dioxide price increases for all grades worldwide, including a $0.05 per pound increase in the U.S. to be effective March 1, 2002.  It is logical to assume  that prior to these price increases, Defendants communicated with each other directly (bi-laterally and/or multi-laterally) and indirectly (such as through industry analysts, consultants, or others) and reached an understanding or agreement to increase industry prices.  Defendants' price-fixing agreement or understanding was reached in secret, so Plaintiffs do not presently know the precise circumstances surrounding its formation.  The facts indicate that this understanding or agreement was maintained and fostered throughout the Class Period by means of other communications, which led to numerous additional price increases and relatively stable customer positions and market shares. Defendants' communications were conducted surreptitiously.

75. After Defendants' announcements of the early 2002 price increases, but several weeks before their effective date of March 1, 2002, a chemical and oil industry news service published an article on February 11, 2002 entitled "Ti02 Producers Seek Large Price Increases As Profitability Hovers Near Break-Even Point."  The article noted that support for the worldwide increases "appears unanimous" and it predicted further increases if demand recovered in the next few months.  The article quoted an industry analyst, James Fisher of IBMA, as stating, "Every producer is hurting. They all need to get prices up."  The article continued, "Producers concede that buyers may question the increases because of last year's falloff in demand, but they stress that the

-22-

increases are necessary to rebuild margins." The article also quoted high-level executives from Defendants DuPont (Ian Edwards, Global Marketing Director for Titanium Dioxide), Millennium (Bruce Zwicker, Vice President of the Global Coatings Business), and Huntsman (Stuart Heyes, Vice President of NAFTA Sales), commenting on industry prices, margins, consumption, and demand.

76.    In the summer of 2002, Defendants announced price increases worldwide again. In the U.S., prices of Titanium Dioxide grades sold to the coatings and plastics industries increased $0.06 per pound, and prices of laminate grades sold to the paper industry increased by $0.08 per pound. A few months later, in and around September 2002, a U.S. price increase of $0.04 per pound for other grades sold to the paper industry was announced.

77.    Defendants also increased prices in 2003. For example, Defendants and their co-conspirators announced price increases in North America in January 2003 (for all grades except paper grades, effective February 1, 2003), March 2003 (for paper grades, effective April 1, 2003), and September 2003 (for all grades, effective October 1, 2003).

78.    Even though global demand declined in 2003 and industry capacity utilization was approximately 85% that year, Titanium Dioxide prices still increased. For example, the North American annual average price per ton of Titanium Dioxide (including cost of goods, insurance, and freight) increased from $1,753 to $1,830 from 2002 to 2003, an increase of 4 %.

79.    Defendants increased prices several times in 2004. There was a U.S. price increase of $0.05 per pound for all grades effective March 15, 2004. There were also U.S. increases of $0.04 per pound for all grades effective June 15, 2004 (Millennium, DuPont, Tronox, Huntsman) or July 1, 2004 (Kronos); $0.03 - $0.07 per pound, depending on grade, effective October 1, 2004; and $0.06 per pound for all grades effective January 1, 2005.

80.    The North American annual average price per ton of Titanium Dioxide increased from $1,830 to $1,921 from 2003 to 2004, an increase of 5 %.

81.    In an article dated February 28, 2005, after the 2004 Fourth Quarter price increases, an industry analyst was reported to say that he "expects 75-85 percent of the increase to get implemented by the end of [the first quarter of 2005]" and that he "expects benchmark pricing in

*Class Action Complaint*

the U.S. to be around $1 per pound once the increase goes through."

82.     Defendants increased prices in 2005.  For example, DuPont announced a $0.05 per pound increase for all grades effective April 1, 2005, which was in addition to the $0.06 increase that it had announced in December 2004 that had become effective January 1, 2005. There were also U.S. price increases of $0.04 per pound for all grades, effective July 1, 2005 and for $0.06 per pound, effective October 1, 2005.

83.     The North American annual average price per ton of Titanium Dioxide increased from $1,921 to $2,169 from 2004 to 2005, an increase of 13%.

84.     Defendants again increased prices in 2006.  For example, Defendants and their co-conspirators announced a $0.05 per pound increase for all grades in North America, effective January 1, 2006.  This increase was in addition to the October 1, 2005 increase.  There was also a U.S. price increase of $0.04 per pound for all grades effective June 15, 2006 (DuPont) and July 1, 2006 (Millennium, Tronox, and Kronos).

85.     Even though global industry capacity increased from approximately 4 million tons to 5.3 million tons from 2005 to 2006 and industry operating rates were approximately 87% in 2006, the North American annual average price per ton of Titanium Dioxide increased from approximately $2,169 to $2,273 from 2005 to 2006, an increase of 5%.

86.     Defendants sought price increases for all grades worldwide in 2007, despite weak demand for Titanium Dioxide in some regions due to declining economic conditions and overcapacity in the market.  In the U.S., Defendants and their co-conspirators announced a $0.05 per pound increase effective July 1, 2007 and a $0.06 per pound increase effective October 15, 2007 (or October 17, 2007 in the case of Huntsman).  The increases were for all grades.

87.     Defendants announced price increases worldwide for all grades in 2008 on several occasions and also implemented "energy surcharges" for the first time.  Defendants and their co-conspirators announced a $0.06 per pound price increase for all grades sold in North America, effective January 15, 2008 (or January 18, 2008, in the case of Huntsman), stating that the increase was in addition to the $0.06 per pound increase previously announced that was effective October 15, 2007.

-24-

88.     On January 7, 2008, the same day of DuPont's first price increase announcement in 2008, an article published in an industry publication quoted a Titanium Dioxide industry analyst and consultant as stating that Titanium Dioxide prices and margins were expected to increase in 2008. Tronox's CEO was also quoted in the same article as stating: "Although supply and demand fundamentals support increased prices, since 2004 the Ti02 industry has been largely unsuccessful in its efforts to offset rising costs of various inputs, from energy to process chemicals, through increased prices." This statement was false and misleading because industry "supply and demand fundamentals" rarely, if ever, explained and supported increased prices during the 2004-2007 time period and because Defendants were at times able to offset increased costs during this period and improve their margins. There was also overcapacity in the industry and flat or weak demand at times during this period, yet, in uneconomic moves, prices were still increased. This statement by Tronox's CEO was also false and misleading to the extent that it justified increased prices based solely on "supply and demand fundamentals" in light of Defendants' unlawfully coordinated and sustained campaign to increase industry prices worldwide, as alleged in this Class Action Complaint.

89.     On May 23, 2008 (the Friday before Memorial Day weekend), defendant Kronos announced a $0.05 per pound increase for all grades sold in North America to be effective June 15, 2008, as well as a $0.03 per pound "energy related surcharge" effective June 9, that would be added to all North American invoices for the sale of all Titanium Dioxide products. Kronos stated that the surcharge "represents further implementation of previously announced North American price increases." This was the first time that an "energy surcharge" was announced in the industry.

90.     On Monday, June 2, 2008, DuPont announced that it would increase prices for all grades in all regions, telling customers that they "can expect the rapid implementation of previously announced price increases, additional increases and, in some areas, energy-related surcharges." That same day, DuPont announced a North American price increase of $0.05 per pound, effective June 15, 2008, for all grades, stating that this increase was in addition to the two $0.06 per pound increases in late 2007 and early 2008, which were still "in the process of being implemented." On June 3, 2008, DuPont announced an "energy cost related surcharge" of $0.04 per pound, effective

-25-

July 1, 2008, for grades of Titanium Dioxide sold in North America to the paper and board industry. DuPont cited the dramatically increased cost of crude oil as an example of an energy cost increase that necessitated the surcharge.

91.     On June 3, 2008, Tronox announced global price increases, stating in its press release that "prices for all TRONOX® titanium dioxide (Ti02) grades sold worldwide will increase by up to 8 percent by July 1." On the same day, June 3, 2008, the Vice President and General Manager of DuPont Titanium Technologies was quoted in a PRNewswire article as saying "We expect to increase the global pricing structure by as much as 8 percent in coming weeks."

92.     On June 4, 2008, Millennium and Tronox announced a $0.05 per pound price increase in North America for all grades. Tronox's increase was effective June 15, 2008 and Millennium's increase was effective July 1, 2008.

93.     Also on June 4, 2008, Huntsman announced "energy related surcharges," including a surcharge of $75 per metric ton for "all sales of imported product into North America." On June 6, 2008, Huntsman announced price increases throughout the world, and on June 9, 2008, Huntsman matched the other Defendants in announcing a North American price increase of $0.05 per pound effective July 1, 2008.

94.     On June 12, 2008, Millennium announced that it would apply "raw material surcharges" to Titanium Dioxide grades sold into the North American paper market of either $0.04 per pound (for Tiona RCS-P grades) or $0.09 per pound (for sulfate anatase grades).

95.     On June 23, 2008, only three weeks after its June 2, 2008 price increase, DuPont announced another price increase, this time for $0.06 per pound for all grades sold in North America, effective July 1, 2008. This increase was in addition to all previous increases and the paper surcharge announced earlier in June.

96.     On June 25, 2008, both Kronos and Tronox matched DuPont's $0.06 per pound increase for all grades sold in North America, effective July 1, 2008. The Tronox announcement stated that the "increase is in addition to the price increases announced in October 2007, January 2008 and on June 4, 2008, and is the next step toward partially offsetting the extraordinary increases in freight, energy, and other input costs that the Ti02 industry has absorbed over the last

*Class Action Complaint*

two years." Kronos also announced another $0.03 per pound energy surcharge to be added to all North American invoices, effective July 15, 2008, which would be in addition to the surcharge that became effective on June 9, 2008.

97. On June 27, 2008, defendant Huntsman matched DuPont's second increase ($0.06 per pound for all grades in North America effective July 1) and also announced another energy surcharge ($0.03 per pound in North America effective August 1). These increases were in addition to all previously announced price increases as well as the June 4, 2008 surcharge.

98. On June 30, 2008, Defendant Millennium joined DuPont and the other Defendants and their co-conspirators, announcing a $0.06 per pound price increase for all grades sold in North America, effective July 1, 2008, which was in addition to its previously announced price increases in North America.

99. On August 1, 2008, Defendant DuPont announced another energy surcharge, this time for $0.06 per pound on all sales of the Titanium Dioxide grades that it sold to the North American paper and board industry, specifically its Ti-Pure® RPS Vantage® grades. Unconscionably, Millennium and Tronox matched DuPont's surcharge increase.

100. On August 19, 2008, Huntsman announced a $0.05 per pound increase on ten Titanium Dioxide grades sold in North America, effective September 1, 2008, or as contracts allowed.

101. On September 2, 2008, DuPont announced a North American price increase, effective that same day, of $0.08 per pound for all Ti-Pure® Titanium Dioxide grades. Kronos and Tronox matched this increase the next day on September 3, 2008. Millennium joined it on September 4, 2008, and Huntsman joined it on September 5, 2008. The Huntsman increase announcement did not clarify whether this increase (which was for all grades) was in addition to the $0.05 per pound price increase for ten grades that it had announced several weeks earlier on August 19, 2008.

102. The September 2008 price increases were misleadingly justified by DuPont, Millennium, and Huntsman because of cost increases, even though oil prices had fallen far below the record highs that they had reached earlier in the year. Defendants' 2007-2008 price increases

-27-

and energy surcharges also occurred in spite of declining demand in the United States for Titanium Dioxide due to recessionary economic conditions, including declining demand in the paint and construction industries. Titanium Dioxide demand generally had decreased almost 20% from 2000-2008 and more than 25% from 2004-2008.

103. In short, over the course of approximately 14 weeks, from late May 2008 to early September 2008, Defendants and their co-conspirators uniformly announced three separate Titanium Dioxide price increases and at least two energy surcharges, in spite of declining demand. The prices of ilmenite and rutile titanium ore, key raw materials for making Titanium Dioxide, also decreased from 2007-2008, further showing a disconnect between the 2008 price increases and their purported justification.

104. Some of the coordinated price increase announcements of the Defendants and their co-conspirators during the Class Period are listed by effective date in the following table:

**Examples of Certain U.S. TiO2**
**Industry Price Increase Announcements by**
**Effective Date in Cent Per Pound**

| Effective Date | Dupont | Millennium | Kronos | Tronox | Huntsman |
|---|---|---|---|---|---|
| 03/2002 | $0.05 | $0.05 | $0.03 | $0.05 | $0.05 |
| 07/2002 | $0.06 | $0.06 | $0.03 | | |
| 08/2002 | | | | $0.06 | |
| 10/2002 | $0.04 | $0.04 | | | |
| 02/2003 | $0.06 | $0.06 | | $0.06 | |
| 10/2003 | $0.06 | $0.06 | $0.03 | $0.06 | |
| 03/2004 | $0.05 | $0.05 | $0.05 | | |
| 04/2004 | | | | | $0.05 |
| 06/2004 | $0.04 | $0.04 | | $0.04 | $0.04 |
| 07/2004 | | | $0.04 | | |
| 10/2004 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 01/2005 | $0.06 | $0.06 | $0.06 | | |
| 04/2005 | $0.05 | $0.07 | $0.05 | $0.05 | |
| 07/2005 | $0.04 | $0.04 | $0.04 | $0.04 | |
| 10/2005 | $0.06 | $0.06 | $0.06 | | $0.06 |
| 01/2006 | $0.05 | $0.06 | $0.05 | $0.05 | $0.05 |
| 06/2006 | $0.04 | | | | |
| 07/2006 | | $0.04 | $0.04 | $0.04 | |
| 08/2006 | | | | | $0.04 |

-28-

| 10/2006 | $0.04 | | | | |
|---|---|---|---|---|---|
| 07/2007 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 10/2007 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 11/2007 | | $0.06 | | | |
| 01/2008 | | $0.06 | $0.06 | $0.06 | $0.06 |
| 06/2008 | $0.05 | | $0.05 | $0.05 | |
| 07/2008 | $0.06 | $0.05 | $0.06 | $0.06 | $0.05 |
| 08/2008 | | | | | $0.06 |
| 09/2008 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 01/2009 | $0.04 | | | | |
| 06/2009 | | | $0.04 | | |
| 08/2009 | $0.02 | $0.02, $0.03 | $0.03 | $0.02 | $0.02, $0.03 |
| 10/2009 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 01/2010 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 04/2010 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 06/2010 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 09/2010 | | $0.08 | | $0.08 | $0.08 |
| 10/2010 | $0.08 | | $0.08 | $0.08 | |
| 01/2011 | $0.10 | $0.10 | $0.10 | $0.10 | $0.08 |
| 04/2011 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 |
| 06/2011 | $0.10 | $0.10 | | $0.10 | $0.20 |
| 07/2011 | $0.25 | $0.25 | $0.35 | $0.25 | $0.15 |
| 08/2011 | $0.10 | | $0.10 | | |
| 09/2011 | $0.32 | $0.10 | $0.10 | $0.10 | $0.10 |
| 10/2011 | | | $0.25 | | |
| 11/2011 | $0.15 | $0.15 | | $0.15 | $0.15 |

Sources: Defendants' press releases; 2002-2008 *Chemical Market Reporter*, *Chemical Week*, and other industry news articles.

105.    All these acts indicate that Defendants unconscionably reached an unlawful agreement or understanding to fix, raise, maintain, and stabilize Titanium Dioxide prices during the Class Period.  Pursuant to the alleged conspiracy, Defendants and their co-conspirators engaged in deceptive behavior including secret discussions about industry pricing, capacity, costs, and customers, and conspired and agreed to support industry price increase announcements.  It is clear that Defendants knew that if they attempted to take significant business or market share from another producer on the basis of price (*e.g.*, by "attacking" or trying to "steal" another Defendant's customer with a low-price offer), they risked retaliation from that producer and the potential peril of their own customer accounts, not only in the United States but also around the world.  For example, Defendant Huntsman was careful not to appear to compete aggressively for the business of a

-29-

DuPont customer, lest its own customer accounts then be subject to retaliation from DuPont. Plaintiffs allege that such conduct was not limited to Huntsman but was also practiced by the other Defendants, pursuant to and consistent with an understanding or agreement among DuPont, Millennium, Kronos, Huntsman, and their co-conspirators to keep customer positions and industry prices stable. Price increase announcements were routinely supported in the industry during the Class Period, and this consistent conduct in light of Defendants' considerable contacts with each other also gives further support to the allegation that an anticompetitive understanding or agreement existed among Defendants during the Class Period.

106. The conspiracy among Defendants was successful in unfairly increasing prices during the Class Period, even when industry overcapacity and weak demand existed. For example, in November 2007, Defendant Millennium announced that it was closing a Titanium Dioxide plant in France, in part due to industry overcapacity. As discussed above, Defendants announced worldwide price increases in 2007 and in 2008. Unlike in the 1990s, when market forces caused industry overcapacity to generate lower prices and poor industry margins, Defendants' conspiracy managed to prevent overcapacity from appreciably impacting prices during the Class Period.

107. Defendants' price increases during the Class Period had their intended effect, and the alleged conspiracy has been profitable for Defendants. For example, the average annual price per ton of Titanium Dioxide in North America increased from approximately $1,753 in 2002 to $2,273 in 2006, an increase of 30%. Defendants Huntsman and Kronos dramatically increased their operating income and margins between 2002 and 2003. Even after discounting the $142 million in insurance proceeds that Defendant DuPont received for damages to its Mississippi plant from Hurricane Katrina in 2005, DuPont's operating income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide business) increased approximately 45% from 2002 to 2007. In addition, in 2008 and in spite of declining demand for Titanium Dioxide and recessionary economic conditions in the United States and elsewhere, the global Titanium Dioxide industry earned over $1 billion in pre-tax operating income. Industry leader and Defendant DuPont achieved approximately half of that amount.

## VIII. PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY

108. Defendants' combination and conspiracy has had the following effects, among others:

    a. Price competition in the sale of Titanium Dioxide by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

    b. Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been unfairly raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c. Defendants charged purchasers of Titanium Dioxide inflated, fixed, and stabilized prices for such Titanium Dioxide;

    d. Having paid an unfairly high price for an essential component of products they sold to Plaintiffs and the Class, firms who sold products containing Titanium Dioxide to Plaintiffs and the Class passed Defendants' overcharges onto them;

    e. Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Class;

    f. All persons and entities purchasing products containing Titanium Dioxide have been deprived of free and open competition.

109. During the Class Period, Plaintiffs and the members of the classes paid supracompetitive prices for products containing Titanium Dioxide.

110. Increases in the price of Titanium Dioxide caused during the Class Period increases in the prices of products containing Titanium Dioxide.

111. Titanium Dioxide comprises a not insignificant portion of the cost of products containing the chemical.

112. The purpose of the conspiratorial conduct of the Defendants and their coconspirators was to raise, fix, rig, or stabilize the price of Titanium Dioxide and, as a direct and foreseeable

-31-

*Class Action Complaint*

1   result, the price of products containing Titanium Dioxide.  Economists have developed techniques

2   to isolate and understand the relationship between one "explanatory" variable and a "dependent"

3   variable in those cases when changes in the dependent variable are explained by changes in a

4   multitude of variables, even when all such variables may be changing simultaneously.  That

5   analysis – called a regression analysis – is commonly used in the real world and in litigation to

6   determine the impact of a price increase on one cost in a product or service that is an assemblage of

7   costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of

8   Titanium Dioxide on prices for products containing the chemical even though such products contain

9   a number of other components whose prices may be changing over time.  A regression model can

10  explain how variation in the price of Titanium Dioxide affects changes in the price of products

11  containing Titanium Dioxide.  In such models, the price of Titanium Dioxide would be treated as an

12  independent or explanatory variable.  The model can isolate how changes in the price of Titanium

13  Dioxide impact the price of products containing Titanium Dioxide while controlling for the impact

14  of other price-determining factors.

15        113.    The precise amount of the overcharge impacting the price of products containing

16  Titanium Dioxide can be measured and quantified.  Commonly used and well-accepted economic

17  models can be used to measure both the extent and the amount of the supracompetitive charge

18  passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and members of the

19  classes can be quantified.

20        114.    By reason of their illegal, unfair, and anticompetitive conduct, Plaintiffs and the

21  members of the classes have sustained injury to their businesses and/or property, having paid higher

22  prices for products containing Titanium Dioxide than they would have paid in the absence of

23  Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in

24  an amount presently undetermined.  Specifically, and by way of example, Plaintiffs and the

25  members of the classes have suffered during the Class Period overcharge loss due to unjustified

26  increased in the price of paint containing Titanium Dioxide, as a result of the conspiracy described

27  in this Class Action Complaint, including damages caused by the inability to pass along all such

28  price increases.

-32-

115.    Plaintiffs and the members of the Classes have suffered an antitrust injury of the type that the various state laws invoked by this Class Action Complaint were meant to punish and prevent, and Plaintiffs' and Class Members' damages are measurable.

## IX. PLAINTIFFS' CLAIMS ARE NOT BARRED
## BY THE STATUTE OF LIMITATIONS

**A.      The Statute of Limitations Did Not Begin To Run Because Plaintiffs Did Not And Could Not Discover The Claims**

116.    Plaintiffs repeat and reallege the allegations set forth above.

117.    Plaintiffs and the members of the classes had no knowledge of the combination or conspiracy alleged in this Class Action Complaint, or of facts sufficient to place them on inquiry notice of the claims set forth in this Class Action Complaint, at least until sometime after the August 2012 certification of a class of direct purchasers of Titanium Dioxide as a result of Defendants' pricing scheme.

118.    Plaintiffs and the members of the classes are persons and entities who purchased products containing Titanium Dioxide during the Class Period.

119.    Plaintiffs and the members of the classes had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Class Action Complaint until sometime after the certification of a class of direct purchasers of Titanium Dioxide in August 2012.

120.    Prior to the certification of a class of direct purchasers of Titanium Dioxide in August 2012, facts were not available to the Plaintiffs and the members of the classes that revealed sufficient information to suggest that Plaintiffs had a claim against the Defendants. Plaintiffs and the members of the classes did not have facts or information concerning Defendants' dealings with each other or with direct purchasers of Titanium Dioxide, much less the fact that Defendants and their co-conspirators had engaged in the combination and conspiracy alleged in this Class Action Complaint.

121.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members

-33-

1    of the classes have alleged in this Class Action Complaint.

2    **B.    Fraudulent Concealment Tolled the Statute of Limitations**

3          122.    In the alternative, application of the doctrine of fraudulent concealment tolled the

4    statute of limitations on the claims asserted in this Class Action Complaint by Plaintiffs and the

5    Class.

6          123.    Because Defendants' agreements, understandings and conspiracies were kept secret

7    and not known to Plaintiffs until sometime after the certification of a class of direct purchasers of

8    Titanium Dioxide in August 2012, Plaintiffs and members of the classes before that time were

9    unaware of Defendants' unlawful conduct, and they did not know before then that they were paying

10   supracompetitive prices throughout the United States for products containing Titanium Dioxide

11   during the Class Period.

12         124.    The affirmative acts of the Defendants alleged in this Class Action Complaint,

13   including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a

14   manner that precluded detection.

15         125.    By its very nature, Defendants' and their co-conspirators' alleged price-fixing

16   conspiracy was inherently self-concealing.  Plaintiffs thus had neither actual nor constructive

17   knowledge of the facts constituting their claims for relief despite diligence in trying to discover the

18   pertinent facts.  Plaintiffs and members of the classes did not discover, and could not have

19   discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators

20   were violating the antitrust laws, at least until sometime after the certification of a class of direct

21   purchasers of Titanium Dioxide in August 2012.  Nor could Plaintiffs or the class members have

22   discovered the alleged violations earlier than that time, because Defendants and their co-

23   conspirators are alleged to have affirmatively concealed their conspiracy by meeting secretly to

24   discuss Titanium Dioxide prices, customers and markets; by agreeing among themselves at

25   meetings and in communications not to discuss publicly, or otherwise reveal, the nature and

26   substance of the acts and communications in furtherance of their illegal scheme; by deceptively

27   giving false and pretextual reasons for price increases, and by describing Titanium Dioxide

28   pricing falsely as being the result of competitive factors rather than collusion; and by wrongfully

-34-

and fraudulently concealing their collusive activities through various other means and methods designed to avoid detection.

126.   Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' (non-public) meetings and communications with each other. Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for Titanium Dioxide. As explained above, it was not until sometime after the certification of a class of direct purchasers of Titanium Dioxide in August 2012 that Plaintiffs and the Class Members learned that they had suffered damages as a result of the illicit artifice underlying this Class Action Complaint.

127.   Because Defendants' agreements, understandings and conspiracies were kept secret and not known to Plaintiffs until sometime after August of 2012, Plaintiffs and members of the classes before that time were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices throughout the United States for products containing Titanium Dioxide during the Class Period.

128.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

129.   Plaintiffs and members of the classes could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy. The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, communications and agreements. If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion. Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other nonconspirators.

130.   As alleged above, in 2002 after years of declining prices, the price of Titanium

*Class Action Complaint*

1    Dioxide began to increase. The price increases and "surcharges" implemented by Defendants and

2    their co-conspirators during the Class Period tended to be based on a need to improve margins,

3    justify future investment, offset increased costs and/or meet allegedly increased demand at a time

4    of tight supply. The justifications offered by Defendants and their co-conspirators for their price

5    increases were false, pretextual and/or misleading and operated to conceal the conspiracy. In fact,

6    price increases were the result of collusive conduct among the Defendants and their co-

7    conspirators, which was undisclosed at the time of the increases. To the extent there was any truth

8    in the explanations offered by Defendants for their numerous price increases during the Class

9    Period, the explanations were nevertheless misleading because of Defendants' conspiracy, which

10   was kept secret from the public.

11        131.   For example, in early 2002 when industry prices had hit bottom and Titanium

12   Dioxide producers were desperate to increase prices, they offered a variety of justifications for price

13   increases. Huntsman's Vice President of NAFTA sales was quoted in an article as saying that

14   "recent pricing has been insufficient to justify investments in major new capacity, which will be

15   needed by 2003 to 2004, leading to a tight market at that time." But this was false and misleading

16   because new capacity was in fact not needed. Huntsman and other producers, who successfully

17   increased prices in 2002-2005, actually shut down some capacity during the 2003-2004 period.

18        132.   Indeed, a lack of new capacity was used at times to justify price increases during the

19   Class Period, even though Defendants and their co-conspirators often had more than enough

20   capacity (and inventory) on hand to supply global markets. For example, Huntsman and

21   Millennium decreased capacity at certain plants in 2004, and shortly after the October 2007 price

22   increase, Defendant Millennium closed a plant in France citing "the over capacity of titanium

23   dioxide in the world market," among other reasons.

24        133.   Often during the Class Period, Defendants justified the need for price increases due

25   to poor or otherwise "unacceptable" industry margins even though the Titanium Dioxide business

26   of DuPont and other Defendants earned hundreds of millions of dollars in profits annually. For

27   example, in August 2007, DuPont informed customers (even customers who were being supplied

28   by other Defendants) that price increases were justified in part because industry profitability had

-36-

declined, even though DuPont's operating income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide business) increased approximately 45% from 2002 to 2007. Also, in 2008, a year in which the paint and plastics industries (which account for approximately 80% of Titanium Dioxide consumption) were beleaguered by recession, DuPont, the industry leader, earned over $500 million in pre-tax operating income from global Titanium Dioxide sales.

134. In addition, when DuPont led an industry price increase in September 2008, its price increase announcement contained various justifications for the increase from its Global Business Director, Ian Edwards. The justifications included not only the existence of higher raw material, energy and transportation costs (which plagued a vast number of industries in 2008), but also the purported fact that "Demand for Ti02 remains strong." This was false and misleading, as demand for Titanium Dioxide was declining in 2008, particularly given recessionary economic conditions in the paint, construction, paper and plastic industries. In fact, demand for Titanium Dioxide had been declining for years. For example, the market volume of Titanium Dioxide sold in the U.S. declined over 25% between 2004-2007.

135. Although Defendants' price increase announcements during the Class Period often did not contain justifications for price increases (such justifications were typically given to customers orally), the announcements nevertheless constituted implicit statements that the price increases in question were legitimate and were the result of competitive market forces. Customers also were often told that price increases were needed because raw material costs were increasing and industry margins were being adversely impacted. For example, after Defendants announced price increases to be effective on October 1, 2004, an article published in Paint and Coatings Industry magazine on October 1, 2004 stated: "Dupont said the price increases are the result of rising raw-material costs, economic expansions that are driving 'very strong global Ti02 demand,' high capacity rates, and 'reinvestment economics for capital funding to support industry growth.'" Similar statements were issued by other suppliers. Huntsman Tioxide said the price hikes "reflect both strong global market demand and the significant impact of raw material, energy and freight cost increases." These statements were false and misleading because (1) capacity was not "high"— the industry operating rate averaged approximately 87% in the 2002-2004 period and (2) ore costs,

*Class Action Complaint*

which are a substantial part of the raw material costs of manufacturing Titanium Dioxide, were either decreasing (ilmenite ore) or stable (rutile ore) during the 2002-2004 period.

136.     Defendants' customers, including Plaintiffs and members of the classes, were thus conditioned by experience in dealing with Defendants in what they believed to be a competitive industry to expect price increases from time to time.  Plaintiffs and members of the classes were lulled into believing that price increases were the normal result of competitive market forces rather than the product of collusive, unlawful efforts.  Indeed, as alleged herein, Defendants and their co-conspirators made statements in the media in support of price increases that were presumed to be true and were designed to convince members of the classes to pay purportedly legitimate price increases.

137.     Plaintiffs are informed and believe, and thereon allege, that Defendants' reasons for the price increases of Titanium Dioxide during the Class Period were materially false and/or misleading and were made, at least in part, in order to conceal Defendants' anticompetitive scheme as alleged in this Class Action Complaint.

138.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this complaint.

## X.     CLAIMS FOR RELIEF

### A.     First Claim for Relief:  Violation of State Antitrust Statutes (On Behalf of Plaintiffs and the Damages Class)

139.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

140.     From as early as March 1, 2002 until at least the filing of this Class Action Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Titanium Dioxide in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

141.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive levels the price for Titanium Dioxide and to allocate customers for Titanium

-38-

1    Dioxide in the United States.

2    142.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators

3    performed acts in furtherance of the combination and conspiracy, including:

4    (a)    Participating in meetings and conversations among themselves in the United States

5    and elsewhere during which they agreed to price Titanium Dioxide at certain levels, and otherwise

6    fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the

7    classes with respect to Titanium Dioxide sold in the United States;

8    (b)    Allocating customers and markets for Titanium Dioxide in the United States in

9    furtherance of their agreements; and

10    (c)    Participating in meetings and conversations among themselves in the United States

11    and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

12    143.    Defendants and their co-conspirators engaged in the actions described above for the

13    purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and

14    the allocate customers with respect to Titanium Dioxide.

15    144.    Defendants' anticompetitive acts described above were knowing, willful, and

16    constitute violations or flagrant violations of the following state antitrust statutes.

17    145.    Defendants have entered into an unlawful agreement in restraint of trade in violation

18    of the Arizona Revised Statutes, §§ 44-1401, et seq.

19    (a)    Defendants' combinations or conspiracies had the following effects:  (1) Titanium

20    Dioxide price competition was restrained, suppressed, and eliminated throughout Arizona; (2)

21    Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

22    throughout Arizona; (3) Plaintiffs and members of the classes were deprived of free and open

23    competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

24    inflated prices for products containing Titanium Dioxide.

25    (b)    During the Class Period, Defendants' illegal conduct substantially affected Arizona

26    commerce.

27    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

28    members of the classes have been injured in their business and property and are threatened with

-39-

1    further injury.

2        (d)    By reason of the foregoing, Defendants entered into agreements in restraint of trade

3    in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the

4    classes seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

5        146.    Defendants have entered into an unlawful agreement in restraint of trade in violation

6    of the California Business and Professions Code, §§ 16700, *et seq.*

7        (a)    During the Class Period, Defendants and their co-conspirators entered into and

8    engaged in a continuing unlawful trust in restraint of the trade and commerce described above in

9    violation of Section 16720 of the California Business and Professions Code.  Defendants, each of

10   them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and

11   allocate markets for, Titanium Dioxide at supracompetitive levels.

12       (b)    The aforesaid violations of Section 16720, California Business and Professions

13   Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the

14   Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain,

15   and stabilize the prices of, and to allocate markets for, Titanium Dioxide.

16       (c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and

17   their co-conspirators have done those things which they combined and conspired to do, including

18   but in no way limited to the acts, practices, and course of conduct set forth above and the following:

19   (1) Fixing, raising, stabilizing, and pegging the price of Titanium Dioxide; and (2) Allocating

20   among themselves the production of Titanium Dioxide.

21       (d)    The combination and conspiracy alleged herein has had, *inter alia*, the following

22   effects upon the commerce of California:  (1) Price competition in the sale of Titanium Dioxide has

23   been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Titanium

24   Dioxide sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and

25   pegged at artificially high, non-competitive levels in the State of California and throughout the

26   United States; and (3) Those who purchased products containing Titanium Dioxide from entities

27   who purchased the chemical from Defendants and their co-conspirators have been deprived of the

28   benefit of free and open competition.

-40-

*Class Action Complaint*

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property in that they paid more for products containing Titanium Dioxide than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the classes seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the classes, who resided in the District of Columbia and/or purchased products containing Titanium Dioxide in the District of Columbia, were deprived of free and open competition, in the District of Columbia; and (4) Plaintiffs and members of the classes, who resided in the District of Columbia and/or purchased products containing Titanium Dioxide in the District of Columbia, paid supracompetitive, artificially inflated prices in the District of Columbia for products containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all forms of relief available under District of Columbia Code Ann. §§ 28-45601, *et seq.*

148.    Defendants have entered into an unlawful agreement in restraint of trade in violation

-41-

of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)     Defendants unlawful conduct had the following effects: (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (d) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiff and members of the classes pain supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered in to agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

149.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes, 10/1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with

-42-

1    further injury.

2        (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

3    trade in violation of 740 Illinois Compiled Statutes 10/1 *et seq.* Accordingly, Plaintiffs and

4    members of the Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1,

5    *et seq.*

6        150.    Defendants have entered into an unlawful agreement in restraint of trade in violation

7    of the Iowa Code §§ 553.1, *et seq.*

8        (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

9    Dioxide price competition was restrained, suppressed, and eliminated throughout Iowa; (2)

10   Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

11   throughout Iowa; (3) Plaintiffs and members of the classes were deprived of free and open

12   competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

13   inflated prices for products containing Titanium Dioxide.

14       (b)    During the Class Period, Defendants' illegal conduct substantially affected Iowa

15   commerce.

16       (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

17   members of the classes have been injured in their business and property and are threatened with

18   further injury.

19       (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

20   trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the

21   classes seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

22       151.    Defendants have entered into an unlawful agreement in restraint of trade in violation

23   of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

24       (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

25   Dioxide price competition was restrained, suppressed, and eliminated throughout Kansas; (2)

26   Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

27   throughout Kansas; (3) Plaintiffs and members of the classes were deprived of free and open

28   competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

-43-

*Class Action Complaint*

1    inflated prices for products containing Titanium Dioxide.

2        (b)    During the Class Period, Defendants' illegal conduct substantially affected Kansas

3    commerce.

4        (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

5    members of the classes have been injured in their business and property and are threatened with

6    further injury.

7        (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

8    trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of

9    the classes seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

10       152.    Defendants have entered into an unlawful agreement in restraint of trade in violation

11   of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

12       (a)    Defendants' combinations or conspiracies had the following effects:  (1) Titanium

13   Dioxide price competition was restrained, suppressed, and eliminated throughout Maine; (2)

14   Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

15   throughout Maine; (3) Plaintiffs and members of the classes were deprived of free and open

16   competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

17   inflated prices for products containing Titanium Dioxide.

18       (b)    During the Class Period, Defendants' illegal conduct substantially affected Maine

19   commerce.

20       (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

21   members of the classes have been injured in their business and property and are threatened with

22   further injury.

23       (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

24   trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and

25   members of the classes seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

26       153.    Defendants have entered into an unlawful agreement in restraint of trade in violation

27   of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

28       (a)    Defendants' combinations or conspiracies had the following effects:  (1) Titanium

-44-

*Class Action Complaint*

Dioxide price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

154.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of

-45-

*Class Action Complaint*

1   trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and members of

2   the classes seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

3         155.   Defendants have entered into an unlawful agreement in restraint of trade in violation

4   of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

5         (a)   Defendants' combinations or conspiracies had the following effects:  (1) Titanium

6   Dioxide price competition was restrained, suppressed, and eliminated throughout Mississippi; (2)

7   Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

8   throughout Mississippi; (3) Plaintiffs and members of the classes who resided in Mississippi and/or

9   purchased products containing Titanium Dioxide in Mississippi were deprived of free and open

10   competition in Mississippi; and (4) Plaintiffs and members of the classes who resided in Mississippi

11   and/or purchased products containing Titanium Dioxide in Mississippi paid supracompetitive,

12   artificially inflated prices in Mississippi for products containing Titanium Dioxide.

13         (b)   During the Class Period, Defendants' illegal conduct substantially affected

14   Mississippi commerce.

15         (c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

16   members of the classes have been injured in their business and property and are threatened with

17   further injury.

18         (d)   By reason of the foregoing, Defendants have entered into agreements in restraint of

19   trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members

20   of the classes seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

21         156.   Defendants have entered into an unlawful agreement in restraint of trade in violation

22   of the Nebraska Revised Statutes §§ 59-801, *et seq.*

23         (a)   Defendants' combinations or conspiracies had the following effects:  (1) Titanium

24   Dioxide price competition was restrained, suppressed, and eliminated throughout Nebraska; (2)

25   Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

26   throughout Nebraska; (3) Plaintiffs and members of the classes were deprived of free and open

27   competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

28   inflated prices for products containing Titanium Dioxide.

*Class Action Complaint*

1    (b)    During the Class Period, Defendants' illegal conduct substantially affected Nebraska

2    commerce.

3    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

4    members of the classes have been injured in their business and property and are threatened with

5    further injury.

6    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

7    trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and

8    members of the classes seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

9    157.    Defendants have entered into an unlawful agreement in restraint of trade in violation

10   of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

11   (a)    Defendants' combinations or conspiracies had the following effects:  (1) Titanium

12   Dioxide price competition was restrained, suppressed, and eliminated throughout Nevada; (2)

13   Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

14   throughout Nevada; (3) Plaintiffs and members of the classes who resided in Nevada and/or

15   purchased products containing Titanium Dioxide in Nevada were deprived of free and open

16   competition in Nevada; and (4) Plaintiffs and members of the classes who resided in Nevada and/or

17   purchased products containing Titanium Dioxide in Nevada paid supracompetitive, artificially

18   inflated prices in Nevada for products containing Titanium Dioxide.

19   (b)    During the Class Period, Defendants' illegal conduct substantially affected Nevada

20   commerce.

21   (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

22   members of the classes have been injured in their business and property and are threatened with

23   further injury.

24   (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

25   trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*  Accordingly, Plaintiffs and

26   members of the classes seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

27   158.    Defendants have entered into an unlawful agreement in restraint of trade in violation

28   of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

-47-

1    (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

2    Dioxide price competition was restrained, suppressed, and eliminated throughout New Hampshire;

3    (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

4    throughout New Hampshire; (3) Plaintiffs and members of the classes were deprived of free and

5    open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

6    inflated prices for products containing Titanium Dioxide.

7    (b)    During the Class Period, Defendants' illegal conduct substantially affected New

8    Hampshire commerce.

9    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

10    members of the classes have been injured in their business and property and are threatened with

11    further injury.

12    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

13    trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and

14    members of the classes seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et*

15    *seq.*

16    159.    Defendants have entered into an unlawful agreement in restraint of trade in violation

17    of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

18    (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

19    Dioxide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2)

20    Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

21    throughout New Mexico; (3) Plaintiffs and members of the classes were deprived of free and open

22    competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

23    inflated prices for products containing Titanium Dioxide.

24    (b)    During the Class Period, Defendants' illegal conduct substantially affected New

25    Mexico commerce.

26    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

27    members of the classes have been injured in their business and property and are threatened with

28    further injury.

*Class Action Complaint*

1    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

2    trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and

3    members of the classes seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

4    160.    Defendants have entered into an unlawful agreement in restraint of trade in violation

5    of the New York General Business Laws §§ 340, *et seq.*

6    (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

7    Dioxide price competition was restrained, suppressed, and eliminated throughout New York; (2)

8    Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

9    throughout New York; (3) Plaintiffs and members of the classes who resided in New York and/or

10    purchased products containing Titanium Dioxide in New York were deprived of free and open

11    competition in New York; and (4) Plaintiffs and members of the classes who resided in New York

12    paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide when

13    they purchased, in New York, products containing Titanium Dioxide or purchased, in New York,

14    products containing Titanium Dioxide that were otherwise of lower quality than would have been

15    absent the conspirators' illegal acts, or were unable to purchase products containing Titanium

16    Dioxide that they would have otherwise purchased absent the illegal conduct.

17    (b)    During the Class Period, Defendants' illegal conduct substantially affected New

18    York commerce.

19    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

20    members of the classes have been injured in their business and property and are threatened with

21    further injury.

22    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

23    trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a

24    per se violation of the Act. Accordingly, Plaintiffs and members of the classes seek all relief

25    available under New York Gen. Bus. Law §§ 340, *et seq.*

26    161.    Defendants have entered into an unlawful agreement in restraint of trade in violation

27    of the North Carolina General Statutes §§ 75-1, *et seq.*

28    (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

-49-

*Class Action Complaint*

1    Dioxide price competition was restrained, suppressed, and eliminated throughout North Carolina;

2    (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

3    throughout North Carolina; (3) Plaintiffs and members of the classes who resided in North Carolina

4    and/or purchased products containing Titanium Dioxide were deprived of free and open

5    competition in North Carolina; and (4) Plaintiffs and members of the classes who resided in North

6    Carolina and/or purchased products containing Titanium Dioxide in North Carolina paid

7    supracompetitive, artificially inflated prices in North Carolina for products containing Titanium

8    Dioxide.

9        (b)    During the Class Period, Defendants' illegal conduct substantially affected North

10   Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

11   and members of the classes have been injured in their business and property and are threatened with

12   further injury.

13       (c)    By reason of the foregoing, Defendants have entered into agreements in restraint of

14   trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members

15   of the classes seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

16       162.   Defendants have entered into an unlawful agreement in restraint of trade in violation

17   of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

18       (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

19   Dioxide price competition was restrained, suppressed, and eliminated throughout North Dakota; (2)

20   Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

21   throughout North Dakota; (3) Plaintiffs and members of the classes were deprived of free and open

22   competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

23   inflated prices for products containing Titanium Dioxide.

24       (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on

25   North Dakota commerce.

26       (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

27   members of the classes have been injured in their business and property and are threatened with

28   further injury.

*Class Action Complaint*

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

164.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the classes who resided in South Dakota and/or purchased products containing Titanium Dioxide in South Dakota were deprived of free and open competition in South Dakota; and (4) Plaintiffs and members of the classes who resided in

-51-

1    South Dakota and/or purchased products containing Titanium Dioxide in South Dakota paid

2    supracompetitive, artificially inflated prices in South Dakota for products containing Titanium

3    Dioxide.

4         (b)    During the Class Period, Defendants' illegal conduct has a substantial effect on

5    South Dakota commerce.

6         (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

7    members of the classes have been injured in their business and property and are threatened with

8    further injury.

9         (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

10    trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and

11    members of the classes seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et*

12    *seq.*

13        165.    Defendants have entered into an unlawful agreement in restraint of trade in violation

14    of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

15         (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

16    Dioxide price competition was restrained, suppressed, and eliminated throughout Tennessee; (2)

17    Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

18    throughout Tennessee; (3) Plaintiffs and members of the classes who resided in Tennessee and/or

19    purchased products containing Titanium Dioxide in Tennessee were deprived of free and open

20    competition in Tennessee; and (4) Plaintiffs and members of the classes who resided in Tennessee

21    and/or purchased products containing Titanium Dioxide in Tennessee paid supracompetitive,

22    artificially inflated prices in Tennessee for products containing Titanium Dioxide.

23         (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on

24    Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

25    and members of the classes have been injured in their business and property and are threatened with

26    further injury.

27         (c)    By reason of the foregoing, Defendants have entered into agreements in restraint of

28    trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and

*Class Action Complaint*

members of the classes seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

166.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Utah; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)   During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*   Accordingly, Plaintiffs and members of the classes seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

167.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)   During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

-53-

*Class Action Complaint*

1 members of the classes have been injured in their business and property and are threatened with

2 further injury.

3     (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

4 trade in violation of Vermont Stat. Ann. 9 §§ 2451, *et seq.* Plaintiffs are entitled to relief pursuant

5 to Vermont Stat. Ann. 9 § 2465 and any other applicable authority. Accordingly, Plaintiffs and

6 members of the classes seek relief available under Vermont Stat. Ann. 9 §§ 2451, *et seq.*

7     168.    Defendants have entered into an unlawful agreement in restraint of trade in violation

8 of the West Virginia Code §§ 47-18-1, *et seq.*

9     (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

10 Dioxide price competition was restrained, suppressed, and eliminated throughout West Virginia; (2)

11 Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels

12 throughout West Virginia; (3) Plaintiffs and members of the classes who resided in West Virginia

13 and/or purchased products containing Titanium Dioxide in West Virginia were deprived of free and

14 open competition in West Virginia; and (4) Plaintiffs and members of the classes who resided in

15 West Virginia and/or purchased products containing Titanium Dioxide in West Virginia paid

16 supracompetitive, artificially inflated prices in West Virginia for products containing Titanium

17 Dioxide.

18     (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on

19 West Virginia commerce.

20     (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

21 members of the classes have been injured in their business and property and are threatened with

22 further injury.

23     (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of

24 trade in violation of West Virginia Code §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members

25 of the classes seek all available under West Virginia Code §§ 47-18-1, *et seq.*

26     169.    Defendants have entered into an unlawful agreement in restraint of trade in violation

27 of the Wisconsin Statutes §§ 133.01, *et seq.*

28     (a)    Defendants' combinations or conspiracies had the following effects: (1) Titanium

*Class Action Complaint*

Dioxide price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the classes seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

170.    Plaintiffs and members of the classes in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the classes have paid more for products containing Titanium Dioxide than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

171.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and members of the classes.

172.    Accordingly, Plaintiffs and the members of the classes in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

*Class Action Complaint*

**B.    Second Claim for Relief:  Violation of State Consumer Protection Statutes**
**(On Behalf of Plaintiffs and the Damages Class)**

173.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Class Action Complaint.

174.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

175.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a)    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which products containing Titanium Dioxide were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the classes.

(b)    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10).

(c)    Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(d)    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the classes have been injured in their business and property and are threatened with further injury.

-56-

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the classes seek all relief available under that statute.

176.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants illegal conduct substantially affected California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Class Action Complaint, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     The Defendants' conduct as alleged in this Class Action Complaint violated Section 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of products containing Titanium Dioxide in the State of California within the meaning of Section 17200, California

-57-

*Class Action Complaint*

1   Business and Professions Code; and

2         (g)    Defendants' unlawful conduct had the following effects: (1) Titanium Dioxide price

3   competition was restrained, suppressed, and eliminated throughout California; (2) Titanium

4   Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

5   California; (3) Plaintiffs and members of the classes who resided in California and/or purchased

6   products containing Titanium Dioxide in California were deprived of free and open competition in

7   California; and (4) Plaintiffs and members of the classes who resided in California and/or

8   purchased products containing Titanium Dioxide in California paid supracompetitive, artificially

9   inflated prices in California for products containing Titanium Dioxide.

10        (h)    Defendants' acts and practices are unlawful, fraudulent, or deceptive within the

11   meaning of Section 17200 of the California Business and Professions Code.

12        (i)    Plaintiffs and members of the classes are entitled to full restitution and/or

13   disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been

14   obtained by Defendants as a result of such business acts or practices.

15        (j)    The illegal conduct alleged herein is continuing and there is no indication that

16   Defendants will not continue such activity into the future.

17        (k)    The unlawful, fraudulent, deceptive, and unfair business practices of Defendants,

18   and each of them, as described above, have caused and continue to cause Plaintiffs and the

19   members of the classes to pay supracompetitive and artificially inflated prices for products

20   containing Titanium Dioxide. Plaintiffs and the members of the classes suffered injury in fact and

21   lost money or property as a result of such unfair competition.

22        (l)    The conduct of Defendants as alleged in this Class Action Complaint violates

23   Section 17200 of the California Business and Professions Code.

24        (m)   As alleged in this Class Action Complaint, Defendants and their co-conspirators

25   have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair

26   competition. Plaintiffs and the members of the classes are accordingly entitled to equitable relief

27   including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and

28   benefits that may have been obtained by Defendants as a result of such business practices, pursuant

to the California Business and Professions Code, Sections 17203 and 17204.

177. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a) Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Titanium Dioxide was sold, distributed, or obtained in the District of Columbia.

(b) The foregoing conduct constituted "unlawful trade practices" within the meaning of D.C. Code § 28-3904.

(c) During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

(d) Defendants' unlawful conduct had the following effects: (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(e) As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the classes seek all relief available under that statute.

178. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a) Defendants' unlawful conduct had the following effects: (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Florida; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4)

-59-

1  Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products

2  containing Titanium Dioxide.

3      (b)    During the Class Period, Defendants' illegal conduct substantially affected Florida

4  commerce and consumers.

5      (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

6  members of the classes have been injured in their business and property and are threatened with

7  further injury.

8      (d)    Defendants have engaged in unfair competition or unlawful, unfair, or deceptive acts

9  or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members

10  of the classes seek all relief available under that statute.

11      179.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable,

12  or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*

13      (a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

14  affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels,

15  the prices at which Titanium Dioxide was sold, distributed, or obtained in Massachusetts and took

16  efforts to conceal their agreements from Plaintiffs and members of the classes.

17      (b)    The aforementioned conduct on the part of the Defendants constituted "unfair

18  methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

19  commerce," in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2, 11.

20      (c)    Defendants' unlawful conduct had the following effects: (1) Titanium Dioxide price

21  competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Titanium

22  Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

23  Massachusetts; (3) Plaintiffs and members of the classes were deprived of free and open

24  competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially

25  inflated prices for products containing Titanium Dioxide.

26      (d)    During the Class Period, Defendants' illegal conduct substantially affected

27  Massachusetts commerce and consumers.

28      (e)    As a direct and proximate result of the unlawful conduct of the Defendants,

-60-

*Class Action Complaint*

1   Plaintiffs and the members of the classes have been injured in their business and property and are

2   threatened with further injury.

3          (f)     Defendants have engaged in unfair competition or unfair or deceptive acts or

4   practices in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2,11 and, accordingly, Plaintiffs

5   and the members of the classes seek all relief available under that statute.

6          180.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable,

7   or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev.

8   Stat. § 407.010, *et seq.*

9          (a)     Defendants engaged in the conduct described in this Class Action Complaint in

10  connection with the sale of products containing Titanium Dioxide in a market that includes

11  Missouri.

12         (b)     During the Class Period, Defendants' illegal conduct substantially affected Missouri

13  commerce and consumers.

14         (c)     Defendants agreed to, and in fact did, fix, control, and/or maintain at artificial and

15  non-competitive levels, the price at which Titanium Dioxide was sold, distributed, or obtained in

16  Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state

17  law, violated public policy, was unethical, oppressive, and unscrupulous, and caused substantial

18  injury to Plaintiffs and members of the classes.

19         (d)     Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs

20  and members of the classes concerning Defendants' unlawful activities and artificially inflated

21  prices for Titanium Dioxide.  The concealed, suppressed, and omitted facts would have been

22  important to Plaintiffs and members of the classes as they related to the cost of products containing

23  Titanium Dioxide.

24         (e)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price

25  competition was restrained, suppressed, and eliminated throughout Missouri; (2) Titanium Dioxide

26  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri;

27  (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4)

28  Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products

-61-

*Class Action Complaint*

1  containing Titanium Dioxide.

2      (f)    The foregoing acts and practices constituted unlawful practices in violation of the

3  Missouri Merchandising Practices Act.

4      (g)    As a direct and proximate result of the above-described unlawful practices, Plaintiffs

5  and members of the classes suffered ascertainable loss of money or property.

6      (h)    Accordingly, Plaintiffs and members of the classes seek all relief available under

7  Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits

8  "the act, use or employment by any person of any deception, fraud, false pretense, false promise,

9  misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact

10 in connection with the sale or advertisement of any merchandise in trade or commerce," as further

11 interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this

12 Count.

13     181.   Defendants have engaged in unfair competition or unfair, unconscionable, or

14 deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer

15 Protection Act of 1970, Mont. Code, §§ 30-14-201, *et seq.*

16     (a)    Defendants unlawful conduct had the following effects: (1) Titanium Dioxide price

17 competition was restrained, suppressed, and eliminated throughout Montana; (2) Titanium Dioxide

18 prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana;

19 (3) Plaintiffs and members of the classes who resided in Montana and/or purchased products

20 containing Titanium Dioxide in Montana were deprived of free and open competition in Montana;

21 and (4) Plaintiffs and members of the classes who resided in Montana and/or purchased products

22 containing Titanium Dioxide in Montana paid supracompetitive, artificially inflated prices in

23 Montana for products containing Titanium Dioxide.

24     (b)    During the Class Period, Defendants' illegal conduct substantially affected Montana

25 commerce and consumers.

26     (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

27 members of the classes have been injured in their business and property and are threatened with

28 further injury.

-62-

*Class Action Complaint*

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code. §§ 30-14-201, *et seq.*, and accordingly, Plaintiffs and members of the classes seek all relief available under that statute.

182.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at a non-competitive and artificially inflated levels, the price at which Titanium Dioxide was sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the classes.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices" in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, and as set forth in N.M.S.A. § 57-12-2E, resulted in a gross disparity between the value received by Plaintiffs and the members of the classes and the prices paid by them for products containing Titanium Dioxide.

(c)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Now Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the classes have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the classes seek all relief available under that statute.

-63-

*Class Action Complaint*

183.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which Titanium Dioxide was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and the members of the classes.

(b)  Defendants deceptively led purchasers, such as Plaintiffs and members of the classes, to believe that the products containing Titanium Dioxide they had purchased had been sold at a legal, competitive price, when they had in fact been sold at a collusively obtained and inflated price, that passed on to them the artificially inflated price of Titanium Dioxide.

(c)  The conduct of the Defendants described in this Class Action Complaint constituted consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)  Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New York; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the classes who reside in and/or made purchases of products containing Titanium Dioxide in New York were deprived of free and open competition and subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the classes who reside in and/or made purchases of products containing Titanium Dioxide in New York paid supracompetitive, artificially inflated prices in New York for products containing Titanium Dioxide, and were subjected to Defendants' deceptive practice in New York.

(e)  During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

(f)  During the Class Period, each of the Defendants named in this Class Action Complaint directly, or indirectly and through affiliates they dominated and controlled,

1    manufactured, sold, and/or distributed Titanium Dioxide in New York.

2        (g)    Plaintiffs and members of the classes seek all relief available pursuant to N.Y. Gen.

3    Bus. Law § 349(h).

4        184.    Defendants have engaged in unfair competition or unfair, unconscionable, or

5    deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

6        (a)    Defendants agreed to, and did in fat, act in restraint of trade or commerce by

7    affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price

8    at which Titanium Dioxide was sold, distributed, or obtained in North Carolina and took efforts to

9    conceal their agreements from Plaintiffs and members of the classes.

10       (b)    The conduct of the Defendants described in this Class Action Complaint constituted

11   consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which

12   resulted in consumer injury and broad adverse impact on the public at large, and harmed the public

13   interest of North Carolina consumers in an honest marketplace in which economic activity is

14   conducted in a competitive manner.

15       (c)    Defendants' unlawful conduct had the following effects upon purchasers in North

16   Carolina or products containing Titanium Dioxide:  (1) Titanium Dioxide price competition was

17   restrained, suppressed, and eliminated throughout North Carolina; (2) Titanium Dioxide prices were

18   raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3)

19   Plaintiffs and members of the classes who reside in North Carolina and/or purchased products

20   containing Titanium Dioxide in North Carolina were deprived of free and open competition in

21   North Carolina; and (4) Plaintiffs and members of the classes who resided in North Carolina and/or

22   purchased products containing Titanium Dioxide in North Carolina paid supracompetitive,

23   artificially inflated prices in North Carolina for products containing Titanium Dioxide.

24       (d)    During the Class Period, Defendants' illegal conduct substantially affected North

25   Carolina commerce and consumers.

26       (e)    During the Class Period, each of the Defendants named in this Class Action

27   Complaint, directly, or indirectly and through affiliated they dominated and controlled,

28   manufactured, sold, and/or distributed Titanium Dioxide in North Carolina.

-65-

*Class Action Complaint*

(f)     Plaintiffs and members of the classes seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the classes seek all relief available under that statute.

185.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the classes were deprived of free and open competition; and (4) Plaintiffs and members of the classes paid supracompetitive, artificially inflated prices for products containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 29-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the classes seek all relief available under that statute.

186.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Titanium Dioxide was sold, distributed, or obtained in Vermont.

*Class Action Complaint*

1       (b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of

2 the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for

3 Titanium Dioxide.  Defendants owed a duty to disclose such facts, and Defendants breached that

4 duty by their silence.  Defendants misrepresented to all purchasers during the Class Period that

5 Defendants' Titanium Dioxide prices were competitive and fair.

6       (c)     Defendants' unlawful conduct had the following effects: (1) Titanium Dioxide price

7 competition was restrained, suppressed, and eliminated throughout Vermont; (2) Titanium Dioxide

8 prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont;

9 (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

10 (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices

11 for Titanium Dioxide.

12       (d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and

13 members of the Damages Class suffered an ascertainable loss of money or property as a result of

14 Defendants' use or employment of unconscionable and deceptive commercial practices as set forth

15 above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

16       (e)     Defendants' deception, including their affirmative misrepresentations and omissions

17 concerning the price of Titanium Dioxide, likely misled all purchasers acting reasonably under the

18 circumstances to believe that they were purchasing Titanium Dioxide at prices set by a free and fair

19 market.  Defendants' misleading conduct and unconscionable activities constitute unfair

20 competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and,

21 accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

22 statute.

23 **C.**    **Third Claim for Relief:  Unjust Enrichment (On Behalf of Plaintiffs and the Damages Class)**

24

25      187.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

26      188.    As a result of their unlawful conduct described above, Defendants have and will

27 continued to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, as a

28 minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

*Class Action Complaint*

189.    Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the classes for products containing Titanium Dioxide.

190.    Plaintiffs and the members of the classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Plaintiffs and the members of the classes are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the classes may make claims on a pro rata basis.

191.    Pursuit of any remedies against the entities from which Plaintiffs and members of the classes purchased products containing Titanium Dioxide subject to Defendants' conspiracy would have been futile, given that those entities did not take part in Defendants' conspiracy.

**D.    Fourth Claim for Relief:  Injunctive and Equitable Relief (On Behalf of Plaintiffs and the Nationwide Class)**

192.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

193.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

194.    At least as early as March 2002, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Titanium Dioxide, thereby creating anticompetitive effects.

195.    The anticompetitive acts were intentionally directed at the United States market for Titanium Dioxide and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Titanium Dioxide throughout the United States.

-68-

196.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Titanium Dioxide.

197.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Titanium Dioxide have been harmed by being forced to pay inflated, supracompetitive prices for Titanium Dioxide.

198.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

Defendants' conspiracy had the following effects, among others:

(a)   Price competition in the market for Titanium Dioxide has been restrained, suppressed, and/or eliminated in the United States;

(b)   Prices for Titanium Dioxide sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States;

(c)   Prices for products purchased by Plaintiffs and the members of the Nationwide Class containing Titanium Dioxide manufactured by Defendants and their coconspirators were inflated; and

(d)   Plaintiffs and members of the Nationwide Class who purchased products containing Titanium Dioxide indirectly from Defendants have been deprived of the benefits of free and open competition.

199.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Titanium Dioxide than they would have paid and will pay in the absence of the conspiracy.

200.   Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Titanium Dioxide.

201.   Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Titanium Dioxide.

202.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal

*Class Action Complaint*

1    antitrust laws.

2        203.    Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants'

3    unlawful conduct until the Court orders an injunction.

4        204.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against

5    Defendants preventing and restraining the violations alleged herein.

6                            **PRAYER FOR RELIEF**

7        Accordingly, Plaintiffs respectfully request that:

8        A.    The court determine that this action may be maintained as a class action under Rule

9    23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of

10   this action, as provided by Rule 23(a)(2) of the Federal Rules of Civil Procedure, be given to each

11   and every member of the Class;

12       B.    The unlawful conduct, contract, conspiracy, or combination alleged in this Class

13   Action Complaint be adjudged and decreed:

14       (a)    An unlawful combination, trust, agreement, understanding, and/or concert of action

15   in violation of the state antitrust and unfair competition and consumer protection laws as set forth in

16   this Class Action Complaint; and

17       (b)    Acts of unjust enrichment by Defendants as set forth in this Class Action Complaint.

18       C.    Plaintiffs and members of the classes recover damages, to the maximum extent

19   allowed under applicable laws, and that a joint and several judgment in favor of Plaintiffs and the

20   members of the classes be entered against Defendants in an amount to be trebled to the extent such

21   laws permit;

22       D.    Plaintiffs and the members of the classes recover damages, to the maximum extent

23   allowed by applicable laws, in the form of restitution and/or disgorgement of profits unlawfully

24   gained from them;

25       E.    Defendants, their affiliates, successors, transferees, assignees, and other officers,

26   directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on

27   their behalf or in concert with them, be permanently enjoined and restrained from in any manner

28   continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged

*Class Action Complaint*

1   herein, or from entering into any other contract, conspiracy, or combination having a similar

2   purpose or effect, and from adopting or following any practice, plan, program, or device having a

3   similar purpose or effect;

4        F.     Plaintiffs and the members of the classes be awarded restitution, including

5   disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts

6   of unjust enrichment;

7        G.     Plaintiffs and the members of the classes be awarded pre- and post- judgment

8   interest as provided by law, and that such interest be awarded at the highest legal rate from and after

9   the date of service of this Class Action Complaint;

10       H.     Plaintiffs and the members of the classes recover their costs of suit, including

11  reasonable attorneys' fees, as provided by law; and

12       I.     Plaintiffs and members of the classes have such other and further relief as the case

13  may require and the Court may deem just and proper.

14  **JURY DEMAND**

15       Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

16  Procedure, of all issues so triable.

17

18  *Pierce Gore*

     Ben F. Pierce Gore

19       **Pratt & Associates**

     1871 The Alameda, Suite 425

20       San Jose, CA 95126

     Telephone: (408) 369-0800

21       pgore@prattattorneys.com

22       Jonathan W. Cuneo

     Joel Davidow

23       Katherine Van Dyck

     Victoria Romanenko

24       **Cuneo Gilbert & LaDuca, LLP**

     507 C Street, N.E.

25       Washington, DC 20002

     Telephone: (202) 789-3960

26       jonc@cuneolaw.com

     joel@cuneolaw.com

27       kvandyck@cuneolaw.com

28       vicky@cuneolaw.com

-71-

Sandra Cuneo (SBN 110388)
**Cuneo Gilbert & LaDuca, LLP**
11620 Wilshire Boulevard
Suite 900
Los Angeles, CA 90025
Telephone:  310-582-5939
scuneo@cuneolaw.com

Don Barrett
**Barrett Law Group, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com

Thomas P. Thrash
Marcus N. Bozeman
**Thrash Law Firm, P.A.**
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

Dewitt Lovelace
**Lovelace & Associates, P.A.**
12870 US Hwy 98 West, Ste. 200
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com

Shawn M. Raiter
**Larson • King, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com

Phillip Duncan
Richard Quintus
**Duncan Firm, P.A.**
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

-72-

*Class Action Complaint*