**Page 1**

1      IN THE UNITED STATES DISTRICT COURT
2   FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION
3   HALEY PAINT COMPANY, ET AL.
4          Plaintiffs      CIVIL NO.  RDB 10-0318
5   v.                     August 26, 2013
6   KRONOS WORLDWIDE, INC., ET AL.
7          Defendants
8   _____/
9          TRANSCRIPT OF PROCEEDINGS
10      BEFORE THE HONORABLE RICHARD D. BENNETT,
11         UNITED STATES DISTRICT JUDGE
12   APPEARANCES:
13   On behalf of the Plaintiffs:
14
15   Paul Mark Sandler, Esquire
16   Solomon Cera, Esquire
17   Joseph Saveri, Esquire
18   Andrew Dirksen, Esquire
19   Eric Cramer, Esquire
20   Robert Levin, Esquire
21   Lin Chan, Esquire
22   Brendan Glackin, Esquire
23
24
25

**Page 2**

1   On behalf of the Defendants:
2   James P. Ulwick, Esquire
3   Paul Coggins, Esquire
4   Kelly Vickers, Esquire
5   James Cooper, Esquire
6   Ryan Watts, Esquire
    Anne Davis, Esquire
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22   Reported By:
23   Jacqueline Sovich, RPR, CMR, FOCRR
24   Official Court Reporter
25

**Page 3**

1          (PROCEEDINGS)
2          THE COURT:  We're here for a hearing on the numerous
3   motions in limine and in preparing for the trial for September
4   the 9th, and a few other matters that have arisen.
5          If counsel could identify themselves first for the
6   record, please, on behalf of the plaintiffs.
7          MR. SANDLER:  Your Honor, it's a pleasure.  Again,
8   Paul Mark Sandler for the plaintiffs.
9          MR. CERA:  Good morning.  Sol Cera for the
10   plaintiffs.
11          MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri
12   on behalf of the plaintiffs.
13          THE COURT:  Good morning.  Nice to see you.
14          MR. DIRKSEN:  Good morning, Your Honor.  Andrew
15   Dirksen also on behalf of the plaintiffs.
16          THE COURT:  Good morning.
17          MS. CHAN:  Good morning.  Lin Chan on behalf of the
18   plaintiffs.
19          THE COURT:  Nice to see you, good morning.
20          You're in an important position because you're in the
21   jury box.  Okay.  Yes.
22          MR. GLACKIN:  Brendan Glackin on behalf of the
23   plaintiffs.
24          THE COURT:  Yes, nice to see you.
25          MR. LEVIN:  Good morning, Your Honor.  Robert Levin

**Page 4**

1   on behalf of the plaintiffs.
2          THE COURT:  Good morning.
3          MR. CRAMER:  Good morning, Your Honor.  Eric Cramer,
4   also on behalf of the plaintiffs.
5          THE COURT:  Good morning to all you.  And now on
6   behalf of defendants.
7          MR. ULWICK:  Good morning, Your Honor, James Ulwick
8   for the defendant Kronos.
9          THE COURT:  Yes, Mr. Ulwick.  Nice to see you.  Good
10   morning.
11          MR. COGGINS:  Paul Coggins on behalf of Kronos.
12          THE COURT:  Nice to see you.
13          MS. VICKERS:  Good morning, Your Honor.  Kelly
14   Vickers on behalf Kronos.
15          MR. COOPER:  Good morning, Your Honor.  James Cooper
16   for Millennium.
17          THE COURT:  Good morning.
18          MR. WATTS:  Good morning, Your Honor.  Brian Watts
19   for Millennium.
20          MS. DAVIS:  Ann Davis for Millennium.
21          THE COURT:  Good morning.  Good morning. And extend
22   our crowd out here.
23          MR. HUTCHINSON:  Excuse me, but Dan Hutchison also
24   for the plaintiff, Your Honor.
25          THE COURT:  Yes, Mr. Hutchinson.  You certainly are

**EXHIBIT C**

5

1  welcome.  If you are on the trial team, get up here somehow.

2  Move on up here somehow.  You're fine back there?  Okay.  Nice

3  to see all of you.

4        Let me just begin with a few matters and before we

5  get to our interesting day ahead in terms of the various

6  motions in limine here.

7        Obviously, in the matter In Re Titanium Dioxide

8  Antitrust Litigation, that's Civil Number RDB-10-0318.  I would

9  note first of all that I have filed an opinion this morning,

10  and you'll be getting copies of it later in the morning with

11  respect to one motion that is, one matter that was still out

12  there that I've now resolved and upon which I've ruled.

13        I think what I'll do is sort of summarize it for you

14  and read a copy of the order.  Yes, Mr. Ulwick?

15        MR. ULWICK:  I just wanted to mention that we do have

16  people on the phone, if you want to take appearances.

17        THE COURT:  Oh, I'm sorry.  Yes.  And this has to do

18  with, this has to do with the matter of a protective order,

19  correct?  The motion, the emergency motion for protective

20  order, preventing production of plaintiff's confidential

21  discovery materials; is that correct, Mr. Ulwick?  They're on

22  the phone for that?

23        MR. ULWICK:  That's my understanding.

24        THE COURT:  We have counsel for DuPont and for

25  Huntsman, is that correct, on the line?  Good morning to all of

6

1  you.  We miss you here in Baltimore.

2        Good morning.  Just for the record, who's on the line

3  for DuPont?

4        MR. ISBISTER:  Good morning, Your Honor.  John

5  Isbister.

6        THE COURT:  Good morning.

7        MR. ISBISTER:  And I have some counsel with me, too.

8        MS. ROSS LAHLOU:  Good morning, Your Honor.  Shari

9  Ross Lahlou.

10        THE COURT:  Good morning.

11        MR. MCATEE:  Darren Mcatee from Cravath, Your Honor.

12        THE COURT:  Okay.  Good morning.  And then who's on

13  the line for Huntsman?

14        MR. REEDER:  Good morning.  Jim Reeder for Huntsman.

15        THE COURT:  Good morning.

16        MR. ISBISTER:  There is also counsel for the

17  plaintiffs in the California litigation, Your Honor.

18        THE COURT:  Yes.  Are they here in court or just on

19  the phone?

20        MR. STANLEY:  We're here, Your Honor.

21        THE COURT:  They're here.  Yes.

22        Is that Katherine Van Dyck?

23        MS. VAN DYCK:  Yes, Honor.

24        THE COURT:  And you are representing Huntsman; is

25  that correct?

7

1        MS. VAN DYCK:  No, Your Honor.  Cuneo, Gilbert &

2  LaDuca represent the plaintiffs in the California litigation.

3  And Mr. Cuneo, Daniel Cohen, and David Stanley are in the

4  courtroom.

5        THE COURT:  All right.  Okay.  Then we'll just deal

6  with that first.  Basically, there is litigation, and counsel

7  in the courtroom will identify themselves again, please, here.

8        MR. STANLEY:  My name is David Stanley, Your Honor.

9  I'm a member of the Virginia and District of Columbia bars.

10        THE COURT:  Nice to see you.  Good morning.

11        MR. COHEN:  Good morning, Your Honor.  Daniel Cohen,

12  also from Cuneo, Gilbert, and LaDuca.

13        MR. CUNEO:  And Jonathan Cuneo, Cuneo, Gilbert &

14  LaDuca.  I'm a member of the District of Colombia and New York

15  bars.

16        THE COURT:  Welcome to all of you.

17        You'll need to get out of town pretty quickly.  This

18  whole city is shutting down for the Grand Prix.  You can't

19  drive two blocks in either direction here.  We should probably

20  make sure we deal with counsel pretty quickly on this.

21        Essentially, the matter that is being initially

22  raised, and thank you, Mr. Ulwick, I forgot we had counsel on

23  the telephone.

24        There is an action entitled Los Gatos Mercantile,

25  Inc., et al. versus DuPont, et al, which is now pending in the

8

1  United States District Court for the Northern District of

2  California.  And there is an emergency motion, which has been

3  filed by the plaintiffs in this case, in the case before me,

4  filed by Mr. Saveri and Mr. Cera, signed by Mr. Glackin and Mr.

5  Sandler and Mr. Cramer essentially seeking an emergency motion

6  for a protective order, paper number 503 in this case, is

7  seeking a motion for a protective order on an emergency basis

8  preventing the defendants from producing in the context of the

9  lawsuit I just noted in the United States District Court for

10  the Northern District of California from producing confidential

11  discovery materials and class counsel's work product from this

12  instant litigation.

13        And the plaintiffs further request entry of a stay

14  order pending resolution of the motion, the plaintiff's motion,

15  and request for stay are based on the memorandum and

16  declarations that have been filed, and that had -- was filed on

17  August 20th, and essentially the issue here.

18        And then I will say that I received correspondence on

19  August 23rd from you, Mr. Cohen, one of the counsel in the

20  California litigation.

21        MR. COHEN:  Yes, sir.

22        THE COURT:  Was that filed actually in this case,

23  itself before me?

24        MR. COHEN:  We did not file it.  We sent it to

25  counsel.

9

1    THE COURT: All counsel have a copy of it, correct?

2    MR. COHEN: Well, it's cc'd to Joseph Saveri.

3    THE COURT: The point is, it's not filed in the

4    litigation here?

5    MR. COHEN: No, sir.

6    THE COURT: All right. And basically you noted that

7    you would like to address your opposition if permitted to

8    intervene?

9    MR. COHEN: Yes, sir.

10    THE COURT: Let me cut right to the core of this to

11    get to this. I spoke with Judge Orrick on the phone this

12    morning. I called him Friday. I was very impressed by the

13    fact that he called me this morning three hours ahead of time.

14    I told him there was not a District Judge in Maryland that

15    started working at 10 minutes of 7.

16    And I was very impressed because it was clearly

17    before, it's actually more like 6:30 his time, 9:30 our time.

18    Judge Orrick is of the same mind as am I. And it is as

19    follows: Nothing is going to happen in your case until after

20    this case, from my point of view, until this case is tried.

21    And this order is going to be signed, and I don't

22    need to hear from counsel. I don't need to hear from anyone.

23    It's very simple. We're very busy here. We've got loads of

24    motions, and Judge Orrick agrees with me that there's

25    absolutely no rush to your case. Your case was filed in March.

10

1    And this case before me was filed in 2010. This trial date has

2    been set for over a year and a half.

3    And Mr. Cohen, you've raised a series of issues with

4    respect to timely production of subject materials. You've

5    raised issues as to whether or not any attorney work product

6    privilege that may have attached would be waived by the sharing

7    of information during the adversarial proceeding.

8    You've raised many interesting issues, and I don't

9    have a minute to deal with them. We're very busy. And Judge

10    Orrick agrees with me that there's absolutely nothing

11    precipitous about this. There's nothing that's untimely.

12    There's no urgency.

13    So I think the way this can be dealt with is that

14    there is going to be a protective order filed, and no one's

15    going to produce anything on either side of the aisle from this

16    litigation to your litigation for a period of at least 60 days.

17    And once this trial is over, I'll certainly be glad

18    to revisit this sometime on or about October 26th. This case

19    here is scheduled to start trial on Monday September 9th, and

20    we also have the Labor Day weekend that's coming up, and we've

21    got a busy day ahead.

22    So I don't mean disrespect to any of you, and I'm not

23    ruling on the merits up or down on any of these motions. We

24    don't have time to deal with it. Judge Orrick sees no urgency

25    nor do I on this.

11

1    And there are two ways to dealing with it. I'll say

2    what's the pleasure of the plaintiffs in this case. One is

3    either to just enter a stay order on the entire matter or two

4    just to grant the protective order at this point in time with

5    the willingness of this Court, Mr. Cohen, and to the lawyers in

6    the California litigation to revisit it in some 60 days.

7    But again that, the reason I'm just saying that's an

8    approximate date, this litigation is scheduled to go for about

9    four weeks, but you never know how things drag out. I just

10    think it's probably better that I grant the protective order.

11    DuPont, Huntsman, no one's permitted to turn anything over on

12    either side of the aisle in terms of the protective order that

13    I previously entered. And we can revisit it at the end of

14    October.

15    Now, if you want to be heard any further on that Mr.

16    Cohen or Mr. Cuneo, whoever wants to be heard on it, I'm not

17    dealing with the merits. The record will reflect I'm not in

18    any way dealing with the merits of this. It's just the matter

19    of this, the pendency of this litigation in the other matters.

20    Then I'll see if anyone from Huntsman or DuPont has

21    anything to add. You can certainly come around and just -- Mr.

22    Stanley?

23    MR. STANLEY: Stanley.

24    THE COURT: Mr. Stanley, glad to have you.

25    MR. STANLEY: Thank you very much, Your Honor. I

12

1    certainly understand what the Court has said, and I know when

2    enough has been said.

3    It may be that this case will conclude earlier, and

4    if that were the case, we would hope that the Court would

5    entertain.

6    THE COURT: Sure.

7    MR. STANLEY: And it may be also that we may able to

8    work something out with our brother --

9    THE COURT: Well, I guess my point is, so it's

10    understood, if this is important enough for me to spend time on

11    it, and I've got a protective order, then nothing's going to be

12    worked out without my knowing about it, meaning the protective

13    order's been entered, and neither side is going to be handing

14    documents from this litigation to anyone else with any kind of

15    quiet understandings until I deal with it.

16    MR. STANLEY: I understand that.

17    THE COURT: That's my point. And if the case

18    suddenly miraculously, there's a bolt of lightning across the

19    sky, there's a white light and suddenly this case resolves

20    itself in two days and not four weeks, certainly you can so

21    notify me.

22    And Mr. Stanley, and I'll certainly be prepared to

23    move my calendar up in terms of when I'll reconsider the

24    matter.

25    But I think that in the abundance of caution as

13

1 opposed to just staying my decision on this, I'm inclined to

2 grant a protective order at this time without prejudice to

3 either side seeking for me to readdress it in about 60 days.

4          MR. STANLEY:  Very well.  Your Honor, I understand

5 and I appreciate your considering our letter on Friday,

6 allowing us to enter appearances.

7          THE COURT:  Sure.  I don't mean to be too quick with

8 you.  The lawyers will tell you we've got a busy day ahead.

9 We're going to have students from evidence courses around the

10 city to come and watch these debates on esoteric matters.  We

11 can all learn something from each other.

12          Anything you want to add on this, Mr. Cohen, Mr.

13 Cuneo, anything?

14          MR. CUNEO:  No, Your Honor.

15          THE COURT:  All right.  Fine.  Anything from the

16 point of view of Huntsman or DuPont on this matter?  All right.

17 Mr. Saveri, do you want to go over how you want this?  What's

18 the preference?  It's your motion.  I'm inclined to grant it

19 without prejudice to reconsider it and we can address it at a

20 later time.

21          MR. SAVERI:  That would be fine, that would in fact

22 be our preference.

23          THE COURT:  I know you've submitted paper number 506

24 a revised order granting motion for protective order,

25 preventing production of plaintiff's confidential discovery

14

1 materials and work products.  I'll take a look at this.  I'll

2 word the order probably a tad differently.  I might note

3 without prejudice to either side to raise issues that they may

4 say are addressed here.

5          MR. STANLEY:  Your Honor --

6          THE COURT:  Yes, Mr. Stanley?

7          MR. STANLEY:  But when we reach the time when we

8 would be back before the Court, since we are not parties, would

9 you prefer that we file a motion to intervene?  Would you like

10 to grant us Intervenor status at this time for limited --

11          THE COURT:  In terms of a motion to intervene, that's

12 probably the last thing I'd like for you to file.  We have

13 plenty of motions in this case, and I think the way we ought to

14 just deal with this is, that I've dealt with in the context of

15 the motion in this case, that's in this case, paper number 503

16 and a proposed order paper number 506.

17          There's no reason to intervene at this time Mr.

18 Stanley, but the record will reflect that I grant it for the

19 reasons stated on the record, and the record will be clear on

20 this, and I'll probably revise the order noting that it was

21 without prejudice.  If 60 days or sooner, if appropriate, I'll

22 word it in some fashion on those lines.

23          You're welcome to monitor this litigation, as I

24 expect you will be, anyway.

25          MR. STANLEY:  We are.

15

1          THE COURT:  I'm sure you are.  And we'll see where we

2 are on it.

3          MR. STANLEY:  The technical point is we can't file

4 pleadings on the ECF since we're not parties, so we would be

5 have to move to intervene.

6          THE COURT:  I know.  I understand.  We'll just wait

7 on this.

8          MR. STANLEY:  At a later --

9          THE COURT:  At a later point in time.  At later point

10 in time, you'll be able to do that, and then we'll address it

11 at that point in time.  Just -- and this is not -- it doesn't

12 prejudice anyone in the California litigation.

13          Judge Orrick and I had a nice chat this morning about

14 it.  He basically feels his whole case is going to wait the

15 pendency of this case.  That's his view generally.  I can't

16 speak for him, he agreed with me there was just no urgency

17 here, and the various issues that you've raised, you can

18 proceed on whatever schedule he set.

19          But he doesn't find any violence to his scheduling

20 order on this, on his case by taking this approach, and so

21 that's where we are.

22          MR. STANLEY:  I was going to suggest that you speak

23 to him.

24          THE COURT:  It's okay.  We've already done that.  We

25 don't get up quite as early in Baltimore as they do in San

16

1 Francisco.

2          Okay.  With that, thank you.  You all are welcome to

3 stay, if you like.  You're welcome to leave.  I don't think

4 there's any reason to keep counsel for Huntsman and DuPont on

5 the line any further unless there's anything else to be

6 addressed

7          UNIDENTIFIED SPEAKER:  No, we appreciate it.

8          THE COURT:  Thank you all very and, we've dealt were

9 way that matter.

10          Okay.  Thank you.

11          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12          THE COURT:  Have a nice day.

13          Hold on a second, please.

14          All right.  Now, the next matter that I'm about to

15 jump in probably -- and Mr. Ulwick thankfully notified me about

16 the people on the telephone.  We've dealt with that.

17          The order, the memorandum opinion and order that were

18 filed today, I'll summarize it, and we'll have copies for you

19 during the break this morning for everyone, it's been filed

20 electronically already this morning, is with respect to this

21 class action concerning alleged price fixing conspiracy in the

22 market for titanium dioxide, and essentially, obviously, this

23 is on the record, I entered a stay of all proceedings on August

24 6 between the plaintiffs and DuPont and Huntsman with respect

25 to the settlement agreement that has been reached there.

17

1    And then in a memorandum opinion and order I issued
2  on August 14 I denied the motions for summary judgment filed by
3  defendants Millennium and Kronos.
4    Presently pending before this Court has been the
5  defendant's motion to compel arbitration and stay proceedings,
6  a motion to dismiss for improper venue, motion to strike, and a
7  renewed motion to amend the class definition, which is paper
8  number 423.
9    The defendants, Millennium and Kronos, have argued
10 that approximately 320 members of the class are contractually
11 precluded from participating in this class action.  And they
12 seek to enforce arbitration clauses, class action, and jury
13 trial waivers, and forum selection clauses against the relevant
14 class members.
15    They've also asked this Court to amend its definition
16 of the class to exclude any titanium dioxide purchasers whose
17 contracts contain these clauses.
18    I have reviewed these submissions.  A hearing was
19 held on June 25th.  And in addition, I have reviewed the
20 supplemental memoranda regarding the impact of the DuPont and
21 Huntsman settlements.
22    For the reasons that I've stated in my memorandum
23 opinion filed today, which is some 36 pages, I'm granting the
24 defendant's motion to compel arbitration and stay proceedings,
25 motion to dismiss for improper venue, motion to strike and

18

1  renewed motion to amend the class definition.  They are all --
2  those are all being granted.
3    Just to summarize the opinion, again you can analyze
4  it later, with respect to first, the enforcement by non
5  signatory defendants under a theory of equitable estoppel,
6  essentially I have held with respect to that, for those
7  principles of equitable estoppel, the forum collection clause,
8  jury waivers and class action waivers can be enforced by the
9  non signatory defendants.
10    Furthermore, having found that those clauses can be
11 asserted, I have held that they are enforceable to all extents.
12 I have addressed the plaintiff's waiver argument, and have held
13 that the defendants have not waived their rights to enforce the
14 asserted arbitration clauses and class action waivers, and
15 their motion was timely.
16    I have addressed the mandatory arbitration provisions
17 as well and have found those to be applicable as well.  As well
18 as the forum selection clauses.  As well as the jury trial
19 waivers.
20    So I have entered an order here this morning, as well
21 as the fact that there's an amendment to the class definition,
22 I'll go over that in a second so you're aware of that before we
23 start this morning.
24    The class definition will be amended and read as
25 follows, All persons and entities who purchased titanium

19

1  dioxide in the United States directly from one or more of
2  defendants Millennium and Kronos or non parties, DuPont
3  Huntsman, or Tronox, or from any processors, parents,
4  subsidiaries, or affiliates thereof, between February 1, 2003
5  and the present, that being the class period, except those
6  persons and entities who purchased titanium dioxide in the
7  United States directly from one or more of defendants
8  Millennium and Kronos or non parties, DuPont, Huntsman, or
9  Tronox, or from any processors, parents, subsidiaries or
10 affiliates thereof during the class period pursuant to a
11 contract containing one or more of the following.
12    One, arbitration clause.
13    Two, a clause restricting the litigation of disputes
14 to courts other than the U.S. District Court for the District
15 of Maryland.
16    Three, a class action waiver clause.
17    Or four, a provision waiving the right to a jury
18 trial.
19    Also excluded in the class are defendants, their
20 co-conspirators, parent companies, processors, subsidiaries,
21 and affiliates, and all governmental entities based on this
22 amended class definition, all purchasers in the defendants'
23 exhibit 1, tables A through E, which is of record here, ECF
24 number 424-1 will be excluded from the class.
25    And then I have entered an order here today

20

1  consistent with that memorandum opinion and the order reads as
2  follows:
3    The defendants' joint motion to compel arbitration
4  and stay proceedings, motion to dismiss for improper venue,
5  motion to strike jury trial demand planned and renewed motion
6  to amend the class definition ECF number 423 as it pertains to
7  the remaining defendants Kronos and Millennium is granted.
8    Two, the class members whose titanium dioxide
9  contracts can take valid and enforceable arbitration clauses as
10 set forth in table A of defendant's exhibit 1, ECF number 424-1
11 are ordered pursuant to section 4 of the Federal Arbitration
12 Act to pursue their Sherman Act claims if at all in
13 arbitration, and their claims in this litigation are hereby
14 dismissed.
15    Three, the claims of class members whose titanium
16 dioxide contracts contain valid and enforceable forum selection
17 clauses as set forth in tables B and C of the defendants'
18 exhibit 1 are dismissed for improper venue pursuant to 12(b)(3)
19 of the Federal Rules of Civil Procedure.
20    Four, the jury trial demands of class members whose
21 titanium dioxide contracts contain valid and enforceable jury
22 trial waivers as set forth in tables C and E of defendants'
23 exhibit 1 are stricken.  And they are not members of the class
24 as now defined.
25    Five, pursuant to Rule 23(c)(1)(C) of the Federal

21

1  Rules of Civil Procedure, the class definition is amended to
2  read as follows.
3        And then I define it exactly as I have just
4  previously from my memorandum opinion.
5        Six, the joint motion to compel arbitration and stay
6  proceedings, motion to dismiss for improper venue, motion to
7  strike jury trial demands, and renewed motion to amend the
8  class definition, ECF number 423, as it pertains to the
9  settling defendants, DuPont and Huntsman, are stayed pending
10 final approval of those parties' settlement agreements.
11       And then seven, the clerk of the Court shall
12 transmit, et cetera.  And that order was filed today as well,
13 and you all will have copies of it during the break this
14 morning.
15       So with that, I think we're close to getting started
16 on the matter of the pending motions, but I still think we have
17 to deal with another preliminary matter, and that is the issue
18 of jury questionnaires that has been raised and voir dire
19 questions and what have you.
20       So with that, any questions?
21       MR. SANDLER:  Yes, I have two questions.
22       THE COURT:  Sure.
23       MR. SANDLER:  First, following the motions hearing,
24 it is our understanding we're going to have a pretrial
25 conference?

22

1        THE COURT:  Yes.
2        MR. SANDLER:  Is it is possible to take up the
3  questionnaire during the conference or is there --
4        THE COURT:  We'll do it now.  Here's the reason.  The
5  questionnaire's not going to be possible.
6        MR. SANDLER:  Okay.
7        THE COURT:  I mean, this Court's closing Thursday and
8  Friday of this week.  We've got word from the clerk's office
9  that there's a five-week criminal trial that is going to start
10 the same Monday, September 9th.
11       We just can't do it.  And in terms of some suggestion
12 that the jurors arrive and start filling out questionnaires
13 from the logistics, it's not a matter of law on this, it's a
14 matter of just mechanics.
15       You have all been very busy.  We've had a lot of
16 issues we've dealt with.  Perhaps I would have anticipated if
17 the lawyers wanted to consider that, I'm not adverse to it at
18 all.  It's just we can't make it work from the point of view of
19 the clerk's office.  Their view was they needed it far earlier.
20       Then the alternative suggestion perhaps they fill out
21 the questionnaire when they arrive in the morning, it's not
22 doable.  We have three days this week.  Court's closed Thursday
23 and Friday because of the Baltimore Grand Prix, Saturday,
24 Sunday, and Labor Day Monday, and four days next week, the word
25 I get from the check's office is we can't do it.

23

1        So Mr. Ulwick, I'll be glad to hear from you.
2  Nobody's at fault on it.
3        MR. ULWICK:  Understood.
4        THE COURT:  Mechanically, they can't get it done.
5        MR. ULWICK:  We were thinking, Mr. Sandler and I
6  actually talked about this on Friday, and our thought was to
7  see whether or not if we worked with the clerk's office, would
8  it be possible to have it filled out in the morning?
9        Here's my suggestion.  We both think that if the
10 questionnaire is used, it will actually streamline and shorten
11 the voir dire process.  And I am absolutely positively sure
12 that we will have some issues that we will have to deal with on
13 that morning.
14       And so while the Court is dealing with those issues,
15 jurors can fill out the questionnaires, they can be copied and
16 distributed to counsel.
17       We have just a short period of time to review them.
18 I think it will be very useful, I think it would streamline the
19 process.
20       THE COURT:  Well, I guess the point is that just goes
21 to mechanically on this, then I'll hear from you, Mr. Saveri,
22 in a minute.
23       Mechanically, the jurors arrive, Bob I think we've
24 got Monday September 9th how many trials are scheduled here?
25 I think Judge Bredar's.

24

1        THE CLERK:  Judge Bredar's the only one I can think
2  of.
3        THE COURT:  He's got a five-week criminal trial, I've
4  got -- this is a four week civil trial.  Judge Bredar's case is
5  at least a four or five week criminal trial.  And then I think
6  the Court Reporter, Miss Sovich, is correct.  I think we've got
7  like three other jury trials now scheduled.  I'm not sure how
8  mechanically we're going to do this in terms of who will be
9  filling out the questionnaires.
10       And I mean, the reality is, I can't see us having
11 every juror that walks in filling in these questionnaires.
12 Some of them are going to be divided heading off to the
13 criminal courtrooms.
14       MR. ULWICK:  Certainly we can't have everybody do it,
15 that would be ridiculous.  The way it's usually done here, I
16 believe, is the criminal cases get a right of way so those,
17 they get sent to the jurors first.
18       THE COURT:  I'll be honest, I haven't gone through
19 this yet, but I've given this case great priority.  I'm not
20 inclined to have you wait around until criminal jury trials are
21 selected.  I'm not.
22       MR. ULWICK:  Then if we have those 60 jurors that you
23 said you were getting to set aside for our panel, you're
24 talking about a questionnaire that is -- I forget how long it
25 is, I think it's six or seven pages long.  It's not going to

25

1  take that long to fill it out.  It really isn't.

2          And if we are going to be individually talking to

3  jurors at the bench, Judge, we'll be spending more time, I

4  think in the long run.

5          MR. SAVERI:  Your Honor --

6          THE COURT:  Yes, Mr. Saveri?

7          MR. SAVERI:  I completely agree with what Mr. Ulwick

8  just said.  We believe that the jury questionnaires are going

9  to be a very useful device.

10         THE COURT:  I have no doubt about that.

11         MR. SAVERI:  If there could be some way of devoting

12  some time that morning to that process, I think we'll both

13  benefit.

14         So, from our perspective, we completely agree with

15  what Mr. Ulwick said.  We'd like to do what we can to make that

16  happen.

17         THE COURT:  Well, let me throw a thought out here,

18  maybe, and this is a little bit unique, I've not done this

19  before, maybe what we can do is, we're going to pick 10 jurors

20  for this civil case observing -- the informal rule that I've

21  utilized, Mr. Ulwick noted he's utilized, allow the

22  potentiality of one juror a week falling off.  So we'd still

23  have six in the worst case scenario by the end of a four-week

24  trial.

25         We're thinking about bringing in a total panel of 60,

26

1  as I recall.  Is that agreeable from the point of view of the

2  plaintiff, total group of 60?

3          MR. SANDLER:  Yes, Your Honor.  But we did want to

4  revisit that at the pretrial conference the number on the jury.

5          THE COURT:  I can't -- well, what is it that you

6  prefer?

7          MR. SANDLER:  Well, what we were -- when we spoke to

8  you on the phone, we recognize that everyone seemed to be set

9  on that.  Then we talked among ourselves, and we thought that

10  maybe 10 -- it wasn't clear, although the rules are somewhat

11  conflicting whether all ten are going to deliberate.

12         THE COURT:  The rule is under the civil rules, which

13  I always do in a civil case, all the jurors on the jury panel

14  deliberate.  And as long as we have the minimum of six, or if

15  somebody falls off, we're not going to have any alternates.

16         MR. SANDLER:  This may sound peculiar, we want to try

17  the case and do a great job one time.  We really don't want a

18  hung jury.  We thought the fewer, the better.  That ten -- we

19  don't think the trial will go four weeks.  We think it's going

20  to move much faster, particularly with the way you will have us

21  move.  And we don't think that we need that many alternates.

22  We think that eight would be sufficient.

23         THE COURT:  Let's just cut to the core of this now.

24  We have so many things to discuss.  I'm going to stick with the

25  number ten.  I have always felt, you never know, and I think

27

1  it's just a safe rule to follow.

2          Generally, in a week or two weeks civil jury trial, I

3  have had jurors, and I have not had a situation where two have

4  to leave for any reason, but I think it's a safe call just to

5  have ten jurors, given we've got to deal with the other issues,

6  try to get the questionnaire now.

7          So if we have ten jurors, you're essentially agreeing

8  we're going to bring in 60 panel members.

9          Is that agreeable, from the point of view of the

10  plaintiffs?

11         MR. SAVERI:  Yes, we think that's appropriate.

12         THE COURT:  60 people.  Now, maybe what I can do is,

13  I can seek to have -- make an effort to have the 60 jurors

14  designated just for this case.  And clearly, those 60 would not

15  be pulled out for review by the criminal jury trial.

16         And in all candor, that serves my purposes as well,

17  because this case is not taking back seat to any other case, as

18  you all may have heard me remark on other occasions, both

19  officially and non officially, I'm pretty much of the mind the

20  civil bar is entitled to have their day in court and not have

21  to constantly yield to the criminal docket.  So I'm not

22  inclined to have this case sit and wait for the criminal trials

23  to resolve who's going to be selected.

24         And so this does actually serve my purpose of having

25  60 people who are brought in here who are going to be on this

28

1  case.

2          We can do that, can't we?

3          THE CLERK:  I'll make sure.

4          THE COURT:  I think we can do this.  Maybe we can

5  make this work.  The clerk's office is saying there isn't, but

6  maybe it can work this way, that we have 60 people designated

7  for this trial, and those 60 people arrive, and they then fill

8  out a questionnaire, which given the efforts we're making on

9  this side, I know the lawyers are all going to agree upon the

10  wording of the questionnaire without any great legal debates

11  that are going to go on.

12         And we can also try to -- is this is attachment A, I

13  think Bob?  A or B.  I've got one myself up here.

14         THE CLERK:  A, Judge.

15         THE COURT:  Hold on a second.  Yeah, it's exhibit A

16  to paper 504-1.  We could have them fill out the agreed

17  questionnaire, and I don't think it should take more than about

18  20 minutes or 25 minutes for them to do so.

19         MR. ULWICK:  I agree.

20         MR. SAVERI:  Your Honor, excuse me.  Your Honor,

21  we've actually gone through it with some people in our office

22  just to get validation to that.  We think it can actually done

23  pretty quickly if not more --

24         THE COURT:  Their philosophic bent might be a tad

25  different.  And I wouldn't want them to testify, but the

29

1 philosophic bent might be different.

2          (Laughter)

3          MR. SAVERI: We just wanted to make sure to see how

4 long it would take.

5          THE COURT: That's quite all right. So let's say

6 that.

7          MR. SAVERI: Your Honor, if you knew my sister, you

8 would not have said what you just said.

9          THE COURT: All right. And we could have them come

10 up here to the courtroom. And we could -- well, I don't know,

11 we actually exercise -- I'm trying go through the mechanics, we

12 wouldn't necessarily exercise strikes.

13          You would have the information and then we would

14 conduct the voir dire. You've got the answers from the voir

15 dire in the courtroom as well as the jury questionnaires, and

16 we go from there.

17          Although I do think that the way I normally do it is

18 that I get to the series of questions, this may be a quarter or

19 third of the questions, there are personal answers to their

20 questions. And they stand if they have an affirmative response

21 to any of them, I line them up and they come up here to the

22 bench, and they give rather personal answers to some of these

23 questions.

24          And at that time, if there's a motion to strike,

25 either I will strike on the Court's motion or either side can

30

1 make a motion to that strike. And you know right then and

2 there, either they are or are not stricken for cause.

3          I guess what I can envision is, we can have them fill

4 out the questionnaires, have maybe 20 minutes to look at the

5 questionnaires and note which ones you want to strike for cause

6 right away, and we will deal with that.

7          And let's say hypothetically the plaintiff feels four

8 of them should be stricken for cause right anyway, the defense

9 has two or three, we may ultimately bring 51 people in the

10 courtroom, nine of whom they've already been told thank you

11 very much, you may go home. And then we have 51 jurors and off

12 we go.

13          I mean, I don't know how it would play out. But that

14 seems to me to be the way we could do that. That sounds

15 workable to both the plaintiff, Mr. Saveri, and the defense?

16          MR. ULWICK: Yes.

17          MR. SAVERI: Yes. We made progress. We were getting

18 word from -- the whole thing seems to be predicated on the

19 matter of having the 60 people be designated for this trial.

20          THE CLERK: Judge, I just spoke with the jury

21 department, there's a total of six trials, five criminal and

22 this civil case, and it may be we'd have to work it out

23 logistically because there's so many jurors in the assembly

24 room already, we'd have to find them a place to fill out the

25 questionnaire.

31

1          THE COURT: It occurs to me that might make it easier

2 for the clerk's office, because the 60 jurors will be pulled

3 out from the mass of all of them, I'd be willing to bet some of

4 those other trials will be resolved. I don't know about Judge

5 Bredar's case, but this civil and five criminal.

6          THE CLERK: That's right, Judge.

7          THE COURT: Some criminal will work out, no doubt.

8 Based on national statistics, the odds are pretty good.

9          All right. Then we'll do that. So then the first

10 step is here before we get to our motions in limine is we have

11 the exhibit A, which is the juror questionnaire. And it is --

12          MR. SAVERI: Your Honor, there were a couple of

13 versions of that. The last document I have is 505-1, which was

14 filed on --

15          THE COURT: I've got 505-1 in my hand here.

16          MR. SAVERI: Okay.

17          THE COURT: Here's what I think would be productive,

18 so we can get to that these motions in limine, and then can

19 deal with the pretrial conference.

20          There are a total of 33 questions with some 9 or 10

21 pages and then attachments of witnesses and companies and

22 organizations.

23          It seems to me that we could perhaps have the hope

24 that you all can agree upon these questions, and I don't know

25 if that's the case yet or not as to exhibit A.

32

1          MR. ULWICK: No, they are agreed.

2          THE COURT: They are totally agreed?

3          MR. SAVERI: There were some other questions we had

4 disputes about.

5          MR. ULWICK: You said --

6          THE COURT: I don't want, you know --

7          MR. SAVERI: 505-1 presents an agreement between --

8          THE COURT: That's fine. All right. Then we will do

9 this. We'll cross T's and dot I's later. We will do 505-1,

10 the jury questionnaire. We will do this. And we will

11 designate specifically 60 jurors.

12          And I thank the clerk's office for its flexibility.

13 Jackie, thank you for walking us through this. We will do

14 that, and we'll have them be notified.

15          Of course, then again in terms of the notification,

16 I'm not inclined to have us debate how the class -- we're going

17 to go over the matter of what I normally do in terms of after

18 the voir dire, as you'll learn at the pretrial conference, I

19 usually have preliminary instructions where I just summarize

20 what the case is about. And it's a very neutered language or a

21 paragraph or two.

22          This is the contention of the plaintiffs. This is

23 the position of the defendants, they deny the allegations, and

24 I just summarize what the case is about.

25          And what I do in some other cases, I mean, for

33

1  example, in a medical malpractice case, I'll basically say my
2  instructions will apply at the end, basically the elements of
3  medical malpractice is X and I have a very short version, and
4  then I will tell them to the extent my thorough instructions at
5  the end of the day are at variance with these instructions,
6  it's my instructions at the end of the case that control.
7          But I just find it useful to do that with jurors.
8  And for out-of-town counsel, our local rules do not permit the
9  lawyers to speak with jurors after a jury trial.  So what some
10 of us do on the bench, we always talk to the jurors after a
11 jury trial and give feedback to the lawyers.  So I always talk
12 to juries after criminal and civil cases.
13         And I will tell you their feedback is always very
14 positive on this approach.  They like the here's what the case
15 is about, here's what the elements are, so they have some feel
16 for why the lawyers are putting certain items of evidence, it
17 gives them a general framework.
18         The reason I mention that now, I'm not inclined to
19 try to do that when we tell them they're designated for this
20 trial, but I expect we'll have a discussion about that.  I kind
21 of want to get on this pretty quickly.
22         For the purposes of the clerk's office, you're
23 looking at seven work days.  I'm going to have 60 jurors be
24 designated, but there's not going to be any description of the
25 case.  It's just going to be they're being called to jury

34

1  service in the case of In Re Titanium Dioxide Antitrust
2  Litigation.  It's a civil jury trial starting Monday, September
3  9, and they're being called for service on that case.
4          Agreeable to the plaintiff?
5          MR. SAVERI:  Yes, Your Honor.
6          THE COURT:  Agreeable to the defense?
7          MR. ULWICK:  Yes, sir.
8          THE COURT:  There won't be a description of the case.
9  We'll tell them that's what they're being called for.  They'll
10 know when they arrive, we'll go over the mechanics of where
11 they go.  They all watch a video anyway when they first arrive.
12 And they'll all be in -- we'll figure this out, and we'll find
13 another room somewhere to take them, and we'll have them do the
14 questionnaires.
15         All right.  Well, thank you for working this out with
16 us, and I think that we've got that covered.
17         MR. SAVERI:  Thank you, Your Honor.
18         MR. SANDLER:  Your Honor, the second question I had,
19 would it be imposing too much if we took a three-minute recess?
20 You asked if there were any questions, after you summarized
21 your order, I received notes from each one of my co-counsel to
22 ask for a recess so that we could at least ask the questions
23 that we wanted to ask you.
24         THE COURT:  It's a little early to file a motion for
25 reconsideration, Mr. Sandler.

35

1          (Laughter)
2          MR. SANDLER:  Well, Your Honor, we have to talk just
3  for three minutes.
4          THE COURT:  I can imagine.  I can imagine.
5          Well, fine.  We can do that in a second here.  Wait a
6  minute.
7          Where I am now on my agenda is, I've got motions in
8  limine filed by -- I had some 31 motions in limine filed by the
9  plaintiffs, and the defendants have essentially noted some
10 potential areas of agreement as to six of the 31, and there are
11 25 that are of issue that I've got to deal with those.
12         And then I have defendants' joint motions in limine
13 concerning damages, "alleged spoliation of evidence regarding
14 co-conspirators," end of quote.
15         The series of defense motions as well, I don't have
16 them quite specifically numbered.  So we have a fair number of
17 things to go over.  That's all I have left on my agenda.
18 That's what we're doing today.  And then we'll have a pretrial
19 conference.
20         Is that correct from the point of view of the
21 Plaintiffs?
22         MR. SANDLER:  Yes, Your Honor.
23         THE COURT:  Correct from the point of view of the
24 defense?
25         MR. ULWICK:  I rise to let you know if we're going to

36

1  break, we might want to give this to you first.  We did reach a
2  stipulation as to a number of them.  I have them in written
3  form.
4          THE COURT:  Why don't -- I've already got my notes up
5  here.  Do you want to give those to the clerk?  I'll look at
6  those during the break.  I've never been able to have -- quite
7  frankly, if we had a three-minute recess, that would be
8  shortest recess I've ever had.
9          MR. SANDLER:  It's a Baltimore trial lawyer's three
10 minutes compared to a New York minute.
11         THE COURT:  In terms -- and in terms of billable
12 hours you mean 20 I guess?
13         MR. SANDLER:  50.
14         THE COURT:  All right.  Anyway, why we don't take a
15 10 or 15 minute recess, and we'll get started at about 11:30
16 and go until 1:00, break for lunch, and then we'll have the
17 trial continue.
18         I'll start talking to the clerk about the matter of
19 these jury questionnaires.  All right.
20         (Recess.)
21         THE COURT:  Counsel, with that, we're ready to
22 continue here.
23         I've looked at the stipulations, and I guess the best
24 way to do this I think -- well, actually, first of all, let me
25 tell you we've been able to work out the matter of the jury

37

1  questionnaire.  All the people who received notices of
2  potential jury duty for the week of September 9th were already
3  advised that there was a four-week trial among those on the
4  agenda and were to indicate if they had difficulty.
5       So we believe we've gotten reasonably good feedback
6  on people who would have any kind of time issue with a trial of
7  that length.
8       All systems are go.  We agreed upon the particular
9  questionnaire, and that will be given to jurors when they
10  arrive, and they'll fill it out.  So we'll go from there.
11      The stipulations regarding the motions in limine, my
12  view is that we probably can weave these into the list of
13  motions I've already prepared to address in terms of trying to
14  go through the numbers here.
15      And so as these issues arise, if there's been a
16  resolution, then we'll deal with it in that fashion.
17      What I propose do is first we have -- obviously, I'm
18  sure this is not an issue, I'm just verifying so we're clear on
19  this, that each side will have three strikes under 28 USC,
20  Section 1870.  There's three peremptory challenges on either
21  side.  There's no dispute from the point of view plaintiffs on
22  that, correct?
23      MR. SANDLER:  That's fine.
24      THE COURT:  All right.  No dispute from the point of
25  view of the defendants?

38

1       MR. ULWICK:  No.
2       THE COURT:  Okay.  All right.  That's each side
3  jointly together, and there will be three strikes on each side.
4       With respect to the motions here, let me just start
5  with the fact that there are essentially about 31 motions filed
6  by the plaintiff, motions in limine filed by the plaintiff.
7       It's my understanding that with respect to the first
8  motion to exclude witnesses except for one party representative
9  from the courtroom unless they are testifying, it's essentially
10  the sequestration rule under 615 under Federal Rules of
11  Evidence.  The plaintiffs so move and defendants agree, that
12  the defendants accept, the only exception has been that the
13  defendants agree, but don't see any need to exclude witnesses
14  who have completed their testimony.
15      Is that a fair response from the point of view -- am
16  I correct about that from the point of view of the defendants?
17      MR. WATTS:  Yes, it is.
18      THE COURT:  Thank you, Mr. Watts, correct, yes.
19      MR. WATTS:  Yes, Your Honor.
20      THE COURT:  All right.  Thank you.
21      My general preference on that is, you never know how
22  things play out in a trial and suddenly there's some dispute of
23  someone who wants to put in rebuttal or surrebuttal, I think
24  it's a safer practice, I prefer whoever's been excluded, they
25  remain excluded.  We thank them very much.  They're instructed

39

1  not to discuss their testimony and they leave.
2       Because you never know what happens, the notion of
3  them being able to stay after they testify, it sounds good, but
4  sometimes it just doesn't work out.  So I think in an abundance
5  of caution, unless there's a strong reason defendants want to
6  be heard on this, I'm inclined to grant, that issue is fine,
7  and once the person testifies, they leave the courtroom.
8       Is that fine from the point of view of the
9  plaintiffs?
10      MR. SAVERI:  Yes.
11      THE COURT:  From the defense?
12      MR. WATTS:  Yes.
13      THE COURT:  So that one's been resolved, and they'll
14  not be permitted to come back in.
15      All right.  At the next one is plaintiffs' exhibit --
16  I'm sorry.  Or plaintiffs' requested motion in limine number 9,
17  which is to exclude references to and evidence regarding the
18  ability of plaintiffs and class members to pass-through damages
19  or to any alleged benefits to class plaintiffs from the alleged
20  price fixing.
21      According to my review, the parties agree no evidence
22  of pass-through damages to downstream purchasers should be
23  introduced with regard to the plaintiffs or the defendants.
24  There's agreement on that.
25      Is that correct from the point of view, Mr. Glackin?

40

1       MR. GLACKIN:  Yes, Your Honor.  I think that's
2  correct.  I mean, maybe the defendants should speak to the
3  limitation they put in their -- I mean, our position is that
4  there should be no evidence of any kind.
5       THE COURT:  Pass-through.
6       MR. GLACKIN:  Of pass-through of our clients' sales,
7  of any increases in prices that they gave to their customers,
8  anything like that at all, it's all off the table.
9       THE COURT:  All right.  Mr. Cooper, do you want to
10  address this?
11      MR. COOPER:  Yes, thank you, Your Honor.
12      THE COURT:  I thought I understood that you're not
13  opposing that, but maybe if I'm wrong.
14      MR. COOPER:  I don't think there was a stipulation,
15  there was not a stipulation on that issue.
16      THE COURT:  Okay.
17      MR. COOPER:  Your Honor --
18      THE COURT:  I'll be glad to hear from you.
19      MR. COOPER:  We're not opposing sort of the Hanover
20  Shoe rule that is not a limitation on damages or defense
21  argument that damages are reduced by the amount that the
22  plaintiff passed on to its own customers.
23      We're not -- we don't have a dispute about that.
24      Where we do have a dispute, I think was Mr. Glackin
25  saying all evidence with regard to the plaintiffs' ability to

41

1  pass on or any evidence regarding whether it was passing on

2  price increases.

3          And we do have a dispute there because that evidence

4  is relevant for liability, and there will be evidence in the

5  case that our clients deliberated with respect to their price

6  increase announcements and the implementation of those price

7  increases.

8          And one of the considerations was where were their

9  customers and their ability to raise their own prices, because

10 we knew that we would have a harder time raising prices if our

11 customers couldn't in turn pass on.

12         And that goes to liability.  That's not excluded by

13 Hanover Shoe.

14         Also, there will be evidence at trial that one of the

15 reasons the announcement, price increase announcements are made

16 is that customers would use them with their own customers to

17 show that their costs were going up.

18         And that, too, is relevant on liability, not covered

19 by Hanover Shoe.  And so Your Honor should not grant the motion

20 to the extent it seeks to exclude that liability evidence.

21         THE COURT:  Exactly what -- you need to just bring me

22 up to speed a little bit, Mr. Cooper, here on the matter of the

23 distinction between the damages evidence and the liability

24 evidence.

25         Clearly, in terms from the damages point of view,

42

1  you're not seeking -- it's irrelevant from a damages point of

2  view, correct?

3          MR. COOPER:  That's right.  There's a Supreme Court

4  case, Hanover Shoe, and the Supreme Court -- in that case, the

5  defendant wanted -- one of the defenses was --

6          THE COURT:  They passed through the cost to others

7  anyway?

8          MR. COOPER:  If the overcharge was a hundred dollars,

9  I can't come in and say but you passed on $50 to your customer

10 so therefore the damages in this case are only $50.

11         And the Supreme Court in Hanover Shoe says that's not

12 a defense, and you can't put in that evidence.

13         And we're not -- that was my point.  We're not going

14 to be trying to make a showing that the plaintiffs passed on X

15 percent of --

16         THE COURT:  You're saying that it's irrelevant from

17 the point of view of damages?

18         MR. COOPER:  Right.

19         THE COURT:  Damages on that case.

20         What is the relevance with respect to liability?  I'm

21 not sure I understand you.

22         MR. COOPER:  Okay.  I was given two -- first of all,

23 there is no rule that says we can't put in evidence that may

24 bear on in some respects passes on with respect to liability,

25 just as a basic matter.

43

1          And then in this case, I was giving the example of

2  two particular types of liability evidence that we expect will

3  come out at trial that are, we think, admissible.

4          One of those would be evidence that when we were

5  thinking about how much we could charge our customers.  One of

6  the things that we thought about and is reflected in the

7  documents there will be evidence on this at trial, is where

8  were our customers' position the vis-a-vis their customers.  In

9  other words, their ability to raise their own prices.  Okay?

10         So one of the issues in the case is going to be about

11 whether there was thinking by the defendants with respect to

12 their price changes, as I think Your Honor's aware from the

13 summary judgment.

14         And so we're entitled to put in evidence about what

15 our thought process was with respect to price changes.  And one

16 of those things will be, you know, for example, if I'm going to

17 raise a price to a company like Behr, which makes paint that it

18 sells to Home Depot where they are in their contract with Home

19 Depot is relevant to my ability to change my price to them.

20 We'll hear evidence of --

21         THE COURT:  Correct me if I'm wrong, then, your point

22 is that to the extent that the plaintiffs are contending that

23 these price increases are just pretextural from the point of

24 view of covering up the alleged price fixing conspiracy, you

25 would seek to be able to offer evidence showing that it's not

44

1  pretextural in terms of the reasons that prices were raised not

2  on the issue of damages, but in terms of your liability in

3  response to an allegation of the alleged price fixing and the

4  alleged pretext, essentially?

5          MR. COOPER:  That's certainly part of it.  I don't

6  want to say that because --

7          THE COURT:  That's one of the rationales?

8          MR. COOPER:  Exactly.  Pretext may only be one of the

9  arguments.  We want to be able to show our own client's

10 deliberation and explanations with respect to price changes and

11 with respect to our behavior.

12         So another issue in the case is, well, why do you

13 make a price increase announcement?  One of the reasons that

14 you're going to hear at trial, Your Honor, is because our

15 customers like to use those announcements with their customers

16 so they can go into Home Depot and say my costs are rising and

17 I not just making it up, here's an announcement from my

18 titanium dioxide.

19         THE COURT:  Mr. Glackin, do you want to address this?

20         MR. GLACKIN:  Yes, I would, Your Honor.  Thank you.

21         THE COURT:  It seems to me some of this can be

22 addressed from the point of view of a limiting instruction.

23 It's clearly not relevant from the point of view of the

24 damages, but to the extent that your client's position is that

25 this was pretextural, which certainly is an argument you all

45

1  can make in terms of the allegation of price fixing, that's in
2  response to the defendants in terms of what their thought
3  process was.
4        MR. GLACKIN:  So I want to address both points Mr.
5  Cooper made.  On the issue of pretext, I guess I will say first
6  of all with respect to both points, this is a -- this is an
7  issue that has the potential to wreak an immense amount of
8  havoc, because there is -- regardless of whatever limiting
9  instruction the jury gets, they're going to hear evidence, and
10 the evidence is going say things like we know that if it's
11 about the defendants' deliberations, it's going to be we know
12 that our customers have room to increase their prices
13 downstream by five percent so they're going to be able to pass
14 on this price increase that we're going to announce.
15       And that is -- and then on the other point, they're
16 going see, and this is -- this has the real capacity to wreak
17 mischief, the defendants want to introduce dozens of price
18 increase announcements, letters that Haley Paint sent to its
19 customers saying that, hey, our price of titanium dioxide is
20 going up.  We've gotten the price announcement that the price
21 is going up.  So we're afraid we're going to have to increase
22 your price for paint by three percent or four percent.
23       So it's going to be that kind of specific information
24 that is going to invite the jury on its own to think about this
25 issue, and to speculate, you know, well, jeez is it really fair

46

1  for these plaintiffs to get this damage award?
2        THE COURT:  Why would they speculate on this?  If --
3  I mean, I have areas of the law many times where I give
4  limiting instructions to the jury and I find the jurors listen
5  to me.
6        Why could there not just be a limiting instruction to
7  say ladies and gentlemen, with respect to this issue, it's not
8  a matter of damages.  It's strictly a matter of the liability
9  issues between the parties.  We can work out the wording of a
10 limiting instruction.  I can do it right in the midst of trial.
11       MR. GLACKIN:  Well, I guess I'd say two things about
12 that, Your Honor.  One is that this is an area of the law where
13 we will freely admit that the policy decision of the Supreme
14 Court about where to locate the Sherman Act claim goes a little
15 bit against the grain of common sense.
16       I mean, the idea of pass-on is common sensical, and
17 it makes sense to juries.  It makes sense to people that if the
18 seller's price -- if the upstream manufacturer's price is going
19 up, they're familiar with the idea of a retailer marking that
20 up.
21       And so it's a natural thing for them to think.  And I
22 have seen them, I've seen them do it in other cases.  I've seen
23 them do it in other mock juries, they turn to this immediately.
24 And they think about it.  Sometimes it's the first thing they
25 think about.  So to us, this is an issue that really has the

47

1  potential to do a lot of damage.
2        And it's simply -- you know, there are a lot of ways
3  to handle this.  I mean, the defendants want to show evidence
4  that they're deliberating.  They're going get in, if they want,
5  piles of evidence how long they talked to each other, about all
6  their discuss, about their increasing cost of energy, various
7  e-mails they exchanged, business plans they put up.  There's no
8  need.
9        I mean, the idea they can't make this deliberation
10 article without telling the jury that we had the ability to
11 pass on the price increase, it doesn't make any sense.  This is
12 a tiny part of that affirmative defense, or that defense
13 argument.
14       The same thing with respect to our customer -- the
15 fact that the class members made price increase announcements
16 themselves, and maybe they appreciated getting the
17 announcements.
18       Well, first of all, I know that the class
19 representatives have already admitted in deposition that it was
20 useful to them to have the price increase announcements from
21 the defendants in advance, to get advanced notice of price
22 increases.  They can get that fact in without having to put our
23 the our client's own price increase announcements.  That's an
24 admitted fact.
25       If they don't know where the deposition testimony is,

48

1  I'd be happy to point it to them.  So again it is not necessary
2  for them to put in our clients's announcements downstream to
3  establish the point that it was useful to our clients to get
4  advanced notice of a price increase, A, because it's admitted.
5        And, B, because the logical connection there is very
6  tenuous.  I mean, why does it really help that defense, right,
7  to show the jury a price increase announcements from Haley
8  Paint, where Haley Paint is telling its customers that it's
9  going to increase its prices by three percent because of a
10 price increase that's being announced by the defendants?
11       THE COURT:  Well, again, I don't have all the
12 documents in front of me, but presumably, to the extent that
13 Haley Paint has announcements with respect to various market
14 conditions and various market factors, totally independent of
15 titanium dioxide, and the defendants are arguing that certain
16 industry factors came into play that caused them from their
17 point of view to increase prices as a defense to an allegation
18 of price fixing, given they're not going to be permitted to
19 argue from a point of view of damages and are not going to be
20 permitted under the Hanover principles to suggest there aren't
21 damages because they're just passed downstream, the defendants
22 don't suggest they're going to be permitted do that.
23       Do you, Mr. Cooper?
24       MR. COOPER:  I do not.
25       THE COURT:  Believe me, I'm not going to let them.

49

1  So the line-up is as to this, I don't see where we narrow the
2  playing field here.  It's -- to me, I'm certainly willing to
3  give a cautionary instruction, if necessary, on it.
4          You're basically seeking to exclude this under Rule
5  403, whatever probative value there is, is outweighed by
6  prejudice, right?
7          MR. GLACKIN:  Yes.  I would say that it's 403, but
8  403 along side this strong public policy rule that has been in
9  place for decades about where the Sherman Act claim is located
10 and by about the relevance of is this evidence.
11         I guess 403 is the entry point in the Rules of
12 Evidence, but there is a strong Supreme Court authority.  I can
13 just -- I would like to just make one more point, with respect
14 to what Your Honor just said about industry conditions, I mean,
15 it seems to me that there's a certain circularity to saying
16 that when our clients tell their customers the titanium dioxide
17 pricing is going up, because they're being told by the titanium
18 dioxide manufacturers that energy costs are going on, there's a
19 certain circularity to saying that should be an admission by
20 our clients that the energy pricing is going up was the cause
21 of the titanium dioxide price increases.
22         I mean, they're just repeating what they're being
23 told by the manufacturers.
24         This isn't some independent knowledge by them of
25 industry conditions.

50

1          THE COURT:  I know that's what your argument is, I
2  don't know whether that's the case or not.
3          I mean, you know, it's hard to deal with this in a
4  vacuum, but I don't know that's the case.  It may be that your
5  clients have statements to their customers with respect to
6  increasing costs of titanium dioxide.  It may be they have
7  different announcements as to market factors, supply and demand
8  factors.  Shipping costs.  I don't know.
9          But it seems to me to grant a motion in limine with
10 respect to curtailing that introduction of evidence, I feel
11 pretty confident and comfortable we can make sure it's
12 presented in the context in which it should be, and you're
13 clearly going to -- if you want to have a limiting instruction
14 when that kind of evidence comes in, I'll certainly be glad to
15 entertain it.
16         I'm not the least bit reluctant to give a limiting
17 instruction at the time it comes in and flat out tell them this
18 is not a matter of damages, and it is not a defense to allege
19 that you can just pass through the damages to downstream
20 purchasers.  That's not the context at all.  It's in the
21 context of rationale.
22         And so as to that, I pulled some of these I thought
23 we had agreement on but we don't.  I was going to do these in
24 numerical order.  We'll see if we have agreement or not.
25         As to number one of plaintiffs motion in limine,

51

1  number one has been granted.
2          Number nine, I don't see any basis for it, I'll deny
3  number nine.
4          Yes, Mr. Cooper?
5          MR. COOPER:  Thank you, Your Honor.
6          THE COURT:  Keeping ahead of that.
7          MR. GLACKIN:  I don't intend to continue to argue, if
8  there's specific items of evidence, can we renew our objection?
9          THE COURT:  You can certainly note.  If I think it's
10 close, I'm willing to revisit it, but the purpose of this
11 motions hearing is to be able to move this trial along.
12         And just so the record is clear, every motion in
13 limine filed by either side is a matter of record, preserved on
14 the record.  You do not need to renew it at trial.
15         Nor are you prejudiced on this issue, for example,
16 with respect to any appeal if necessary for your clients on
17 this question.  So you preserve it.  You don't need to renew it
18 at trial.  But I'm not inclined to keep going back on these
19 rulings.
20         But as far as I'm concerned, that the defendants
21 understand the context in which they can introduce it, I'm
22 going to be very cautious about the matter of having to step
23 into the area of damages, but for those reasons as best I can
24 articulate in the vacuum in which it presents itself, I'm going
25 to deny the motion in limine number nine, which is filed here

52

1  under seal.
2          All right.  Now, the next one I thought we had some
3  agreement on, but maybe I'm wrong was, the next one is
4  plaintiffs' motion in limine 11, with respect to excluding
5  references to terms or amounts of plaintiffs' settlement with
6  Huntsman, before -- and DuPont for that matter, I gather,
7  before trial.
8          And the defendants I understood everyone agrees there
9  should be no reference to the terms or settlement with Huntsman
10 or DuPont.
11         The defendants argue however, if a Huntsman or DuPont
12 witness testifies, that settlement evidence may be relevant to
13 impeach such a witness.
14         Mr. Saveri, do you want to be heard on this?
15         MR. SAVERI:  I believe --
16         THE COURT:  Is that one of the ones?
17         MR. COGGINS:  Yes, Your Honor.
18         MR. SAVERI:  It's paragraph 7 of the proposed
19 stipulations.
20         MR. SAVERI:  And there was an agreement on the in
21 limine motion, and we also have a proposed instruction on the
22 issue.
23         THE COURT:  All right.  Yes, I see.  That's fine, on
24 that stipulation, and essentially it will be granted.
25         Have those stipulations been filed yet?

**53**

1    MS. VICKERS: No, Your Honor.

2    THE COURT: Miss Vickers, make sure you file, though,

3 because I need to have an ECF reference number. I'll note here

4 now for today's purposes, that motion in limine is being

5 granted.

6    MR. ULWICK: Your Honor, should it be denied as moot

7 in light of the stipulation?

8    THE COURT: I'm going to grant it. I'm not going to

9 be permitting references to settlements with these two to be

10 introduced.

11    MR. ULWICK: I understand that. But to the extent

12 any of these stipulations are in any way different than the

13 actual language of the motion, we can get some confusion.

14    THE COURT: We can say that it's moot by stipulation.

15    MR. ULWICK: All right. Thank you.

16    THE COURT: All right. Then the next one that I had,

17 I thought there was some agreement is the motions, motion in

18 limine, plaintiffs motion in limine number 12.

19    MR. COGGINS: I don't believe so, Your Honor.

20    THE COURT: Hold on a second. Which is to exclude

21 references to a lack of Department of Justice criminal

22 investigation or related facts. And as to that, Miss Chan, do

23 you want to address that? Am I pronouncing it right?

24    MS. CHAN: Chan.

25    THE COURT: Miss Chan, do you want to address that?

**54**

1 And Mr. Coggins you're addressing that for the defendant?

2    MR. COGGINS: Yes.

3    All right. Miss Chan, I'll be glad to hear from you.

4    MS. CHAN: Thank you, Your Honor. I think the

5 defendants agree that evidence of the lack of a criminal

6 investigation by the government is irrelevant and prejudicial.

7    What the crux of their opposition appears to be

8 plaintiffs' references to the DOJ's leniency program, and

9 plaintiffs will agree not to mention the leniency program. So

10 if that's the issue, then we think that there is no -- that we

11 can come to an agreement there.

12    Like settlements, neither party wants to have the

13 DOJ's leniency program coming in one way or another. It's

14 opening a can of worms. It's irrelevant. It's not something

15 that Professor Hamilton plans to testify about.

16    So --

17    THE COURT: Their point has been it's placed in issue

18 by Dr. Hamilton, one of your experts. And your position is

19 that you don't intend to introduce that in any way in the case?

20    MS. CHAN: Correct.

21    THE COURT: All right. Now, Mr. Coggins, do you want

22 to be heard on that?

23    MR. COGGINS: I would, Your Honor. I can be heard

24 from here.

25    THE COURT: Go right ahead.

**55**

1    MR. COGGINS: Your Honor, you know, our point is

2 this, the fact there are literally hundreds of employees at

3 these corporations that are exposed to this program and not a

4 single one, the evidence doesn't show a single one avail

5 himself or herself of the leniency program is very relevant

6 here.

7    THE COURT: Why don't you define for me what the

8 leniency program is?

9    MR. COGGINS: It basically says if you go to the

10 Department of Justice, sort of the like the tax leniency

11 program, if you report something they're not investigating

12 first, you can get a pass on this.

13    And nobody availed himself or herself of that. It's

14 a very --

15    THE COURT: No one meaning on the defense side?

16    MR. COGGINS: None of the employees of any of the

17 defendants availed themselves of this program even though they

18 say the conspiracy lasted a decade.

19    You know, four companies. Actually, more than four

20 companies, five companies, hundreds of people passing in and

21 out with knowledge of this. The fact that nobody approached

22 the Justice Department, nobody sought leniency, it goes beyond.

23    We're not, as she pointed out, we're not contesting

24 that we're not going to get into whether or not there was an

25 investigation. There wasn't. But it's the old saying, Your

**56**

1 Honor. A secret is safe between two people as long as one of

2 them is dead.

3    Here the defendants are entitled to argue that if

4 there were a decade long conspiracy in which hundreds of people

5 were exposed, somebody, somebody would have crossed the street

6 and gotten immunity from prosecution.

7    THE COURT: Here's my problem with that, Mr. Coggins.

8 You certainly can argue that it was a decades-long conspiracy

9 that someone, somewhere, would have made some comment somewh

10 about the nature of the conspiracy. But to say that they would

11 have made a comment somewhere to someone at the Department of

12 Justice I think steps over the line mainly because the matter

13 of no one making such a comment, of attacking the plaintiffs'

14 case by noting they don't have, one, from your point of view,

15 one, I guess what would be called a smoking pistol, not one

16 person that's coming forward and testifying directly as to the

17 alleged conspiracy. You're certainly free to argue that. But

18 I see no need for it to go into the matter of quote "the

19 leniency program of the Department of Justice" and what the

20 leniency program is.

21    As well as that's getting very close to the matter,

22 there is not a Department of Justice investigation, apparently.

23 And as to that, I find that -- one, I find it not to be

24 relevant. No disrespect to the Department of Justice, but

25 given the types of cases I see the Department of Justice

57

1  bringing, it doesn't shock me at all, because they have --
2  seems like they have a focus on criminal justice lately.  I
3  think I've seen one criminal tax case in this courthouse in the
4  last ten years.
5          So they certainly don't have the same emphasis upon
6  certain things they did some years ago when some of us were
7  prosecutors.  So the notion that, well, there isn't a criminal
8  investigation by the Department of Justice, so ergo there must
9  not be some problem really falls on this Court's deaf ears.
10  It's totally --
11          Secondarily, if there's a relevance, it's absolutely
12  outweighed by prejudice under 403.  The jury starts to think if
13  the Justice Department doesn't find difficulty with it, there
14  may not be some difficulty.
15          Quite frankly, now, with the change in priorities of
16  the Justice Department and the monetary constraints, that's not
17  -- and the change of emphasis upon criminal prosecutions over
18  the last 10 or 15 years is so irrelevant.
19          But as to the Department of Justice and secondarily,
20  I find the whole matter to be prejudicial and even the matter
21  of the leniency program, in terms of what the leniency program
22  is.
23          That's of limited probative value.  To whatever
24  extent there is probative, it becomes prejudicial, and it
25  becomes confusing to the jury, in my opinion.

58

1          You certainly are free from the opening whistle to
2  have the final shout to the jury before they go to deliberate
3  that there is no smoking gun.  There's no smoking pistol.
4  There's not one person in ten years they can point, to et
5  cetera, you have a perfectly good advocacy.
6          But to say because if there were someone would have
7  gone to the Department of Justice, we're not going to go there
8  on that.
9          MR. COGGINS:  All right.  Even though, just so I
10  understand, we can point out essentially there were no whistle
11  blowers here, would that be fair?
12          THE COURT:  We're not going to get into the matter of
13  whistle blowers and going to government authorities on that,
14  because once again, you open up Pandora's box as to where you
15  go with that kind of information.
16          I think it suffices from your perspective, and
17  certainly is relevant with respect to there being no person of
18  any kind of anywhere who's ever made a comment to anyone about
19  this.
20          It's perfectly fair.  This issue I think was
21  addressed was it Huntsman that had a change in leadership on
22  several occasions?
23          MR. COGGINS:  I think it was Millennium.
24          THE COURT:  It's fair for Millennium to mention we've
25  had change of leadership on several cases, but yet no one's

59

1  passed the baton, no inference of that, Mr. Cooper, and Mr.
2  Watts and Miss Davis are certainly free to take that approach.
3          But to go that next step and say there's no whistle
4  blower going to a government agency or the Department of
5  Justice doesn't have an inquiry, I know you're not trying to do
6  that, but there is a leniency program, here's what they could
7  have done, I'm not comfortable with that.  I have strong
8  hesitation about it.
9          MR. COGGINS:  Understood.
10          THE COURT:  Thank you very much, Mr. Coggins.
11          So the motion in limine number 12 is granted for the
12  reasons indicated here on the record.  But again everyone's
13  issues on this are preserved.  No one's waiving their issues on
14  this for the record here.
15          The next I thought there was some agreement, I
16  already made my notes.  I apologize to everyone.  I thought
17  there was some agreement as to plaintiffs' -- yes, plaintiffs'
18  motion in limine 21 essentially requesting the Court issue an
19  order excluding expert testimony that defendants did or did not
20  violate the Sherman Act.
21          Essentially from what I can see here, the plaintiffs
22  are seeking to prevent any expert from testifying that the
23  defendants did or did not violate the Sherman Act.
24          The defendants essentially, I think, recognize that I
25  think I addressed this issue in my earlier memorandum opinion

60

1  on the motion to exclude experts.
2          Are we still in disagreement on this?  Is that part
3  of the stipulation here, I gather, Mr. Saveri?
4          MS. VICKERS:  It is not.
5          MR. SAVERI:  All we would say, Your Honor's already
6  addressed this.
7          THE COURT:  I think I have.
8          MR. SAVERI:  We're fine.
9          THE COURT:  Ms. Vickers?
10          MS. VICKERS:  Mr. Ulwick.
11          MR. ULWICK:  This one's mine.
12          I think we're in agreement.  I just want to be clear
13  about what our position is.  Our experts are going to abide by
14  the Court's ruling.  We would expect that the plaintiffs'
15  experts would abide by it as well.
16          If you read their reports, they're replete with
17  statements that would be, in our view, a violation of that
18  rule.  We're going to be pretty vigilant about it.  But I think
19  we all agree that no expert should be opining about whether it
20  is or is not a violation of the Sherman Act.
21          THE COURT:  Agree, Mr. Saveri?
22          MR. SAVERI:  We'll be vigilant as well, Your Honor.
23          THE COURT:  Given that you've noted, perhaps you all
24  realize at some point in time, indecision is not one of my
25  problems, perhaps to a fault.

61

1    I don't intend to have any expert get close to it.
2  They'll be brought down right in front of the jury.  Objection
3  sustained.  That's not within the province of this expert.  So
4  everyone bears the risk.
5    No expert should be close to opine on what is the
6  ultimate issue in the case.  I'm not going to permit it on
7  either side.  To the extent somebody even gets close, maybe the
8  first one will realize, we're just not going there, that's both
9  sides.
10    Yes, Mr. Sandler.  I gather you're rising to agree
11  with me; is that right?
12    MR. SANDLER:  Your Honor, in most instances, I do
13  agree with you.  I'm not disagreeing.  I want to ask a question
14  as to what you mean by getting close.
15    For example, if an expert is asked to explain to the
16  jury what is the Sherman Act and what it's all about, is that
17  in your mind getting close?
18    THE COURT:  It's getting close.  I tend to like
19  medium instructions from the law.
20    MR. SANDLER:  I wasn't talking about instruction.
21    THE COURT:  What I'm trying to say is that it's
22  getting close when experts on either side try to opine on the
23  law.  They can opine on the industry.  They can opine with
24  respect to -- for example, they can opine as to what is a
25  cartel, and the defense experts can opine as to what is not a

62

1  cartel.
2    Again, I can't rule on these in a vacuum, but the
3  plaintiffs can have expert testimony as to the nature of how a
4  cartel works.
5    The defendants can certainly have someone say, look,
6  this is what -- for example, the notion of conscious parallel I
7  found was somewhat, you know, interesting in that they can
8  opine, look, in a small oligopoly, not many companies, the
9  companies do this because they react in a certain way.  That's
10  perfectly appropriate for the defense to respond in that
11  fashion.
12    I don't view either of those as opining on the law or
13  on the ultimate issue or invading the province of the Court.
14  It is a legal matter.
15    MR. SANDLER:  That's what I was asking.  But in
16  opening statements, our side will have to say this is a
17  violation.
18    THE COURT:  Both sides are going to be able to -- in
19  terms of -- you could say your view is we believe the evidence
20  is going indicate the following.
21    MR. SANDLER:  That it violates the Sherman Act, et
22  cetera, et cetera.  I wanted to know the definition.
23    THE COURT:  You're not going to get up there and say
24  as Dr. Hamilton, our expert, is going to tell you, this is a
25  violation of the law.

63

1    MR. SANDLER:  I'm going to say the Judge is going to
2  say that.
3    THE COURT:  I don't think so.
4    Are we all clear on to that?  Seriously.
5    MR. SANDLER:  We're clear.
6    THE COURT:  Does that address your point, Mr. Ulwick,
7  on this?
8    MR. ULWICK:  Yes.  And consistent with the position I
9  took a little bit earlier, I'm not sure you necessarily have to
10  grant it.
11    THE COURT:  I think that's right.  I think it's moot,
12  and I'm just going to indicate that it's moot by agreement of
13  the parties.
14    MR. ULWICK:  Great.  Thank you.
15    THE COURT:  All right.  Then the last of the ones
16  that I -- these are the ones I thought we had agreement on.
17  We've got some things ahead.
18    The last one I thought we had some meeting of the
19  minds on before we get to the stipulations, again, Mr. Saveri
20  and Mr. Ulwick, I'll weave in the stipulations as the
21  particular issues approach.
22    Motion in limine number 23 on the part of the
23  plaintiffs.  Again, this is all under paper number 471, exclude
24  arguments about references to and evidence regarding the risk
25  of an improper duplicative recovery and the existence of the

64

1  indirect purchaser action.
2    And I thought I had -- from what I could tell, the
3  parties agree that there should be no argument about or
4  reference to improper double recovery or the existence of the
5  indirect purchaser case; is that correct?
6    MR. SAVERI:  Yes, Your Honor.  We believe there's no
7  opposition.
8    THE COURT:  Do you agree with that, Mr. Watts?
9    MR. WATTS:  Defendants --
10    THE COURT:  Under Mr. Ulwick's suggestion, that will
11  be moot by agreement of counsel.
12    Okay.  Now, with that --
13    MR. ULWICK:  I think you can add 22, which I think is
14  pretty much the same as 21.
15    MR. SAVERI:  Your Honor, we agree.
16    THE COURT:  All right.  22, exclude expert testimony
17  relating to the possible pretext of the defendants' behavior
18  and justifications for their conduct.
19    MR. ULWICK:  Really the same as 21.
20    THE COURT:  All right.  It will be moot by agreement
21  of counsel.
22    Okay.  So with that, what I propose to do is now is
23  go back and I'll weave in.  Again, Mr. Ulwick and Mr. Saveri
24  can alert me to the stipulations that may play in the ones as
25  we go through.

65

1        Now, I've got to go back here and the motion in

2 limine number 2 --

3        MR. ULWICK:  This one I think is stipulated to, Your

4 Honor.

5        THE COURT:  Okay.  Hold on.  All right.  I'm

6 excluding references to class representatives or class members.

7 This is now moot by stipulation.

8        MR. ULWICK:  Right.  Yes, sir.

9        MR. SAVERI:  Right.

10       MR. ULWICK:  It's stipulation number 5, I think.

11       MR. SAVERI:  Paragraph 5 on the second page.

12       THE COURT:  Neither plaintiffs nor defendants may

13 introduce at trial evidence or argument concerning class

14 representatives or class members' attendance or non attendance

15 at trial.

16       Okay.  Number 3 is exclude all undisclosed evidence

17 including introduction of or reference to documents not

18 produced to plaintiffs in discovery.

19       The thrust of the -- it seems to be stating the

20 obvious, but the thrust of the defendants' response has been

21 that it's not -- it's premature, overbroad.  But you want to

22 put some meat on this, Mr. Levin?

23       MR. LEVIN:  Yes, Your Honor.

24       THE COURT:  Who's going to address it from the

25 defense side, Miss Vickers?

66

1        MS. VICKERS:  Yes, Your Honor.

2        MR. LEVIN:  Yes, Your Honor, I'll attempt to put some

3 meat on the bones of this.

4        Motion in limine number 3 was filed about two or

5 three weeks prior to the filing of the proposed pretrial order.

6 And in the proposed pretrial order, the defendants' exhibit

7 list includes about 475 documents bearing no Bates number,

8 which signifies that those documents were not produced in

9 discovery.

10       And I'd like to hand, if I could, up to Your Honor,

11 via the clerk, a sheet, and I'll hand several to Mr. Ulwick.

12 The salience of this, Your Honor, we have about 475 documents

13 that were never produced.

14       The sheet with the yellow highlighting on, with the

15 highlighted items, are ones that by our analysis do not appear

16 to be referenced or included or attached to the defendants'

17 reports of the defendants' experts Dr. Rubinfeld and Dr.

18 Willig.

19       And we think they should be excluded from evidence.

20 And we really don't have time at this stage of the proceedings

21 to hunt around for items like U.S. Geological survey reports

22 and documents.  So that these are mystery documents, and we

23 really don't want to go on a wild goose chase in search of

24 them.

25       By the way, on defendants' exhibit lists, they're

67

1 numbers 2489 through 2964.  It's about one-sixth of the total

2 documents on defendants' exhibit list.

3        In our Rule 34 document request, we did ask for all

4 documents either received by experts or produced to experts,

5 and we asked for all documents that the defendants intend to

6 introduce at trial.

7        THE COURT:  That was your request number 34?

8        MR. LEVIN:  No, I'm sorry.  Rule 34 document

9 production request.

10       THE COURT:  I'm sorry.  You specifically did ask for

11 all documents?

12       MR. LEVIN:  Yes.  Request number 46 and 47, let me

13 just -- I left it in my desk.

14       Yes.  We asked in 45, we ask for all documents that

15 you produced or made available to or received from any expert

16 including all consulting experts and their staff.

17       And in the last final document request was all

18 documents you intend to use or will rely upon at trial.  And

19 the response -- there were general objections, but the response

20 seemed to be, oh, we'll produce such things at the proper time

21 and whatever, so we don't have them.  And there are 475 of

22 them, and we respectfully ask they be excluded.

23       THE COURT:  Miss Vickers?

24       MS. VICKERS:  Your Honor, first, I'd like to note

25 this is the first time we're hearing exactly what documents

68

1 were at issue for this motion in limine.

2        Nevertheless, we had e-mail correspondence with the

3 plaintiffs a couple weeks ago after we exchanged trial exhibit

4 lists where these issues were highlighted that some of the

5 documents were not produced.

6        And we responded to plaintiffs and let them know

7 these documents consisted of public documents.  And for the

8 most part, you can see on this list it is references that were

9 highlighted and used by our experts in their expert reports.

10       I don't have it in front of me, I don't know exactly

11 what the experts produced when we made that production back in

12 December of last year.

13       But I'd like to note that we also had a stipulation

14 with the plaintiffs on what documents would be produced in

15 relation to expert reports.

16       Also during the e-mail correspondence where

17 plaintiffs raised this, we told them, look, these are all

18 public documents that don't need to be produced, it's my

19 understanding, and let them know if they had specific issues

20 finding documents.

21       THE COURT:  Where are the public documents that you

22 intend to introduce at trial that don't need to be produced?

23       MS. VICKERS:  Things like here from a public website.

24 It's not my understanding that parties have the obligation to

25 go to a public website and put a Bates number on a document to

69

1 send it to the plaintiffs. That's not a document. That's in
2 my client's custody or control, not in -- it's just a public
3 web site.
4         These aren't new documents. These are documents that
5 our experts relied on when they filed their expert reports back
6 in December of last year. So these aren't --
7         THE COURT: Are there documents that plaintiffs have
8 listed that they did not disclose to you in discovery?
9         MS. VICKERS: Yes, Your Honor. There are similarly
10 documents that are not Bates labeled on the plaintiffs' list.
11        THE COURT: How many of those are there?
12        MS. VICKERS: 50 or so. I don't have the number
13 offhand.
14        THE COURT: How many do you think are on your side
15 that they listed that are not disclosed?
16        MR. LEVIN: We counted 475 non Bates labeled.
17        MS. VICKERS: On the plaintiffs' list?
18        MR. LEVIN: Oh. I'm sorry.
19        MR. SAVERI: Your Honor, we could go through it. I
20 don't believe there's anything on our attachment to our
21 pretrial exhibit list that has the not been produced in this
22 case, and that's indicated by Bates number.
23        What we're talking about here is 475 documents that
24 have never been introduced in this case.
25        THE COURT: All right. Go ahead, Miss Vickers.

70

1         MS. VICKERS: I was going to say I'm not sure we can
2 sit here today and say they've never been produced in the case
3 if they're listed under what the experts been relied on and we had a
4 stipulation with the plaintiffs about what we were going to
5 actually produce.
6         So it's not accurate to say these documents have
7 never been produced. It's not as if these documents were ever
8 raised in the litigation. I'm sorry.
9         MR. LEVIN: Your Honor --
10        THE COURT: Go ahead, Mr. Levin.
11        MR. LEVIN: Yes. My colleague Mr. Dirksen advises
12 they have sort of put unidentified backup expert materials on
13 their list. We don't know what those are.
14        While some of the documents that are highlighted have
15 Internet website addresses, I mean, some of them are things
16 like the U.S. Geological Survey Mineral Commodity summaries,
17 2002.
18        The Enoch Pratt library doesn't have it, as far as I
19 know, and we're in the final stages of trial preparation. We
20 really don't want to be hunting around for these items.
21        THE COURT: Miss Vickers?
22        MS. VICKERS: These are documents that our experts
23 looked at, relied on for purposes of the expert reports. If
24 the plaintiffs had issues obtaining copies of those documents
25 and they weren't subject to the stipulation, we would have been

71

1 happy to identify those at this point.
2         But the fact that they're raising this for the first
3 time is sandbagging us on this hearing, that we're hearing
4 about this for the first time.
5         THE COURT: Well, this isn't for the first time.
6 They raised this on July 26th when they filed their motion in
7 limine.
8         MS. VICKERS: Right.
9         THE COURT: All right. They raised it.
10        MS. VICKERS: But they didn't have specifics as to
11 what documents they're talking about in our response to the
12 motion. We said it was overbroad and vague, and we did not
13 know what documents they were talking about in this motion.
14        THE COURT: I guess my difficulty with this is the
15 following, just under the general parameters of Rule 37 and
16 Rule 26, we really shouldn't be having this discussion on
17 either side.
18        Certainly, there are documents that come up as to
19 which the Court can take judicial notice. But if one of the
20 documents, for example, is a geological survey, and the
21 plaintiffs take issue with it, we've had plenty of time here,
22 lord knows, in terms of discovery, exhaustive discovery on both
23 sides, that we shouldn't be having this kind of problem.
24        And I'm troubled by it, because it doesn't seem that
25 difficult to just list, difficult to respond to request for

72

1 production of documents in terms of listing and providing the
2 information as to those items that you intend to introduce at
3 trial.
4         There was specificity in that request, correct, Mr.
5 Levin, in terms of what you intend to introduce at trial?
6         MR. LEVIN: Yes, Your Honor.
7         THE COURT: Okay. When was that filed?
8         MR. LEVIN: Our document production request was filed
9 two years ago.
10        THE COURT: When was the most recent answer filed?
11 Because it's obvious that people prepare for trial and they
12 supplement responses, those things happen. But when was the
13 last?
14        Miss Vickers, when was your last response to request
15 for production of documents filed? I'm assuming there may have
16 been a supplemental version of whatever, when was the last time
17 you said, all right, here in response, what is that date?
18        MS. VICKERS: I recall the fact discovery closed in
19 September, October, and then the Court will recall we had
20 expert discovery after that. It would have been sometime in
21 the end of last year.
22        MR. LEVIN: Your Honor, if I might very briefly, on
23 July 26, one of our colleagues from the plaintiffs' side
24 e-mailed Miss Vickers and said that defendants' exhibit list
25 which was submitted on July 29 of this year contains many

73

1  documents with no Bates numbers, that indicates these documents
2  have not been previously produced by the defendants.  Please
3  provide us with a copy of all such documents immediately.  We
4  haven't received them.
5        THE COURT:  Do you want to add something, Mr. Ulwick?
6        MR. ULWICK:  I would, please.
7        THE COURT:  Sure.
8        MR. ULWICK:  Sending a request for all the documents
9  that you plan to introduce at trial is a standard request, and
10 it's a standard reply.  The standard reply everybody put
11 forward is we're not going to tell you now in the middle of
12 discovery what we intend to produce at trial.  How do we know
13 what that is going to be?  Plus, it's our work product.
14 Everybody objects on that basis.  I'm sure we did here.
15       In addition, everybody says you'll get that when the
16 Court says you get it, which is governed by the order that you
17 send.  It's on the scheduling conference, which is produce your
18 exhibit list at the pretrial conference.
19       That's when we produced the list of those documents.
20 So it's -- I think it's incorrect to argue here that we had
21 some obligation to be handing to the plaintiffs as we're going
22 along preparing the case or responding to discovery every
23 document that we think we might want to introduce at trial.
24       That happens at the point in time when we, under your
25 schedule, give them our exhibit list.

74

1        On this exhibit list, there are all these things.
2  These aren't new things.  These are ones that were added that
3  were listed under our experts.  Materials they reviewed.
4        THE COURT:  How many of these 450 are listed under
5  the expert?  Or experts?
6        MR. ULWICK:  I think all of them.
7        MS. VICKERS:  I'm looking at this list.  It looks to
8  me all on this page are related to experts.  But again, I don't
9  know of the 475, which ones.
10       THE COURT:  Mr. Levin, what do you think is the
11 figure with respect to those that are listed by your expert?
12       MR. LEVIN:  One of our colleagues went through the
13 expert reports to see if -- and found that the highlighted ones
14 that we've handed up on that sheet, as far as we can tell, are
15 not listed in the expert reports.
16       Also the Kronos --
17       THE COURT:  Well, some of them were listed on the
18 expert reports.
19       MR. LEVIN:  Yeah, I think so.
20       MS. VICKERS:  And cited.
21       THE COURT:  As to those that have been listed on the
22 expert reports, Mr. Levin, clearly there's note -- there's no
23 surprise to the plaintiffs there in terms of what they do or
24 don't want to utilize of those reports, correct?
25       MR. LEVIN:  Well, I mean, we did ask defendants to

75

1  produce all documents received from any experts.
2        And for example, Kronos said Kronos will produce non
3  frivolous documents responsive to this request consistent with
4  obligations under Rule 26 at the appropriate time.
5        We think the appropriate time has long passed.
6        THE COURT:  Well, it may or may not.  My point is to
7  the extent they've been listed in expert reports, I'm merely
8  trying to get to the spirit of Rule 26 and Rule 37 in terms of
9  there being no surprise by ambush prior to trial.
10       But it doesn't seem there's much of an ambush there
11 to the extent an expert makes reference to a report, and they
12 either may or may not want to utilize it, and you're certainly
13 aware of it at that time.
14       Of these 450 that you're noting, how many do you
15 think have been listed in expert reports?  And are there any --
16 or how many they're actually not listed in expert reports?
17       MR. LEVIN:  I don't have a precise count, but I'm
18 advised the ones highlighted yellow are not listed in the
19 expert reports.
20       THE COURT:  How many are we talking about here?
21       MR. LEVIN:  About 40 or so.
22       THE COURT:  You're saying these have been highlighted
23 in yellow, which is document 501-2, paper 101 out of 120?
24       You're saying that these particular exhibits that
25 have been listed were not even referenced in expert reports?

76

1        MR. LEVIN:  I didn't personally do that analysis, but
2  that's my understanding.
3        THE COURT:  I understand.  Okay.
4        Miss Vickers, just moving along here on this, my
5  rule, my view of this is, to the extent that there have been
6  reports that have been listed in expert reports, that is
7  certainly sufficient notice.  And while the purer method would
8  be to supplement your response, I understand what Mr. Ulwick's
9  argument was, they have been referenced, and the other side is
10 aware that it appears we've taken 250, and we've whittled it
11 down to 40.
12       But as to these 40, they're not referenced anywhere.
13 What is your argument as to these 40 some that are highlighted
14 in yellow here?
15       MS. VICKERS:  Your Honor, it's my understanding,
16 looking at these documents and what they are, that these are
17 documents that were cited in the footnotes in the expert
18 reports.  So they may not have been listed as documents relied
19 on, on the exhibits of the expert report, but they were
20 certainly contained within the expert reports.
21       THE COURT:  So your view is all of them are contained
22 in the expert reports?
23       MS. VICKERS:  Yes.
24       THE COURT:  Mr. Levin?
25       MR. LEVIN:  Your Honor, I can't answer that question

77

1 with precision, so I don't want to speculate.

2 THE COURT: Well, here's the resolution of this. The

3 resolution of this is, is that in terms of the compliance with

4 Rule 26 (c) and Rule 37 (c), essentially, is that, and then

5 your -- both Mr. Ulwick and Mr. Levin are going to both refer

6 to the matter at the appropriate time, Mr. Ulwick has noted

7 when this view of the appropriate time is, as to those items,

8 if they are listed in an expert report, while the purer method

9 would have been to also have them be listed again in a

10 supplemental answer to the document request, that there is no

11 requirement that it be done.

12 So and I'm not going to -- I'm going to deny the

13 motion to exclude undisclosed evidence to the extent that it

14 references documents that are referred in the expert reports.

15 To the extent that there are documents that are not

16 referred to anywhere including the expert reports, that's a

17 different matter.

18 And then it becomes a matter of whether or not

19 they're documents in which the Court could or could not take

20 judicial notice.

21 So it seems to me that where we are is we've narrowed

22 this down to a workable number of 40 or so, it seems to me, Mr.

23 Levin, Miss Vickers, we don't need to stop what we're doing now

24 with these other motions.

25 Just, Miss Vickers, you point out to Mr. Levin where

78

1 they've been listed in the expert, and if they weren't, Mr.

2 Levin, you point out to me ones that were never listed anywhere

3 in an expert report, and then I'll have to go to the

4 substantive analysis as to the type of document which the Court

5 could or would take judicial notice on that.

6 Yes, Mr. Saveri?

7 MR. SAVERI: Your Honor, could we at least get copies

8 of those documents? I mean, one of the problems we had is they

9 were never produced in the case. They have no Bates numbers.

10 If the defendants have them on their list, can they at least

11 produce a copy?

12 THE COURT: I don't think it's too much to ask.

13 They're somewhere, obviously.

14 MS. VICKERS: Yes, Your Honor.

15 THE COURT: You can certainly have them ready by

16 September 9th. I think you probably have them ready now?

17 MS. VICKERS: Yes.

18 THE COURT: Let Mr. Saveri see them.

19 MR. LEVIN: This page is in the nature of a spot

20 check.

21 THE COURT: I understand. The ruling on it is, as

22 I've said, I think it's clear to everyone, even though the

23 defendants are not precluded and the motion's going to be

24 denied, to the extent there's reference to documents in expert

25 reports, the question becomes, if there's no reference anywhere

79

1 including expert reports or anywhere on some of these

2 documents, then I'm inclined to grant the motion in limine to

3 that extent.

4 And then there's another step there, and that's

5 whether it's a type of document, I'm not going to stop what

6 we're doing here to look, but it may be the type of document

7 where I can take judicial notice of the fact that we'll wait

8 and see.

9 We'll just have to let this one hold for a while.

10 MS. VICKERS: Your Honor --

11 THE COURT: Yes, Miss Vickers?

12 MS. VICKERS: Sorry to interrupt. I just wanted to

13 seek one clarification.

14 When we looked at the list, the plaintiffs initially

15 sent us some of the documents they had on their list, which

16 actually were from their own expert reports, from the

17 plaintiffs' expert reports. I just wanted to clarify whether

18 we needed to produce those documents, or if it's sufficient not

19 to produce those documents.

20 THE COURT: I think whatever you intend to put in

21 evidence, they're entitled to know.

22 MS. VICKERS: Okay.

23 THE COURT: Okay.

24 MS. VICKERS: Thank you, Your Honor.

25 THE COURT: It's not an answer to say your expert

80

1 mentioned it so we can get it in on either side. If you're

2 going to put something in evidence, either side is entitled to

3 know what you put into evidence.

4 MS. VICKERS: Thank you, Your Honor.

5 THE COURT: So we'll let motion in limine number 3

6 sit for a while.

7 MS. VICKERS: Okay.

8 THE COURT: Okay. Now, we've got motion in limine

9 number 4 to exclude witnesses not previously disclosed by

10 defendants in the required discovery disclosures. And as to

11 that, let me hear first from you Mr. Levin, and then I'll hear

12 from the defense.

13 MR. LEVIN: Your Honor, we received an e-mail from

14 Miss Vickers this morning indicating the defendants do not

15 oppose motion in limine number 4.

16 THE COURT: Is that correct, Miss Vickers?

17 MS. VICKERS: That's correct.

18 THE COURT: Under the Ulwick rule, that will be

19 granted as it is moot. Moot by agreement.

20 All right. Number 5, exclude witnesses from

21 testifying who do not possess knowledge relevant to this case.

22 MR. LEVIN: Yes, Your Honor. This related to two

23 witnesses, Mr. Giandonato and Mr. Wertz of the Haley Company.

24 Now only it relates to Mr. Wertz, because the defendants

25 indicate I believe they're not intending to call Mr.

81

1 Giandonato. We have moved in limine to essentially preclude
2 the calling or deposition or live testimony of Mr. Wertz on the
3 ground that he lacks any relevant information or knowledge
4 about this case.
5        He was an employee of the Haley Company. His role
6 was limited to perhaps placing an order for titanium dioxide,
7 the price of which, and the terms of which had already been
8 negotiated and dealt with by other people in the companies.
9        So essentially, he was performing a ministerial or
10 sort of secretarial role, and just on the grounds of
11 cumulativeness.
12       THE COURT: Whatever his role was is not viewed very
13 highly now by the plaintiffs.
14       MR. LEVIN: It's not viewed as damages or
15 embarrassing, but he just has nothing to add of substance, to
16 save time in the case.
17       THE COURT: Who wants to address this from the
18 defense, Miss Vickers?
19       MS. VICKERS: That's me, also, Your Honor.
20 Plaintiffs' counsel is correct, Joe Giandonato's off the table.
21 For Mr. Wertz, we have designated deposition testimony for Mr.
22 Wertz.
23       Defendants don't agree that he doesn't have any
24 knowledge that's relevant to the case at all.
25       I attended his deposition. He testified extensively

82

1 about the differences in titanium dioxide products, what it
2 takes for a particular customer to switch products.
3        As the Court knows since the briefing in this case,
4 one of the issues is whether or not titanium dioxide is a
5 commodity and a drop-in substitute. So Mr. Wertz does have
6 knowledge that is relevant to this case.
7        At this point, defendants can't say specifically
8 whether or not we're going to play that deposition testimony.
9 But we don't think it's proper for a motion in limine at this
10 point to preclude us from playing that deposition testimony in
11 the event that it becomes necessary from the defense's
12 perspective.
13       THE COURT: Mr. Levin?
14       MR. LEVIN: We just think it's cumulative, and those
15 topics are going to be covered by other witnesses, other
16 depositions.
17       THE COURT: I'm sure you prefer the viewpoints of
18 others than him, apparently, but I think this really goes to
19 the weight and not admissibility.
20       So plaintiffs' number 5 will be denied.
21       MS. VICKERS: Thank you, Your Honor.
22       THE COURT: All right. Plaintiffs' number 6, exclude
23 live witnesses from testifying in the defendants' case who were
24 not made available for live testimony in plaintiffs'
25 case-in-chief.

83

1        Glad to hear from you on that, Mr. Levin.
2        MR. LEVIN: Thank you, Your Honor.
3        From plaintiffs' perspective, number 6 is moot.
4        THE COURT: Do you agree with that, on the defense
5 side? Mr. Coggins?
6        MR. COGGINS: Yes, Your Honor.
7        THE COURT: We'll invoke what we'll call the Ulwick
8 rule here today, we'll just put it down as being moot.
9        All right. Number seven, preclude defendants'
10 cross-examination of their witnesses during plaintiffs' case
11 beyond the scope of their direct examination.
12       MR. LEVIN: Your Honor, this is pretty close to being
13 moot, and the reason I say pretty close is that essentially
14 there are certain witnesses, defendant executives, defendants'
15 corporate executives, certain personnel who will testify live
16 in the plaintiffs' case because they've been subpoenaed
17 pursuant to defendants' agreement to accept service of those
18 subpoenas, or the defendants have represented that they're
19 bringing certain persons to court, and they understand the
20 plaintiffs will call such person.
21       And as to those witnesses, in other words,
22 defendants' executives who testify in the plaintiffs' case,
23 plaintiffs agree that the defendants can fully cross-examine
24 those witnesses during the plaintiffs' case.
25       Now, there may be --

84

1        THE COURT: Sounds like it isn't moot. It sounds
2 like you've withdrawn your motion in limine.
3        MR. LEVIN: Well, what I would say is this, there are
4 a number of other persons employed by the defendants whom we
5 may call for strictly document admissibility purposes depending
6 on what happens with the parties' meet and confer sessions
7 regarding document admissibility and what happens on I believe
8 September 4, which is what we call document day where we'll
9 appear before the Court, and the Court will make rulings on
10 admissibility.
11       If we need to call record -- we've subpoenaed record
12 custodians from Kronos and Millennium. We've served those
13 custodians of records on counsel for Kronos and Millennium.
14       If we need to call custodians or executives from
15 defendants strictly to authenticate a document, you received
16 this in the ordinary course of business, your company had an
17 e-mail system, and so forth, if we need to do that in our case,
18 plaintiffs' case, then our position would be that the
19 defendants' cross of those witnesses should be limited to the
20 document admissibility issue, and they should not be allowed to
21 do a free ranging examination of their own people in our case.
22 So --
23       THE COURT: Doesn't this -- isn't this position --
24 doesn't this run somewhat contrary, Mr. Levin, to Rule 611 with
25 respect to the latitude accorded to the Court with respect to

85

1 whether testimony should or should not be limited to certain
2 areas?
3          MR. LEVIN:  Well, certainly, we don't dispute that
4 the Court has latitude, discretion.
5          THE COURT:  Quite frankly, I don't know, what is the
6 basis for suggesting there's a limitation?  I mean, on either
7 side, seems to me that they have the right to explore.
8          I mean, I usually accord great latitude, 611, I
9 generally have a habit of doing in all cases.  And to the
10 extent one wants to have a very exhaustive, ask a lot of
11 questions, still want to call them back, that's their
12 prerogative.
13          MR. LEVIN:  Our point, Your Honor, is if we called
14 people like Mr. Cianfichi and Mr. Zwicker and Mr. Maas in our
15 case, we have no problems, and we ask about the merits, we have
16 no problem with full cross-examination by the defendants of
17 those witnesses.
18          But if the defendants say, if they refuse to -- if
19 they challenge all the business record foundational facts and
20 so forth, and make us spend many hours or days of trial time on
21 that sort of thing, and we then have to call their people to
22 talk about how they have an e-mail system in their company and
23 that e-mails are kept on their server and so forth, and we
24 don't get into the merits of the case, and we don't think that
25 the defendants should then spend five hours with each of these

86

1 witnesses asking, you know, doing exculpatory examinations of
2 their own clients, because they were only called for document
3 admissibility purposes because the defendants essentially were
4 trying to put sort of sand in the gears in terms of getting our
5 evidence in by challenging whether their own business records
6 are in fact business records, which then necessitates our
7 calling their custodians of records to say gee whiz, the
8 defendants' e-mail about strictly business matters are really
9 business records.
10          That's our point.
11          THE COURT:  Well, I gather your point's also then
12 they would be free to call them a second time and --
13          MR. LEVIN:  In their case.
14          THE COURT:  All right.
15          MR. LEVIN:  We really don't want the defendants by
16 challenging their own business records to essentially create a
17 Trojan horse where they bring in all of their people in our
18 case.
19          THE COURT:  All right.  Who wants to address this,
20 Mr. Coggins?
21          MR. COGGINS:  I'll address it.  I think you hit it
22 right when you said 611 governs this.  It's going to be a
23 witness-by-witness thing.
24          It really applies only to witnesses outside the
25 subpoena range is what they're talking about.  If they're

87

1 within the range, they can -- they're really talking about with
2 Kronos at least witnesses outside the subpoena range.
3          If we bring a witness here, we don't know in advance.
4 The Court doesn't know in advance how broad it's going to be on
5 direct examination.
6          I think probably the Judge might take that into
7 account in determining how broad is the cross-examination.  It
8 just doesn't seem that this is the need for a motion in limine.
9 But it's basically Rule 611 judgment of the Court on a
10 witness-by-witness basis.
11          THE COURT:  I just think, Mr. Levin, sort of looking
12 at the respective submissions here, I will tell you I'm not
13 going to have a witness be cross-examined for five hours and
14 then have the defendant bring the person back up to repeat the
15 same testimony for five hours.
16          That's not what you're suggesting, correct, Mr.
17 Coggins?
18          MR. COGGINS:  That's right, Your Honor.
19          THE COURT:  The bottom line is I'm not going to grant
20 this motion in limine, but I don't think it's going to prove to
21 be much of an issue.  The opposing side can quickly get a
22 matter resolved, and it's in evidence in the case.  They don't
23 have to put the person on the witness stand in their case.
24          But I'm going to deny that.
25          MR. LEVIN:  Thank you, Your Honor.

88

1          THE COURT:  Motion in limine number 7.  Okay.  Now,
2 number 8, to exclude testimony about references to evidence
3 about the global GSP, Global Statistics Plan being
4 pro-competitive or established for pro-competitive reasons.
5 I'll be glad to hear from you on this, Mr. Cera.
6          MR. CERA:  Thank you, Your Honor.  Good afternoon.  I
7 think this will be short.  On further consideration of this,
8 there is an issue about the general admissibility of
9 information derived from the Global Statistics Program, it's a
10 subject matter of the defendants' motion in limine, but to the
11 extent that evidence comes in, which obviously we believe it
12 should, we will withdraw this motion in limine and not argue
13 that these types of references should not be made.
14          THE COURT:  All right.  It's withdrawn.
15          Is there a defense motion in limine keeping out --
16 seeking to preclude the Global Statistics Program evidence from
17 being introduced?
18          MR. WATTS:  Your Honor, that's not an accurate
19 description of our motion.  Our motion is very limited.
20          THE COURT:  We'll get to it this afternoon.  I will
21 tell you sort of in advance on this, I made a note here, either
22 side's going to be able to address this.
23          MR. WATTS:  We understand.
24          THE COURT:  I understand the case, and I understand
25 the importance they've attached to the Global Statistics

**Page 89**

1  Program, and I understand the position of the defense on it.

2       And I don't see how we're going to have a motion in

3  limine on either side as to the Global Statistics Program.

4  That's going to be -- seems to me, and you can get ready for

5  this afternoon when we get to the defense motions, but it seems

6  to me that both sides are going to want to address that pretty

7  thoroughly.  Seems to me it's going to be a question for the

8  finder of fact for the jury ultimately.  But I'll be glad to

9  hear from you this afternoon, Mr. Watts, when we get to it.

10       MR. WATTS:  Thank you, Your Honor.

11       THE COURT:  Number 9 I think I've already addressed

12  previously.  We have the pass-through damages question, and

13  we've already addressed that.  It's been denied for the reasons

14  stated on the record here.

15       Now, we have number 10 to exclude references to and

16  evidence of Tronox's bankruptcy or the fact it's not a

17  defendant.

18       Mr. Cera, I'll be glad to hear from you.

19       This is motion in limine number 10.

20       MR. CERA:  Your Honor, Tronox is not a defendant.  It

21  is bankrupt.  It is not before the Court.  And it has filed a

22  Chapter 11 many years ago.

23       You know, this motion sort of derives from what I was

24  taught a long time ago, that if you're cross-examining a

25  witness and you're asking a leading question, it is not proper

**Page 90**

1  to submit a question that is outside the bounds of what is in

2  evidence and what you know can be supported by the record.

3       And the situation here is that the defendants want to

4  proffer apparently the bankruptcy of Tronox as an explanation

5  or rationale for the failure of the alleged conspiracy to be

6  effective.

7       And we believe that would be improper.  And the

8  reason that's improper, Your Honor, is it's a matter of public

9  record that Tronox itself has declared and spent years and

10  millions of dollars in its bankruptcy case asserting that it

11  went bankrupt because its former owner, Kerr-McGee, imposed on

12  it at the time it was -- went public and was spun off, decades

13  of environmental liabilities that Kerr-McGee had incurred

14  throughout its history of existence in uranium mines, nuclear

15  plants, service stations and the like, and that is the

16  reason Tronox went bankrupt.

17       It is completely divorced from, separate from, and

18  has nothing to do with the titanium dioxide business that

19  Tronox was engaged in.

20       These liabilities were massive.  They're enormous.

21  They're in the billions of dollars.  They were subject of a

22  United States government action.

23       In fact, the United States has intervened in the

24  Tronox bankruptcy case.  So we don't think that's a fair

25  question position or question for the defense to proffer at

**Page 91**

1  trial.  That's our basis.

2       THE COURT:  Thank you, Mr. Cera.

3       Who wants to address this, Mr. Watts?

4       MR. WATTS:  That's right.

5       THE COURT:  That it gets to Dr. Willig's --

6       MR. ULWICK:  It impacts what some of the experts

7  says, not just Dr. Willig.

8       THE COURT:  Can't Dr. Willig testify with respect to

9  financial difficulties without referencing Tronox's bankruptcy?

10       MR. WATTS:  Certainly he can talk about the

11  defendants' financial difficulties, but we think it's highly

12  relevant evidence.

13       We have an alleged co-conspirator who filed

14  bankruptcy in the middle of the period.

15       THE COURT:  Why did they file bankruptcy?

16       MR. WATTS:  Your Honor, my understanding is that --

17  and I know Mr. Cera's involved in the litigation, but my

18  understanding is that's still a matter of litigation.

19       THE COURT:  That's right.  So how do I permit that to

20  come in?  I know the inference you want to have drawn is that

21  there was no existence of a conspiracy on many matters.  One of

22  the alleged co-conspirators, who's supposedly to benefit from

23  this, in fact, went bankrupt.  So it wasn't much of a

24  conspiracy essentially is the thrust of your argument?

25       MR. WATTS:  Well, that would be one of many

**Page 92**

1  arguments.

2       THE COURT:  The point is, how do we know what the

3  basis of it is?  We're off the playing field in terms of how do

4  we determine what the basis of Tronox's bankruptcy was?  The

5  reason for the filing?  There may or may not be other factors.

6  I don't have time to litigate that.

7       MR. WATTS:  Your Honor, the reasons for the filing

8  are not -- not really that important.  The key is that not only

9  Tronox was having financial difficulty at that time, so did

10  Millennium and other --

11       THE COURT:  Dr. Willig can testify as to others

12  having financial difficultes.  He can testify.

13       You're not disputing, Mr. Cera, that he can testify

14  that Tronox had financial difficulties.

15       MR. CERA:  No, Your Honor.

16       THE COURT:  In the context of others having financial

17  difficulties?  You're contesting crossing that line and

18  mentioning bankruptcy.

19       MR. CERA:  Yes.

20       THE COURT:  Mr. Watts, on that, I mean

21  hypothetically, if you had the -- you have the five most

22  corrupt business executives on the face of the earth all

23  sitting around meeting over drinks as to how they can cast an

24  evil spell on the entire world.

25       And as to one of the five, he also has been rifling

93

1  money out of the corporation, hand over fist, embezzling money
2  from his company, and his company goes bankrupt, I don't know
3  that you can then proffer an argument that there's no
4  conspiracy because number 5 went bankrupt, if the conspiracy
5  had been successful, number 5 may have gone bankrupt because
6  there was an embezzlement going on, for example.
7       That's a rather elementary hypothetical.  My point is
8  how do we know what the basis of Tronox's bankruptcy?  There
9  may be a plethora of reasons for it.
10      MR. WATTS:  Right, Your Honor.  I don't think that
11 it's really a good use of the Court's time to go into the
12 actual details of why Tronox is in bankruptcy.  But there are
13 two points I'd like to make.
14      One, there's no question that Millennium witnesses
15 understood that Tronox was having trouble at the same time they
16 were having trouble.
17      They were explaining to customers that TI 2 suppliers
18 were having trouble in the marketplace, you have one whose gone
19 into bankruptcy.  We're having trouble, too, and we need to
20 raise our prices.
21      THE COURT:  You're free to present testimony that
22 there are financial difficulties on the part of many, many
23 companies.  And for that reason, you're free to present
24 testimony for that reason you have to raise prices.
25      But I find it will be of no relevance under Rule 401

94

1  to render any fact more probable than not with the introduction
2  of the evidence that Tronox, am I pronouncing that correctly?
3       MR. WATTS:  Tronox.
4       THE COURT:  Tronox went bankrupt.  And certainly, the
5  argument -- there wasn't much of a conspiracy here because
6  Tronox's, one of the alleged co-conspirators, went bankrupt.
7  I'm not going permit that.  We don't know why they went
8  bankrupt.  And to raise that, to raise that, necessarily,
9  permits the plaintiffs then to have to explore the various
10 reasons why the company went bankrupt.
11      So we might as well cut right to the core right now.
12 This is a fairly important matter, because I have no intentions
13 of throwing out Tronox's bankruptcy -- permitting the matter of
14 Tronox's bankruptcy to be thrown out there as proof of how
15 there couldn't be much of a conspiracy because one of these
16 companies went bankrupt.
17      We don't know why they went bankrupt.  There are all
18 kind of reasons of mismanagement, you know, not the least of
19 which might be over CEO compensation, which is a major issue in
20 the world economic markets.  Everyone knows that.
21      I just don't know what the basis of Tronox's
22 bankruptcy is, none of us do.
23      MR. WATTS:  Your Honor, we just -- what I understood
24 Your Honor's position is that the fact of the bankruptcy can be
25 admitted.

95

1       THE COURT:  No.  No.  No.  Fact of the financial
2  difficulties can be admitted by everyone.  Okay.  But we don't
3  need to get into the matter of -- Tronox is not in the case.
4       The jury's going to be advised they're not to be
5  concerned about why they're not in the case.
6       We'll get to the whole matter of Huntsman and DuPont.
7  We're going to handle that in terms of they're not in the case
8  and not to worry about that.
9       And the fact that Tronox, and the argument -- and it
10 has no relevance.  Tronox's bankruptcy has no relevance in this
11 case.  And if the argument is -- and I understand what the
12 argument might be that, you know, it wasn't much of a
13 conspiracy because they went bankrupt, I'm not going to permit
14 it.
15      I don't know why they went bankrupt.
16      Yes, Mr. Cooper?  You're thoughtful of Mr. Watts,
17 he's getting beaten up in a barrel.  We're laughing here.
18      MR. COOPER:  I just want to understand, Your Honor,
19 so there would be evidence, for example, where a customer is
20 coming in and saying my other supplier Tronox is in bankruptcy.
21 There will be a document that says a customer came to me,
22 Tronox is or is about to go into bankruptcy, we're worried
23 about a supply issue.
24      We may say hey, that's an opportunity for us to raise
25 our price internally.  I'm just wondering how we handle that

96

1  kind of document, because we want to explain what our
2  deliberation is in raising our prices.  It would be relevant
3  because even on the face of the document or the witness
4  testimony, the issue that they're having with another supplier,
5  and by the way, those sales are in the case.
6       THE COURT:  You can indicate that someone is coming
7  to you because another supplier's having financial
8  difficulties.
9       MR. COOPER:  Redact those.
10      THE COURT:  Redact it.  We're not going to get into
11 the bankruptcy of Tronox at all here.  Nor is there going to be
12 argument to that effect one way or the other.
13      So to that extent, the motion in limine number 10 on
14 the part of the plaintiffs is granted for reasons indicated on
15 the record.
16      And with that, I think we've already dealt with 11
17 and 12.  11, it was moot by stipulation.
18      12 was granted.
19      And that takes us to 13.  And we're still moving
20 forward.
21      So it's now 1:00, and it's time to break for lunch,
22 and we'll see where we go on this.
23      I've kept -- I've actually kept my day open tomorrow
24 morning.  We may drift through the day and drift until
25 tomorrow.  These are important issues.  We're not trying to

97

1  rush.

2          Is everybody of the mind that may be necessary?  From

3  the point of view of the plaintiffs' counsel.

4          Defense counsel?

5          MR. SANDLER:  Whatever is necessary.

6          THE COURT:  We may have to drag over into tomorrow

7  morning.  I don't want to rush everybody.  There's so many

8  hours in a day.  Based on the pace, we're moving as quickly and

9  expeditiously as we can.

10         So be ready to address plaintiffs' motion in limine

11 number 13.  And once we get through the plaintiffs', then we'll

12 deal with the defense.  And we'll have a pretrial conference

13 right afterwards, but we may not get to it until tomorrow.

14         MR. SANDLER:  How much time?  I mean, the pretrial

15 conference, I'm sure there are a lot of issues to discuss, so

16 I'm glad Your Honor has advised us that you are available

17 tomorrow if we need it.

18         THE COURT:  I have matters in court here in the

19 afternoon.  I've intentionally kept the morning open just for

20 the fact we may have to go over until the morning.  We have to

21 wait and see.

22         With that, we'll take a one hour recess for lunch.

23 We'll be starting at 2:00.

24         (Luncheon recess)

25         THE COURT:  Okay.  With that, we are continuing on

98

1  the hearing on the motions in limine.  And I believe we're

2  still on the plaintiffs' list, and we are at motion in limine

3  number 13 to exclude references to and evidence regarding Gary

4  Cianfichi's retention by Kaplan Fox.

5          And with that, if I can hear from you, Miss Chan?

6          MS. CHAN:  Thank you, Your Honor.  Evidence regarding

7  Mr. Cianfichi's retention by Kaplan Fox is an irrelevant side

8  show.  Defendants' opposition to plaintiffs' motion in limine

9  saying that it shows Mr. Cianfichi's consciousness of innocence

10 is exactly the kind of unfounded jury speculation that this

11 motion in limine was designed to avoid.

12         There are many other reasons why Mr. Cianfichi could

13 have been retained by Kaplan Fox.  It could be that he didn't

14 understand the purpose of his retention by Kaplan Fox.  It

15 could be that he wanted to talk them out of taking the case.

16 It could be that he wanted to make money.  It's just not clear.

17         So if there were more context here, maybe in another

18 world there would be something relevant, but as it is, we just

19 don't know why Kaplan Fox retained him.  We don't know why.

20         Cianfichi agreed to be retained, and we don't know

21 why Kaplan Fox did not pursue this case.

22         This is kind of like the Tronox bankruptcy issue.  It

23 does not show anything legitimate.  It just calls for wild

24 speculation, and it will create a trial within a trial.

25         And it begs the question should we put Mr. Kaplan on

99

1  the stand to testify about why he hired Mr. Cianfichi and

2  whether he believed Mr. Cianfichi's version of events.

3          So it begs the question, how many days of the

4  three-week trial you would want to spend on this side show?

5          THE COURT:  Thank you, Miss Chan.  I'll be glad to

6  hear from you, Mr. Cooper.  Mr. Cianfichi was at one time an

7  employee of Millennium?

8          MR. COOPER:  That's correct, Your Honor.  As I think

9  Your Honor's probably aware, he appears to be sort of a central

10 figure in the trial that we're about to have.

11         I think he was -- this is not all going to come in.

12 I'll get to that in a minute, but he was retained as a

13 consultant.

14         THE COURT:  Kaplan Fox is not in this case, correct?

15         MR. COOPER:  Well, they're not counsel of record.

16 The documents they gave to Kaplan Fox were produced by the

17 plaintiffs in this case.  So the documents he gave were in the

18 hands of counsel or plaintiffs in this case.

19         But that's not really -- that's sort of tangential.

20         The point here to the testimony simply is when he was

21 retained --

22         THE COURT:  Retained by whom?

23         MR. COOPER:  By Kaplan Fox.

24         THE COURT:  Okay.

25         MR. COOPER:  And they were conducting an

100

1  investigation into the titanium dioxide and the question of

2  whether there was price fixing.  And the testimony would simply

3  be about his response that he provided complete accurate

4  information to them, didn't hide anything, gave them everything

5  that they asked.  That's what it would be.  It is like in a

6  criminal case where you're arrested or you're stopped by the

7  police, you know, eliciting testimony that you didn't run, it's

8  the same kind of thing.  It's not going to be a side show.

9          THE COURT:  Well, Cianfichi was an employee of

10 Millennium, who was later hired and retained by Kaplan Fox.

11         MR. COOPER:  Yes.

12         THE COURT:  Hired and retained to do what?

13         MR. COOPER:  To provide information.

14         THE COURT:  To provide information on what?

15         MR. COOPER:  The titanium dioxide industry.  So he

16 provided information as to -- he gave them a list of price

17 increase announcements, a list of all the TDMA names.

18         THE COURT:  Is he still retained by Kaplan Fox?

19         MR. COOPER:  No, he's not.

20         THE COURT:  How long was he employed by Kaplan Fox?

21         MR. COOPER:  I don't know off the top of my head,

22 Your Honor.  It was a few months, I think.

23         THE COURT:  I'm just trying to get the gist of why he

24 was retained.  In other words, they retained him because they

25 thought he was going to provide information on Millennium and

101

1  could find a smoking pistol and they weren't satisfied later

2  and released him?

3        MR. COOPER:  No.  My guess is they retained him as

4  part of their investigation, and they collected facts, which

5  the plaintiffs have produced in this case, his own documents

6  they've produced in this case.  But again that's -- the only

7  point --

8        THE COURT:  And you would call him as a witness to

9  show that he provided information, and none it was

10 incriminatory so to speak as to Millennium?  Is that the

11 thrust?

12       MR. COOPER:  Well, I believe it would already be on

13 witness statements.  So we're talking about I would ask four or

14 five questions to elicit that he did not hide.  This is before

15 the lawsuit was filed.

16       THE COURT:  He didn't hide.  He was hired.  Why would

17 he hide?  He's being paid money.

18       MR. COOPER:  Exactly.  And he provided information

19 with respect to price increase announcements, meetings, all of

20 that kind of stuff.

21       THE COURT:  What would you suggest would be the

22 alternative?  He wasn't subpoenaed, he was hired, correct?

23 Somebody gave him a job, gave him money, and he said fine, I'll

24 be employed or I'll be a consultant.  You pay me money and I'll

25 give you information.

102

1        MR. COOPER:  That's true.

2        THE COURT:  The information.

3        MR. COOPER:  They said tell us about titanium

4  dioxide, and he gave them a lot of information.  He did not

5  have anything to hide.  He provided complete --

6        THE COURT:  Presumably, if he had something to hide,

7  he still would have given information.

8        MR. COOPER:  Well, I don't know.  If he had something

9  to hide, presumably he would have hidden it.  Just so you know

10 in the same way that you might be able to able to make an

11 inference that if you don't run away from the police you don't

12 have anything to hide.  That evidence comes in.

13       THE COURT:  Sometimes, not always.  Is that the

14 thrust of it?

15       MR. COOPER:  Yes, that's the thrust.

16       THE COURT:  It is not relevant under Rule 401.  The

17 motion of the plaintiff, motion in limine number 13, is

18 granted.

19       It doesn't really make any fact of consequence more

20 probable than not under Rule 401, Mr. Cooper, in my view, and

21 it's sort of gone far afield.

22       It would be different if this was some situation of

23 someone being subpoenaed and either trying to avoid process or

24 not provide information.  This is nothing more than your one of

25 your client's former employees seeing a financial opportunity

103

1  and being paid money by a law firm, and it either did or didn't

2  go anywhere.  That was the end of the story.  I find very -- I

3  don't find anything to be made more probable than not because

4  of Mr. Cianfichi did.

5        Okay.  The next one is motion in limine number 14 to

6  preclude references to class members who opted out or the

7  impact of opt-outs on a class size.

8        Is that one subject to a stipulation or not?  All

9  right.  Motion in limine number 14.

10       I'll be glad to hear from you, Miss Chan.

11       MS. CHAN:  Okay.  In defendants' opposition brief,

12 they seem to focus on their concern that plaintiffs will

13 mislead the jury about class membership.  And we'd like to

14 reassure the Court that plaintiffs will never say that we

15 represent every single titanium dioxide purchaser.

16       So if that's what defendants are concerned about,

17 about misleading the jury about the class membership, that just

18 won't happen.

19       For any other reason, the fact of opt-outs or impact

20 of opt-outs on the class size does not need to be referenced.

21 It doesn't say anything about liability.  We know from other

22 antitrust cases that class members opt out for a variety of

23 reasons.  Sometimes they opt out to file their own lawsuits.

24 Sometimes they do so to reach a private settlement with the

25 defendant.  So it doesn't have any effect on liability or

104

1  damages.

2        And it's potentially prejudicial, unfairly so,

3  because it may cause the jury to speculate why these class

4  members opted out.  Maybe they'll speculate they didn't believe

5  in the case, and it may be confusing as to damages and may lead

6  the jury to discount the damages award to account for opt-outs.

7        Just to address another point that was made in

8  defendants' opposition brief, plaintiffs agree that we can --

9  they can admit liability evidence as to the opt-outs.  For

10 instance, defendants can show that they competed for Valspar's

11 business.  But what they can't show or argue about is the fact

12 that Valspar opted out of the lawsuit and bring that into

13 evidence.

14       So it's the fact of the opt-out, not the underlying

15 liability evidence, that this motion in limine addresses.

16       THE COURT:  Thank you, Miss Chan.

17       Who's going to respond, Mr. Ulwick?  I'll be glad to

18 hear from you.

19       MR. ULWICK:  This will be short, Your Honor.  With

20 those clarifications by the plaintiffs, I don't think we have

21 any issues left because we weren't going to stand up and give a

22 list here's a list of all of the plaintiffs that opted out.  We

23 clearly weren't going to do that.

24       But what we said was two things we were concerned

25 about were the ones she just said that they won't do, number

**105**

1  one, get up and say we represent all of the people who
2  purchased titanium dioxide during this time period when they
3  clearly didn't.  So that's fine.
4        And then the second is that, this can't -- this issue
5  can't be a way of preventing us from showing competition,
6  evidence that would show that there was hot competition for
7  purchaser A, who is an opt-out person and have the plaintiffs
8  argue, oh, no, you can't put that in, they opted out.
9        So as long as we all agree that evidence is still
10  relevant and admissible, then fine.
11        THE COURT:  All right.  That seems to resolve that.
12  And I'll put that into the Ulwick doctrine, and that is moot by
13  agreement.
14        Okay.  Then we're up to number 15, motion in limine
15  number 15 of the plaintiff to exclude arguments that
16  plaintiffs' claims are barred because they arise from foreign
17  commerce or foreign activities.
18        Glad to hear from you, Miss Chan.
19        MS. CHAN:  Right.  This motion deals with a potential
20  defense under the Foreign Trade Antitrust Improvements Act,
21  which excludes from the Sherman Act breached anti-competitive
22  conduct that causes for an injury.
23        It doesn't apply in this case, because this only --
24  this case only deals with U.S. titanium dioxide purchases.  So
25  it's not relevant to any of defendants' defenses.

**106**

1        It's potentially confusing to the jury.  It could
2  lead a jury to believe that just because certain meetings or
3  agreements took place in Belgium, for instance, on foreign
4  soil, that there's no liability.
5        THE COURT:  If I understand that act, it only relates
6  to seeking damages from the foreign activity, correct?
7        MS. CHAN:  I think it deals with liability.
8  Liability as well.
9        THE COURT:  Well, as I understand it, the plaintiffs
10  have represented --
11        (Pause.)
12        THE COURT:  Essentially, it's only related to the
13  activity in the United States.
14        MS. CHAN:  Right.  This case is only related to U.S.
15  purchases of titanium dioxide.
16        THE COURT:  Let me hear from the defendants in terms
17  of how would this even arise.  Who's coming up for the defense,
18  Mr. Watts?
19        MR. WATTS:  We don't oppose the motion in principle,
20  we don't have an FTIA motion prepared to file.  We don't think
21  the motion is proper.
22        It seems like that if there were an -- if plaintiffs
23  were to put in evidence about foreign purchases that they are
24  claiming for damages, we understand they're saying they're not
25  going to do, then we would have this argument.

**107**

1        But at this time, we don't see a reason why there
2  should be a motion in limine limiting potential legal argument
3  that we may have.
4        THE COURT:  And how would you have a potential legal
5  argument as to the Foreign Trade Antitrust Improvements Act?
6        MR. WATTS:  Well, if plaintiffs were to somehow
7  change course and argue that sales in Europe or elsewhere are
8  part of the class, for example.
9        THE COURT:  You're not doing that, correct, Miss
10  Chan?
11        MS. CHAN:  Correct.
12        MR. WATTS:  Then we're okay.
13        THE COURT:  Then it's moot.  It's moot by agreement.
14        Number 16, exclude references to the impact of the
15  defendants' businesses on the local or U.S. economy.
16        Miss Chan?
17        MS. CHAN:  Right.  Plaintiffs agree with defendants
18  that it's okay to present limited references to the nature,
19  location, and size, meaning the dollar value, of their commerce
20  of their business.
21        But what this motion is getting at is potentially
22  prejudicial information that defendants may try to introduce.
23        For instance, the number of employees whom they
24  employ.  The need to increase profits to avoid layoffs.  That's
25  the kind of prejudicial information that's likely to sway the

**108**

1  sympathies of the jury.
2        It's irrelevant.  Benefit to the economy is not an
3  excuse for price fixing, so it doesn't form an affirmative
4  defense or tend to make defendants' liability any more or less
5  likely.
6        And in fact the case that defendants rely upon,
7  *Square D versus Breakers Unlimited,* make this exact
8  distinction.  It says that defendants can -- or the business
9  can present a reasonable amount of information about itself,
10  but the Court in that case actually granted the motion in
11  limine to exclude information about the companies involved that
12  would quote "appeal to the sympathies of the jury," and that's
13  what we're asking for here.
14        THE COURT:  Mr. Cooper?
15        MR. COOPER:  Good afternoon, Your Honor.  We're not
16  intending to say or argue that if you award damages, a lot of
17  people are going to be unemployed or anything like that.
18        We do think we are entitled to put in information,
19  sounds like we have agreement on this, this is who we are.
20  This is our business.  This is where we're located.  We have a
21  thousand employees.  We make these products, et cetera.
22        And with respect to counsel's suggestion that we're
23  not entitled -- we disagree with the suggestion that we're not
24  entitled to put in evidence about our pricing decisions that
25  may result from how our business is doing.

109

1    In other words, and I think this came up earlier, if
2  we think we needed to raise prices because business conditions
3  dictated, we're entitled to put in that evidence.
4    So it may be that I'm not sure whether we agree or
5  not. We're not going to be making arguments to the jury about
6  how the damages award will put us out of business or throw a
7  lot of local employees out in the streets. But we are going to
8  put in evidence about business conditions being relevant to
9  both to the jury understanding who we are as a defendant but
10  also on pricing decisions.
11    THE COURT: Miss Chan, this motion is very broadly
12  worded. The notion of excluding references to impact on the
13  business on the local U.S. economy, it's clear that we're not
14  -- I'm not going to permit that kind of argument to the jury.
15    Mr. Cooper's indicated he's not going to make it, but
16  the notion of they're going put in a straight jacket, they
17  can't put in the nature of their business, employee, pricing
18  decisions. They're certainly entitled to say by the way, we
19  have to do XY and Z, and this is the reason we did it or else
20  we're going to have to lay off employees.
21    There's no way I'm going to issue an order precluding
22  a defendant in a case like this trying to present why they made
23  business decisions. I think this is very broadly worded. This
24  is not going to be moot, it's flat out denied.
25    Now, having said that, we're not going to have a

110

1  passionate argument about -- and it's not an open door, Mr.
2  Cooper, to start talking you need to let these things slide
3  because we need to keep businesses open. I think you
4  understand the gist of it, but this one is denied.
5    All right. 17, exclude references to and arguments
6  that price increases were justified because profits were needed
7  for industry reinvestment, research, and development.
8    Miss Chan?
9    MS. CHAN: Okay. So here plaintiffs agree that
10  defendants can say that increasing costs or the need to invest
11  in the industry caused price increases. What this motion is
12  about is that they can't say that increasing costs or research
13  and development efforts justify price fixing.
14    The way --
15    THE COURT: I would be very hard pressed to believe
16  they're going to do that. It would almost amount to an
17  admission here.
18    Is Millennium or Kronos inclined to argue that?
19    MR. COGGINS: This will be moot by agreement. We're
20  not going to go there. We're saying this is one of the things
21  that drives pricing decisions, R & D.
22    THE COURT: I'm inclined, Miss Chan, this is for the
23  same reason as to 16, this is very broadly worded, and I have
24  no intentions of putting those kind of restrictions on the
25  defense.

111

1    But I can't imagine they're going get up and say we
2  really committed all these sins, but let's explain why. I
3  don't think that's a defense here. So that one will be denied
4  as well.
5    Hold on one second.
6    (Pause.)
7    THE COURT: Just for the record, I have a note here
8  that Katherine Van Dyke representing the parties from the
9  Northern District of California is trying to dial in on the
10  court conference dial number for this morning, but it's not
11  working, her direct dial number.
12    I believe we have counsel here from that case; is
13  that correct? Yes, Mr. Cuneo.
14    Mr. Cuneo, with all due respect to Miss Van Dyke,
15  she's certainly welcome to talk about the case, but we're not
16  going to line up a telephone so she can -- she doesn't
17  represent a party to the cases. Correct?
18    MR. CUNEO: Correct.
19    THE COURT: I have no intentions, no disrespect,
20  believe me, we won't put this on C-Span if she wants streaming
21  conferences here, and it's a waste of the money, from the point
22  of view the Court. I have no intentions of doing it.
23    So no disrespect to her, but it's a little bit
24  unprecedented. You can tell her there's no way I'm going to do
25  that. Take this note back. And tell -- good grief.

112

1    Just tell Miss Van Dyke we appreciate her curiosity.
2    (Laughter.)
3    THE COURT: And I'm sure she wants to listen to some
4  of charisma and some of the evidence, but that's another
5  matter. Just tell her you're here, you're doing a great job,
6  and you'll tell her I sent my regards, thank you very much.
7    All right. Now, the next motion in limine is number
8  18, exclude expert testimony about how many references to and
9  reliance upon data, economic literature, and other authority
10  not previously disclosed.
11    Miss Chan?
12    MS. CHAN: All right. Plaintiffs appreciate that Dr.
13  Murphy is no longer testifying. The same issue, though, exists
14  with Professors Rubinfeld and Willig. It was brought up this
15  morning with respect to the 475 documents with no Bates
16  numbers.
17    We've never had a chance to cross-examine experts
18  regarding some of the documents that were never disclosed to
19  us.
20    This is prejudicial. It will make it very difficult
21  for us to put on a case.
22    THE COURT: Haven't I already addressed that in my
23  discussion with Mr. Levin?
24    MS. CHAN: Well, what we're asking for is that on top
25  of excluding documents that have not been disclosed to.

113

1        THE COURT:  Or referenced.

2        MS. CHAN:  Or referenced, that the testimony relying

3  on those documents --

4        THE COURT:  Very simple on this.  I think consistent

5  with my discussion with Mr. Levin this morning, to the extent

6  that there's reference of documents by experts and my

7  discussion of Miss -- I think it was Miss Vickers this morning

8  on this, to the extent that there is -- there has been

9  reference to documents in the expert reports themselves, they

10 do not need to also additionally disclose in the response to

11 the request for documents.

12        To the extent that there are documents that were not

13 discussed or disclosed in the context of expert testimony or

14 depositions, then as to those matters, they can introduce those

15 exhibits.

16        Apparently, we've got gone from a universe of 450 to

17 perhaps 50, is that correct, Miss Vickers?

18        MS. VICKERS:  I think those were the numbers that we

19 talked about this morning.  We'll look into exactly how many.

20        THE COURT:  It's a much smaller universe, Miss Chan,

21 as to that.  That's how I ruled with respect to the documents

22 themselves.

23        Now, with respect to excluding expert testimony, I

24 think consistent with that ruling, there cannot be reference or

25 reliance upon documents that have not been disclosed in the

114

1  context of those prior reports.  We'll have to wait and see

2  what those are.

3        So as to that, I think we're just going to have to --

4  that's going to have to await further matters as I think we

5  also addressed, I think it was motion number 3, if I'm not

6  mistaken.

7        And that will just have to remain pending, but the

8  same ruling will apply.  If there's a document that's been

9  referenced in the expert report, the expert can certainly make

10 reference to that in his or her testimony.

11        All right.  So okay.  Now we're up to plaintiffs'

12 motion in limine number 19, exclude expert testimony that

13 defendants' margins were falling.

14        MS. CHAN:  All right.  Again, plaintiffs appreciate

15 that Dr. Murphy's no longer testifying.  The same problem still

16 exists with Professor Willig.  Willig's report at pages 57

17 through 58 say quote "stable or decreasing margins are less

18 consistent with cartel behavior."  However, he provides no

19 support for that position.

20        And in fact, the *Harrington* citation that defendants

21 note, the citation to footnote 139 was only cited for the

22 proposition that quote "changes in price cost margins may be

23 used as a screen for detecting cartel behavior."  That's

24 Willig's report at page 57.

25        And in fact *Harrington* in his detecting cartels

115

1  chapter never says that falling margins are less consistent

2  with cartel behavior.  And without supporting authority for

3  that proposition, expert testimony of falling margins is

4  irrelevant, because margins could be falling for many reasons.

5        It could be that changes in technology are causing

6  falling margins.  It could be that falling margins are why the

7  cartel was formed.  It could be that the cartel was slowing the

8  rate by which margins fall.  It's all speculation.

9        And in essence, the idea that falling margins are

10 inconsistent with collusion is without economic authority.

11 That's lay opinion dressed up as a expert testimony and cloaked

12 with the authority of expert testimony.  And that's what we're

13 asking the Court to exclude.

14        THE COURT:  Well, Miss Chan, on this theory, on any

15 weak testimony whose credibility can be attacked, will be

16 subject to a motion in limine, that's not the purpose of a

17 motion in limine.

18        Your analysis there was what may or may not be

19 brought out by cross-examination of the witness.  And indeed in

20 terms of someone proffers one as an expert, and there's voir

21 dire, the time to approach that is if the person is being

22 proffered as an expert.

23        I don't need to hear argument on this from the

24 defendants.  This is going to be denied.  That's nothing more

25 than challenging the credibility of a witness.

116

1        With that, we're at number 20, to exclude testimony

2  and analysis of Dr. Rubinfeld.  Yes.

3        MR. CRAMER:  Good afternoon.

4        THE COURT:  Mr. Dirksen?

5        MR. CRAMER:  Cramer.

6        THE COURT:  All right.

7        MR. CRAMER:  For the plaintiffs.

8        So I think, Your Honor, this might fall under some of

9  the other discussion that has been had this morning about

10 whether or not information was disclosed in the Rule 26 expert

11 reports.  So this is about a declaration that the defendants

12 submitted on March 25th as exhibit 15 to their Daubert motion

13 against Dr. Lamb.  It was not a Rule 26 disclosure.

14        It was disclosed months after the Rule 26 deadline

15 after the close of fact discovery after the close of expert

16 discovery.  And our position is that Dr. Rubinfeld should not

17 be able to testify about wholly new regression analyses and

18 cost measures that he did for this declaration submitted well

19 after the close of expert and fact discovery.

20        It wasn't disclosed in a timely way.  It was

21 submitted as a declaration as an exhibit to a brief.

22        And, therefore, since it wasn't disclosed, there

23 should not be testimony about it at trial.

24        And let me just stress what Dr. Rubinfeld did in this

25 declaration.  It's not that he just responded to what he

117

1  claimed was clarifying some information in Dr. Lamb's rebuttal.
2       Well, first of all, let me step back for a second.
3  Defendants say that Dr. Lamb -- that Dr. Rubinfeld was merely
4  clarifying some issues that Dr. Lamb raised in his rebuttal.
5  That's why they say they submitted this declaration as an
6  exhibit to their Daubert motion.
7       But they don't say what new issues Dr. Lamb raised or
8  what they're talking about.  And Dr. Lamb did not raise wholly
9  new issues in his rebuttal.
10      He, Dr. Lamb, did what experts do in their rebuttal
11 declarations.  He criticized Dr. Rubinfeld.  And in particular,
12 Dr. Rubinfeld's opposition criticized Dr. Lamb's use of cost
13 measures.
14      And so what Dr. Lamb came back in his rebuttal and
15 said was I, Dr. Lamb, used the correct cost measures, and Dr.
16 Rubinfeld used the incorrect cost measures.  That's typically
17 what happens in rebuttal.
18      Dr. Lamb was deposed.  Expert discovery was closed.
19 And then several months later, they submit a declaration that
20 didn't purport to be a surrebuttal report.  It didn't purport
21 to add to the expert data.  It was -- it was -- so there's just
22 no ground to allow Dr. Rubinfeld to testify about new cost
23 measures, new regression analyses, voluminous new data backup
24 and work papers that we have never had opportunity to take
25 discovery on.

118

1       It was after Dr. Rubinfeld's deposition.  It was
2  after we submitted a rebuttal report so we had no opportunity
3  to have our experts evaluate, discuss it, analyze it, or
4  respond to it.
5       And so we have this analysis that was done out of
6  time, without authority, submitted as an exhibit to a Daubert
7  motion purporting to be a declaration making a clarification.
8       THE COURT:  You have Rubinfeld's initial report,
9  correct?
10      MR. CRAMER:  What's that?
11      THE COURT:  You had Rubinfeld's initial expert
12 report?
13      MR. CRAMER:  Right.  Dr. Rubinfeld can testify in our
14 view about everything that was disclosed in that report.  The
15 problem with this declaration is that what Dr. Rubinfeld did is
16 he took -- he redid his analysis.  He did a wholly new
17 analysis.
18      THE COURT:  Is he entitled to respond to Dr. Lamb?
19      MR. CRAMER:  He is entitled to respond to Dr. Lamb,
20 and whatever he responds to Dr. Lamb at trial, if there's a
21 criticism that Dr. Lamb made about Dr. Rubinfeld, we think Dr.
22 Rubinfeld should be able to respond to that.
23      What should not be allowed, what would severely
24 prejudice plaintiffs, Dr. Rubinfeld should not be able to
25 submit and testify about wholly new cost measures, wholly new

119

1  regression analyses that were submitted out of time as a
2  declaration, not a Rule 26 disclosure, and that go beyond
3  merely responding to Dr. Lamb.
4       He's allowed to respond to criticisms.  What he's not
5  allowed to do, absent seeking leave from the Court at the time,
6  is to create a new analysis and new cost measures.
7       THE COURT:  The defendants have contended that Dr.
8  Lamb have raised new issues, correct?
9       MR. CRAMER:  First of all, they haven't identified
10 what those are.
11      THE COURT:  Yes, they have.  They said there was --
12 as I recall, I'm looking at my notes, I wrote it down
13 somewhere, there was something with respect to cost proxies,
14 various sources, as I recall.
15      MR. CRAMER:  Okay.  So the issue of cost proxies,
16 basically.
17      THE COURT:  If there's anything in Dr. Lamb's report
18 that is new or he hasn't previously indicated, then what would
19 the basis be of Dr. Rubinfeld not being permitted to respond to
20 it?
21      MR. CRAMER:  So let me address the issue of cost
22 proxies.  What happened here was that Dr. Lamb used cost
23 proxies, cost indices in his regression analysis, in his
24 initial report.
25      Dr. Rubinfeld did an analysis and said you shouldn't

120

1  use cost indices, you should use internal cost data.  And
2  that's what he did.
3       He used internal cost data.  He used cost measures
4  from the different defendants, and he ran regression analyses,
5  perfectly legitimate.
6       We responded, Dr. Lamb responded by saying what I did
7  was correct, we should use the indices, not the internal cost
8  data.  And the use of the internal cost data's wrong and what I
9  did was right.
10      That's a rebuttal report.  Dr. Rubinfeld is perfectly
11 fair, perfectly fine for him to come back and say, no, what I
12 did was right.  I should be able to use cost indices that I
13 used in my first report.  That's the way to do it.  I should
14 use the cost from the defendants.  And my regressions that I
15 initially did were right.  That's perfectly legitimate.
16      And Dr. Rubinfeld should be able to come back and say
17 what he did in his Rule 26 disclosed report was correct and
18 that the analysis that he did was right.
19      What he shouldn't be able to do is, without seeking
20 leave of Court, submit completely new analyses.  What Dr.
21 Rubinfeld did, what defendants say in their own Daubert brief,
22 reran his regressions with quote unquote "more consistent cost
23 measures."  So he redid his cost measures because I guess he
24 figured that were problems in his initial report.  So he redid
25 it his cost measures.  He reran his regressions.

121

1    Those were not disclosed as part of his Rule 26

2  report.  That goes well beyond simply responding to quote

3  unquote "new matters" in a rebuttal report.  That's a

4  completely new analysis.

5    And in our view, the way that should have been

6  handled, if the defendants felt that they needed to do new

7  analysis because there were significant flaws in their initial

8  expert reports, they should have come into court at the time.

9  They should have asked for authority to submit a surrebuttal

10 report, and then there could have been, if Your Honor granted

11 that authority, a process, we would have known that the new

12 report was a report that was purporting to allow Dr. Rubinfeld

13 to testify about these new analysis at trial.

14    We could have then taken the deposition of Dr.

15 Rubinfeld and evaluated and evaluated the voluminous new

16 analysis and voluminous new data.

17    THE COURT:  And then you respond to it.  And then the

18 defendant should be permitted to respond to Dr. Lamb by

19 deposition, correct?

20    MR. CRAMER:  If Your Honor had set up that procedure,

21 then the record would have been -- we all would have understood

22 what the record was.  But because defendants did not come into

23 court at the time and say they needed a surrebuttal because

24 their expert had made some mistakes that he wanted to correct,

25 what we're left with is defendants submitting a declaration of

122

1  Dr. Rubinfeld that did not purport to be a Rule 26 report.

2    They attached as exhibit 15 to a Daubert motion and

3  then served on the plaintiffs the underlying voluminous

4  underlying data and work papers.

5    And Your Honor denied the Daubert motion.  Fact

6  discovery and expert discovery were closed.  We had no reason

7  to believe that this -- that the defendants were going to be

8  able to rely upon this new analysis, new cost measures, new

9  data at trial, because they didn't submit it as an amendment to

10 their Rule 26 report.  It did not purport to be that.

11    And because it did not purport to be that, and

12 because fact discovery was closed, and expert discovery was

13 closed, we never had an opportunity to discover it.

14    Second of all, in addition, when we actually

15 submitted a 30(b)(6) deposition notice on DuPont at the time,

16 because one of the cost measures that Dr. Rubinfeld redid was a

17 cost measure based on DuPont's internal data, and since there

18 was some more information that Dr. Rubinfeld was apparently

19 using regarding DuPont's data, we asked to take a deposition of

20 DuPont.  They turned us down.  Why?  Because discovery was

21 closed.

22    So if discovery's closed for the plaintiffs, it

23 should be closed for the defendants.  And it just is unfair in

24 the extreme to the plaintiffs to have us cross-examine Dr.

25 Rubinfeld at trial, and he's going to point to his new analysis

123

1  and his new work papers and his new cost information and his

2  new regressions that we have not -- we've never taken a

3  deposition on that.  We've never been afforded an opportunity

4  to take a deposition on that.  We would never have thought that

5  it was necessary given that it was after the close of fact

6  discovery three months after the close, after they'd submitted

7  their expert report.  It's simply unfair.

8    What they should be able to do, what Dr. Rubinfeld

9  should be able to do at trial, is say no, my initial cost

10 measure and my initial regression are right for this reason.

11    He can't -- he shouldn't be able to just submit

12 something new without seeking Your Honor's authority, without

13 allowing plaintiffs to have a deposition, without allowing us

14 to have any discovery, how can we cross-examine him at trial

15 about something that we know very little bit about?

16    THE COURT:  It sounds like you can do a pretty good

17 job right now cross-examining him.

18    MR. CRAMER:  But at trial I should be able to

19 understand what Dr. Rubinfeld's answers are before I ask them

20 on cross-examination.  I shouldn't have to at trial be asking

21 discovery questions about a new -- about two new analyses and

22 two new cost measures at trial for the first time.  That's

23 simply unfair and severely prejudicial.

24    Our expert, Dr. Lamb, was deposed four times in this

25 case after his first class report, after his second class

124

1  report, after his first merits report, after his rebuttal

2  report.

3    He has been deposed for hours and hours and hours.

4  Defendants had every opportunity they need or wanted to take

5  discovery from our experts.

6    We, on the other hand, have never had an opportunity

7  to take discovery on these new analyses.  It is simply unfair

8  in the extreme to force the plaintiffs to ask discovery

9  questions during a trial about new analyses that were submitted

10 out of time without authority, without leave.  It's unfair to

11 force us to do so.

12    THE COURT:  Thank you, Mr. Cramer.

13    Mr. Ulwick?

14    MR. ULWICK:  This one's mine, Your Honor.  The

15 unfairness in the extreme would be to grant this motion.  And

16 let me explain why.  We have to go back to how we got to where

17 we are, because Mr. Cramer has given you a very one-sided

18 version of what the background is.  So if I may have a moment

19 to that explain.

20    Dr. Lamb puts together a regression model.  He in

21 that regression model, as Your Honor pointed out, relies upon

22 proxies for data.

23    For example --

24    THE COURT:  In the initial report?

25    MR. ULWICK:  In his initial report.  He relies on

125

1  PPI, Producer Price Indexes for the petroleum and coal
2  products. That's at page 62 of his original report.
3         And he doesn't actually rely on the actual costs of
4  the defendants. He relies on these wide Producer Price
5  Indexes.
6         So Dr. Rubinfeld in his report in response points it
7  out and says you, Dr. Lamb, didn't use the evidence that would
8  be most relevant here, the actual cost here, and you've used
9  only a -- this -- these proxies aren't even very good proxies
10  because they don't really even cover some of the main
11  ingredients that are the -- that go into titanium dioxide.
12         So what Dr. Lamb does, in his rebuttal report, he
13  comes back and says -- he goes to the point where Mr. Cramer
14  just said and he says, no, my version is right, and then he
15  goes way further. He goes on and says and your cost data is
16  unreliable and let me show you why. You know why? Because I
17  created a regression analysis, regression model just for his
18  rebuttal report, brand new, not previously disclosed, not in
19  any of his reports, not even in contemplation.
20         Brand new regression analysis, which he then says
21  this shows, and your reliance on the cost data is unreliable
22  and flawed.
23         And he goes on at great length to talk about you, Dr.
24  Rubinfeld, are mistaken because you've done this, and I've
25  shown why in my new, brand new regression analysis. That's

126

1  what they don't want us to have a response to. Because Dr.
2  Rubinfeld in that supplemental declaration that they have had
3  for months and months comes back and says --
4         THE COURT: When was that? That was submitted in
5  March; is that correct?
6         MR. ULWICK: In March.
7         THE COURT: When was the discovery deadline?
8         MR. ULWICK: The discovery deadline for experts I
9  think was --
10         MR. CRAMER: March first was the end of expert
11  discovery. Defendants' expert disclosure deadline was December
12  21st.
13         MR. ULWICK: Well, how did Dr. Rubinfeld respond to
14  something that wasn't there before? It wasn't even an issue
15  before, isn't even an issue until Dr. Lamb makes it an issue in
16  his rebuttal reports.
17         THE COURT: When was his rebuttal report filed?
18         MR. CRAMER: February 18.
19         MR. ULWICK: A couple weeks before the end of
20  disclosure -- between discovery closed.
21         So at the very close of everything, he puts in this
22  brand new issue. And says based on his new analysis and he
23  takes and prepares these charts, the charts say here is why
24  it's unreliable, because if you look at the costs for the
25  various defendants, here are lines that I've created for this,

127

1  these two defendants.
2         THE COURT: Let me just -- I understand the
3  respective arguments. Dr. Lamb's report was filed on February
4  18th.
5         MR. CRAMER: Rebuttal report.
6         THE COURT: Rebuttal report. And Dr. Rubinfeld's
7  response was filed a month thereafter on March 25th.
8         MR. ULWICK: Yes, sir.
9         THE COURT: Okay. And when was the expert discovery
10  deadline?
11         MR. CRAMER: March first.
12         THE COURT: Well, then it sounds like everybody's got
13  dirty hands here.
14         MR. CRAMER: Can I just address this last?
15         THE COURT: No, no, wait. Wait a minute. Wait a
16  minute, Mr. Cramer.
17         MR. CRAMER: Okay.
18         THE COURT: It is too cute by half to wait maybe a
19  week before the deadline and then for Dr. Lamb to increase his
20  report. And having said that, the defendants clearly did not
21  comply with the deadline when they filed by March 25th. And
22  everybody's aware of it.
23         And now we're a week, two weeks out from trial, and
24  Mr. Cramer, your great indignation and concern and prejudice
25  and concern for it is about four months too late.

128

1         MR. CRAMER: Your Honor, I hear you.
2         THE COURT: That's very simple. I don't want to get
3  into it. It's tactics, all trial tactics. I understand
4  tactics on the eve of trial to do it. You could have done it
5  two, three, four months. You chose tactically not to do it
6  now, that's your choice as a lawyer.
7         On the other hand, it's also tactical to have Dr.
8  Lamb submit a report ten days before the deadline. It's
9  tactical with respect to the defense submitting on March 25th.
10         I'm not interested in trial tactics and brinkmanship.
11  Given you're asserted great prejudice and given what's
12  occurred, I'm inclined to schedule a deposition of Dr.
13  Rubinfeld, and I don't think it's going to be all that
14  productive. You already know what he's going to say. I bet
15  you could conduct 90 percent of your cross-examination right
16  now.
17         But given your cries of prejudice, it could have been
18  raised in April, May, June, July, and August, but tactically,
19  have been raised now. They're going to have to be addressed.
20         Now, I'm not going to go up or down on either one of
21  these. I understand what's involved here. I understand why it
22  was ten days before the deadline, and I understand why it was
23  three weeks after the deadline, and I understand why everyone's
24  having brinkmanship right now.
25         MR. CRAMER: Your Honor, may I just address --

129

1    THE COURT: No, you may not. I'm not attacking you
2 personally, Mr. Cramer. I got the big picture. We have a lot
3 to deal with. I'm not interested in trial tactics and
4 brinkmanship and cries of great prejudice. I have the gist of
5 it.
6    MR. CRAMER: We submitted our rebuttal on the date
7 Your Honor said.
8    THE COURT: I understand. I understand. The bottom
9 line is how long would the deposition take if you scheduled Dr.
10 Rubinfeld?
11    MR. CRAMER: We can do it in three and a half hours.
12    THE COURT: Mr. Ulwick, in order to just cut to the
13 core of this, so in my view, I'm trying to make sure that
14 fairness comes out in this courtroom and each side has an
15 opportunity here. So I'm not particularly inclined under one
16 way or the other, under Rule 26 for clever tactics by very good
17 lawyers.
18    I'm interested in a jury hearing evidence so they can
19 decide an issue. And no disrespect to either one of you, you
20 are all very experienced very good lawyers, but I have the gist
21 of it, and I'm not going to go sacrifice evidence that a jury
22 should hear over clever tactics and brinkmanship. Period.
23    So given that, how quickly can Dr. Rubinfeld be made
24 available for a deposition between sometime very quickly so
25 we're ready to go on September 9?

130

1    MR. ULWICK: I have to call him and find out. We're
2 all preparing for trial.
3    THE COURT: I know that. I know that. Where is he?
4 Where's he live?
5    MR. ULWICK: Dr. Rubinfeld will be in New York.
6    THE COURT: All right. Well, it seems to me that
7 you've got plenty of lawyers here flying back and forth across
8 the country. We're talking about three and a half hours. I'll
9 limit it to be no more than a three-hour deposition.
10    MR. ULWICK: Can we make it two hours?
11    MR. CRAMER: There's a lot of --
12    THE COURT: Three hours. Three-hour deposition is
13 fine. Three-hour deposition. You all work it out. Take his
14 deposition.
15    So this matter is being denied as moot because Dr.
16 Rubinfeld's free to testify in response to Dr. Lamb. I
17 understand the gist of it. And I understand the gist of your
18 argument as to Dr. Lamb.
19    But what I'm not going to permit is two shots by one
20 side, one by another over -- I'm not saying they're
21 questionable tactics, they're very good legal tactics, but I'm
22 not allowing a case in which evidence has to be presented to
23 the jury to be affected by trial tactics. That's the bottom
24 line of it.
25    So we'll deal with it sometime between now and

131

1 tomorrow morning, the defense team will find out when Dr.
2 Rubinfeld is available. People can hop up, we don't need to
3 have all the lawyers in the room, we can have lawyers go up to
4 New York and take his deposition for three hours, and that will
5 deal with it.
6    It's an inconvenience to everyone, but I think cuts
7 to the core. So there's no prejudice to your client, Mr.
8 Cramer, and yet, Mr. Ulwick, I'm not inclined although there's
9 certain issues can we get into in terms of timeliness of
10 notice, doesn't make any difference now, both Dr. Lamb and Dr.
11 Rubinfeld can testify as to their reports. Everybody's on
12 notice, and the jury will make a decision. To me, that's the
13 fairest way to deal with it all.
14    MR. ULWICK: Can I say one thing?
15    THE COURT: Sure, sure.
16    MR. ULWICK: Just for the record, I know --
17    THE COURT: I'm not criticizing you, Mr. Cramer, or
18 you, Mr. Ulwick. I'm just saying that I've got the gist of it,
19 and let's get to the reality of what evidence need to come in
20 here in the courtroom and let the jury decide.
21    MR. ULWICK: This is not to change the ruling at all,
22 but just so that you know, your schedule didn't have any point
23 in time when there would be a surrebuttal report. So there was
24 no deadline for us to put it in.
25    THE COURT: I have scribbled in here --

132

1    MR. ULWICK: We did it as quickly --
2    THE COURT: I understand. In fairness to the
3 lawyers, while I'm jumping on the lawyers for clever tactics,
4 perhaps I've got over here on my pad surrebuttal question mark,
5 trying to find out as to when I've called for surreply, and
6 you've noted my deficiency in that regard.
7    So we shouldn't let my mistakes, good trial tactics,
8 or anything, affect what happens in the well of the courtroom.
9 That's what ultimately we all should be seeking. It's
10 perfectly fine.
11    You have a shot to take his deposition, Mr. Cramer,
12 without question. I'm not criticizing you. I'm just saying
13 there's a lot of brinkmanship that goes on in these cases, but
14 my point is ultimately my job is to make sure facts come out
15 here and let the jury decide the case. To me, that's the
16 fairest way to do it.
17    With this, the motion number -- motion in limine
18 number 20 is going to be denied for the reasons stated on the
19 record, but leave -- it will just indicate on the record, I
20 don't need a separate order, leave as is being granted to the
21 plaintiffs to take Dr. Rubinfeld's deposition for no more than
22 three hours, and you will do it when you can coordinate.
23    So I think it goes without saying, this is not going
24 to be scheduled for Sunday afternoon, September 8th, the day
25 before trial.

133

1    I have no disrespect to Dr. Rubinfeld, but I don't
2 want to hear about his vacation schedule from now until
3 September 7. So presumably, you're going to be able to find,
4 and if we have an issue on it, we have an issue. But I assume
5 the experts understand the great privilege and honor of
6 testifying as an expert in this case. There's time commitments
7 that have to be made. I assume they'll be able to make them.
8 That's where we are on that.
9         Okay. All right. Now, we're up to --
10        MR. ULWICK: 23.
11        THE COURT: I think we're up to --
12        MR. COGGINS: 24.
13        MR. SAVERI: I think.
14        THE COURT: We did 21 and 23 before.
15        MR. ULWICK: And 22.
16        THE COURT: Yeah, I think. Hold on one second.
17        MR. ULWICK: Yes, it's 24.
18        THE COURT: Wait one second. All right. We've dealt
19 with 22, and 21, 22 23. Hold on a second.
20        Now we're up to 24. Preclude disclosure to the jury
21 that any damages award will be trebled. Mr. Saveri?
22        MR. SAVERI: Good afternoon, Your Honor. On this
23 motion in limine, I believe it's settled law that we cited in
24 our in limine motion that mentioning the fact that damages will
25 be trebled under the Sherman Act is harmful and confusing.

134

1         It's also irrelevant to the jury's determination.
2 The jury is charged with determining the amount of single
3 damages. Were the Court -- were the jury to know that trebled
4 damages would be available, there's a real potential that the
5 jury would adjust their single damage calculation to reflect
6 that fact, and that's prejudicial.
7         In addition, Your Honor, the trebled damage remedy
8 that exists under the Sherman Act is there for sound public
9 policy reasons to deter antitrust violations, and to the extent
10 the jury would be allowed to know about the fact of trebled
11 damages, it would undercut that up to its core.
12        So for that reason, Your Honor, based on the settled
13 law, we think the motion in limine should be granted.
14        THE COURT: Thank you. Who's addressing this on
15 behalf of the defendants, Mr. Watts?
16        MR. WATTS: It's me. And we have a very narrow
17 response. We agree the defendants are not going to argue to
18 the jury that damages will be trebled in this case and damages
19 will be large.
20        The way that this may come up is that plaintiffs have
21 put at issue that they believe witnesses understood that their
22 contacts with competitors were dangerous. And so that begs the
23 question why did they think that those were dangerous?
24        Witnesses would say, well, I knew that damages for an
25 antitrust case would be large for a company or I would face

135

1 personal risk as well.
2         THE COURT: Large? There's no objection to that, Mr.
3 Saveri, correct?
4         MR. SAVERI: No, Your Honor. It's the trebled part.
5         THE COURT: But clearly they don't intend to say they
6 would be trebled.
7         MR. WATTS: No, Your Honor. But we just want to make
8 clear they should be able to answer that question.
9         THE COURT: They can answer that they understood
10 exposure and damages. They under no circumstances could say
11 that they would be trebled.
12        MR. WATTS: Yes, Your Honor.
13        THE COURT: That's understood. So to that extent,
14 the plaintiffs' motion is granted. And I would certainly hope
15 that any witness who comes on the witness stand will understand
16 the implications of having that somehow come rolling off their
17 tongue or be blurted out.
18        MR. WATTS: Yes, Your Honor.
19        THE COURT: So under no circumstances is that to
20 occur. I'm sure it won't, because it would be a real mess if
21 it did.
22        MR. SAVERI: It's a very hard bell to unring.
23        THE COURT: I totally agree with you, Mr. Saveri,
24 totally agree with you.
25        So no one's going to ring that bell. I haven't had

136

1 any civil witness in a civil case be taken out by the U.S.
2 Marshals yet here, it would be quite traumatic, I'm sure. I'm
3 not sure, Bob, has a witness been arrested and taken out the
4 door? Not in mine, either, I'm sure it won't happen. I'm sure
5 that that won't happen.
6         Yes, Mr. Saveri.
7         MR. SAVERI: I'm standing here ready for the next.
8         THE COURT: 25, exclude evidence regarding the effect
9 of the defendants or class members of a large damage award.
10 I'll be glad to hear from you on that. Go ahead.
11        MR. SAVERI: Your Honor, quite simply, defendants
12 shouldn't offer any argument or evidence about the fact of
13 large damage awards on the defendants. This is irrelevant. It
14 is irrelevant whether litigants are rich or poor. And putting
15 in evidence about the effect of a damage award on the
16 defendants is prejudicial because it distracts the jury from
17 the real issues in the case; that is, whether they violated,
18 whether the defendants violated the Sherman Act, and whether
19 that caused damages to the plaintiffs.
20        THE COURT: Okay. Thank you very much.
21        Who's dealing with this one?
22        MR. COGGINS: I am, Your Honor. I think this is one
23 that we perhaps can be moot by agreement.
24        THE COURT: As I understand your response, I thought
25 I was looking -- I confess, I was starting to get a little

137

1  tired, but I recall at this point, you were talking, you were
2  proffering you should be able to talk about your client's
3  financial condition vis-a-vis their business practices, but
4  you're not going to proffer your client's financial condition
5  in terms of an effect an award would have.
6          MR. COGGINS:  That is correct.
7          THE COURT:  You're not disputing --
8          MR. COGGINS:  They're going through difficult times,
9  hard times, and the Court said that was okay this morning.
10         THE COURT:  I don't think -- that's not the gist, Mr.
11 Saveri, to the extent that you have evidence with respect to
12 how well a company is or is not doing and pricing decisions,
13 quite frankly, that cuts both ways.
14         The plaintiffs can certainly seek to say if you're
15 having tough times, you don't raise prices, that's fair game.
16         Mr. Saveri, I don't think it's really an issue.  They
17 don't intend to argue that a large damage award would have a
18 certain effect upon them.  I would state the obvious, that
19 they're not to make that argument or proceed in that fashion.
20 I think this is probably moot by agreement.  We'll invoke the
21 Ulwick rule there.
22         MR. SAVERI:  Your Honor, 26 is very close.
23         THE COURT:  Preclude reference to discussion of
24 evidence regarding any adverse effect on the defendants and the
25 employees, it's the same principle.

138

1          MR. COGGINS:  It's exactly the same.
2          THE COURT:  It's moot as well.  All right.
3          And then we have 27, exclude references to the
4  financial condition of any named plaintiffs including any
5  references to any plaintiffs or class members bankruptcy or
6  dormant status.
7          Yes, Mr. Cramer?
8          MR. CRAMER:  Your Honor, courts have ruled in the
9  cases that we cited, *Home Star* case, *Sanderson* case, that the
10 financial condition of plaintiffs or named plaintiffs are not
11 relevant to the merits.  They distract the jury from the real
12 issues in the case.
13         This is not a lost profits case, as Your Honor well
14 knows.  This is an overcharge case.  Whether a plaintiff is
15 rich or poor in good condition or bad condition is not
16 relevant, and it can be distracting.
17         Now, the defendants say that, well, it's relevant,
18 the financial condition of a named plaintiff might be relevant
19 to the prices that they pay the defendant.  But this doesn't
20 make any sense.  There's no evidence or economic reason to
21 believe that a purchaser's financial condition is a factor in
22 the price that they pay a manufacturer for titanium dioxide.
23         Companies want low prices whether they're rich or
24 poor.
25         Defendants also say that the financial condition of a

139

1  named plaintiff is relevant to the financial condition of the
2  entire titanium dioxide industry or paint industry.  And that's
3  not so, either.
4          Whether a named plaintiff in its particular
5  circumstances is in bad financial situation has nothing to do
6  with the entire paint industry or the titanium dioxide industry
7  as a whole.
8          The only case the defendants cite is *Ellis v. Penn*
9  *Higher Ed* from the District of California.  That court allowed
10 limited evidence regarding financial information of a
11 plaintiff, of a class case, not an antitrust case, because the
12 damages being sought by that plaintiff related to damages from
13 -- flowing from a bad credit report.
14         And the financial condition of the plaintiff was
15 directly at issue in the plaintiffs' case and its case for
16 damages.
17         So therefore, the financial condition of the
18 plaintiff was relevant, and that information was allowed in for
19 limited purposes.  There's simply no relevance to it here, and
20 it could be a distraction to the jury.
21         THE COURT:  The defendants have suggested that it
22 would relate to the interaction between -- the defense counsel
23 has suggested that evidence would relate to the
24 interaction between one or some of the plaintiffs and some of
25 the defendants in this case.

140

1          MR. CRAMER:  And my response to that is there's just
2  no reason to believe that the economic condition of a purchaser
3  relates to the prices that it pays a manufacturer.  A purchaser
4  --
5          THE COURT:  Doesn't it relate to the prices they're
6  able to pay a manufacturer?
7          MR. CRAMER:  Well, the prices they're able to pay are
8  prices they do pay.  We have nothing against defendants putting
9  information into evidence about the prices that the plaintiffs
10 actually pay, the price increases they actually incur.
11         But there's no reason to believe that because the
12 plaintiff -- if a plaintiff doesn't have money, it doesn't buy
13 the product.  But there's no reason to believe that a
14 particular purchaser, because it's in bad financial condition,
15 gets to pay less as a result of their financial condition.
16         No matter what, no matter what you're buying and no
17 matter what your financial situation, you want to pay lower
18 prices.  So there's no linkage between your own financial
19 condition, Your Honor, and the prices that you pay a
20 manufacturer.
21         The prices that they do pay, that's record evidence.
22 They can put that in.
23         But it doesn't seem to us, Your Honor, that putting
24 in evidence regarding a financial condition, whether a
25 plaintiff is struggling or not has any relevance, and it has

141

1 the potential to distract the jury.

2        THE COURT: In the context of an alleged price fixing

3 scheme.

4        MR. CRAMER: Yes.

5        THE COURT: I understand. Okay.

6 Anything further on this, Mr. Cramer?

7        MR. CRAMER: No.

8        THE COURT: Who's going to respond for the

9 defendants, Mr. Watts?

10       MR. WATTS: Your Honor, we've just found that the

11 motion to be very broad and vague. It wasn't clear to us

12 precisely what plaintiffs intended to preclude us from entering

13 into evidence.

14       As Mr. Cooper mentioned earlier this morning,

15 financial condition or the conditions of the industry

16 downstream can be relevant to independent pricing decisions.

17       THE COURT: As to your clients, yes.

18       MR. WATTS: That's right.

19       THE COURT: How does it relate to the financial

20 situation of its plaintiffs as purchasers of titanium dioxide?

21       MR. WATTS: Well, for example, if the coatings

22 business is going very well, people may deliberate internally

23 about whether a price increase would be a good idea at the

24 time. We don't intend to talk about the balance sheet of the

25 named plaintiffs in this case.

142

1        What we do want to make sure we're able to put into

2 evidence is about when they purchased. And, you know,

3 certainly there are prices which I understand they're not

4 contesting here.

5        But when they purchased, when they stopped

6 purchasing, some of the named plaintiffs stopped purchasing

7 titanium dioxide many, many years ago.

8        THE COURT: They're not objecting to that. They're

9 not talking about when they did or didn't purchase, correct,

10 Mr. Cramer?

11       MR. CRAMER: Correct, we're not.

12       THE COURT: There's no -- they're just objecting as

13 to the precise financial condition of a particular --

14       MR. WATTS: Of a particular plaintiff, we understand

15 that. But we do want to be able to put on evidence about

16 market conditions that --

17       THE COURT: I don't understand that to be the thrust

18 of the motion. The motion has to do specifically with respect

19 to the financial condition of a particular named plaintiff.

20       MR. WATTS: If that's -- again, the motion mentions

21 dormant status, and we're not clear on that. If the defendants

22 can put in evidence about when purchases were made, when they

23 stopped being made by the named plaintiffs, then --

24       THE COURT: Mr. Cramer's indicating they're not

25 objecting to that. They're objecting to seeking to put in

143

1 specific financial information about named plaintiffs, correct,

2 Mr. Cramer? That's the thrust of your motion?

3        MR. CRAMER: Correct.

4        THE COURT: That will be granted. And that motion in

5 limine will be granted. You can put in evidence, Mr. Watts, as

6 to general financial conditions, but not specific financial

7 condition of the named plaintiff, certainly not in terms of his

8 bankruptcy or status.

9        All right. Then the next motion of the defendants is

10 motion in limine number 28, exclude references to and evidence

11 regarding other lawsuits filed by any of the named plaintiffs.

12 Mr. Cramer?

13       MR. ULWICK: Stipulation.

14       THE COURT: There's a stipulation on this?

15       MS. VICKERS: Yes.

16       MR. SAVERI: Excuse me. Miss Vickers, I think it's

17 paragraph one.

18       MS. VICKERS: Yes, paragraph one.

19       THE COURT: All right. I've got it right here.

20 That's good, thank you. I was hoping to look at the

21 stipulation sheet with more frequency here today.

22       Okay. We're up to motion in limine number 29,

23 exclude references to evidence, and evidence regarding the

24 motivation of any of the named plaintiffs who are filing in

25 this lawsuit, how they became involved in the class or to the

144

1 case being lawyer-driven.

2        Mr. Cramer?

3        MR. CRAMER: Your Honor, defendants appear to concede

4 in their opposition to this that the part of the motion about

5 the case being lawyer-driven is inadmissible. They don't

6 address that part. In fact, they distinguish all of our cases

7 by saying the cases relate to that. So I'm not sure where they

8 are on that.

9        We obviously clearly think that's prejudicial and not

10 at all relevant.

11       For the same reasons, we believe --

12       THE COURT: It might be dangerous precedent to find a

13 case is lawyer-driven.

14       MR. CRAMER: For the same reason, we believe that

15 testimony about the subjective motivation behind a named

16 plaintiff bringing this case is not relevant and unduly

17 prejudicial.

18       It seems to me what the defendants do in their

19 response is confuse the basis for bringing this suit; i.e., did

20 they -- does the suit have grounds?

21       Does the named plaintiff believe that prices are

22 officially inflated?

23       Does the named plaintiff believe they're paying

24 higher prices as a result of the conspiracy?

25       Those are completely legitimate questions.

145

1 What are beyond the bounds and prejudicial are
2 questions about how they came to learn about the lawsuit.
3 There's just no relevance to that, and it's prejudicial,
4 especially in a case where there's an allegation that, and
5 where the conduct involved, is an alleged secret conspiracy
6 that defendants were keeping from the named plaintiffs.
7 And it seems to us, Your Honor, that allowing
8 questions of named plaintiffs about their subjective
9 motivations in bringing the suit, how they learned about the
10 suit, have absolutely no relevance at all. They should be able
11 to be asked about their basis for the suit, whether the suit
12 has grounds, whether they paid artificially inflated prices,
13 but should not -- the defendant should not be able to solicit
14 testimony about subjective motivations and how they learned
15 about the lawsuit.
16 THE COURT: Well, Mr. Cooper, you certainly aren't
17 going to be going down a path in terms of this case being
18 lawyer-driven.
19 MR. COOPER: That's correct, Your Honor.
20 THE COURT: So we have that clearly.
21 MR. COOPER: Can we take that off the table?
22 THE COURT: Do we have -- there's certain things that
23 are verboten in this case. We're not going to have -- the word
24 treble is not going mentioned anywhere, and we're not going to
25 say anything about lawyer-driven.

146

1 All right. Now, as to that, I'll be glad to hear
2 from you in terms of the examination of the class
3 representatives and the nature of what you would seek to elicit
4 on cross-examination.
5 MR. COOPER: It sounded like, if I heard Mr. Cramer
6 properly, we've agreed on our side, lawyer-driven is off the
7 table, and he's agreed the class representatives under personal
8 knowledge, et cetera, is fair game.
9 And we're really down to that middle, that one little
10 piece that he mentioned, which is basically, okay, so if you
11 were not aware of any issue, you didn't have an issue with your
12 titanium dioxide pricing, how is it that you end up here in
13 court?
14 The answer being because an investigator contacted me
15 or a lawyer contacted me.
16 The question is, we allowed to put that evidence
17 that? We think it's relevant and --
18 THE COURT: How is it relevant, in what way?
19 MR. COOPER: It explains the disconnect between I'm
20 not aware, I was not aware of any problem. It explains how
21 then did they end up in front of the jury.
22 THE COURT: But what fact is rendered more probable
23 than not under Rule 401 with that testimony as to how they
24 determined it? They may have been totally in the dark. They
25 may or may not have been.

147

1 MR. COOPER: It makes it more likely that they did
2 not suffer any injury.
3 THE COURT: That's the problem. That's the problem.
4 The problem is that under the basic rubric under 401 analysis
5 whether a fact or consequence is rendered more probable than
6 not is the standard under Federal Rules of Evidence.
7 The fact they may or may not have been aware for
8 different reasons does not render any fact more probable or
9 not, meaning that, well, then there's no cause of action.
10 It may be that they haven't even -- they may be very
11 inattentive to the books and the prices. There are loads of
12 reasons why.
13 And so to that, that motion would be granted, Mr.
14 Cooper. You can't go there in terms of how they were aware of
15 the lawsuit.
16 And so I guess as to this one, split the baby in
17 half. I guess it's denied in part and granted in part.
18 Granted with respect to lawyer-driven, granted with respect to
19 how they were made aware of the lawsuit.
20 You certainly are free to go into the nature of their
21 filing of the lawsuit and being -- and their view of why
22 they're participating in the lawsuit, and I don't think Mr.
23 Cramer's suggesting otherwise as to that.
24 Correct, Mr. Cramer?
25 MR. CRAMER: That's correct.

148

1 THE COURT: Okay. All right.
2 MR. CRAMER: Thank you, Your Honor.
3 THE COURT: You're welcome. Okay.
4 Now, we're up to motion in limine number 30. Exclude
5 references to and evidence regarding the amount of titanium
6 dioxide purchased by any of the named plaintiffs. That is
7 number 30.
8 MR. CERA: Your Honor, we have withdrawn that one.
9 THE COURT: Okay. All right. Withdrawn.
10 MR. CERA: So we've got the last plaintiffs' motion.
11 THE COURT: All right.
12 MR. CERA: At last.
13 THE COURT: I won't ever say it's your last motion.
14 MR. CERA: Last motion in limine.
15 THE COURT: It's like a lawyer getting up before a
16 jury and saying I just have one more question.
17 (Laughter)
18 THE COURT: The number of jurors who have commented
19 as to what that is supposed to mean, I can tell you many times
20 when I go back there. It's rather comical. I'm not going to
21 hold you to that.
22 MR. CERA: Thank you, Your Honor.
23 THE COURT: Number 31. Hold on one second here.
24 (Pause.)
25 THE COURT: All right. Number 31, preclude counsel's

149

1  fee arrangement and other aspects of counsel's practice.

2      MR. CERA:  Your Honor, this is Sol Cera for the

3  plaintiffs.  The defendants have agreed, I believe, in their

4  opposition, they won't make reference to what is obviously

5  irrelevant, which is plaintiffs' counsel's fee arrangement has

6  nothing to do with the liability issue.

7      But they've held back somewhat on commenting on

8  aspects of counsel's practice.  And that is similarly

9  completely irrelevant, Your Honor, to any of liability at issue

10  in the case.

11      We've got a group of lawyers on the plaintiffs' side

12  that practice in all kinds of areas.

13      THE COURT:  You need not address this.

14      Mr. Cooper, we're not going to go there, correct?

15      MR. COOPER:  Right.

16      THE COURT:  That's not going to be permitted.  I view

17  it as a personal attack upon brother or sister counsel, and

18  it's not going to be permitted.  I'm sure you wouldn't do that.

19  That motion is moot because it's not going to happen.

20      MR. CERA:  Thank you.

21      THE COURT:  Okay.  So I think we've addressed all

22  motions in limine presented by the plaintiffs, correct, Mr.

23  Saveri?

24      MR. SAVERI:  Yes, Your Honor.

25      THE COURT:  I gather for the record you agree totally

150

1  with all of my rulings; is that correct?

2      MR. SAVERI:  No, Your Honor.

3      (Laughter)

4      THE COURT:  We're laughing in the court.  Clearly, to

5  the extent you don't have exactly what you requested, the

6  record will not reflect that you've yielded in any way in your

7  positions with respect to your clients.

8      MR. SAVERI:  I want to be as crystal clear as we can.

9  We've made our limine motions.  We will want to preserve all of

10  the record on appeal.

11      THE COURT:  You've done so.  And regardless of any

12  wording or concurrence, and this will be true for the

13  defendants as well, you will preserve all of your motions for

14  purposes of an appeal with respect to those.

15      Except I guess as to Dr. Rubinfeld, because we're

16  going to have Mr. Cramer and Mr. Ulwick taking depositions, so

17  to their delight, I might add.

18      MR. SAVERI:  To the delight of everybody, I'm sure.

19      THE COURT:  Okay.  With that, we're ready to go now

20  on the defendants' joint.  What I have on the list here to

21  start with is the defendant's joint motions in limine

22  concerning damages.  And essentially, with respect to that,

23  there are a series of motions here.  First, to exclude evidence

24  of damages after December, 2010.  Essentially the defense's

25  position, as I understand it to be, is that Dr. Lamb was not

151

1  asked to analyze post December 2010 data, and any testimony

2  about Dr. Lamb's estimates will be speculative.

3      The plaintiffs opposed this and argued that he should

4  be able to project 2010 -- 2003 to 2010 data to the 2011, 2013

5  time period.  That's where -- I think that's the crux of that

6  issue.

7      Who's going to speak on this, Mr. Ulwick?

8      MR. ULWICK:  I will, Your Honor.

9      THE COURT:  Okay.

10      MR. ULWICK:  Your Honor, as you know, Dr. Lamb is the

11  plaintiffs' expert on damages.  In his report, he said that he

12  computed the alleged overcharge from February of 2003 through

13  December of 2010.

14      He said he did so at the direction of class counsel.

15      He computed an average overcharge during that period

16  related to sales during that period.

17      And he did so on defendants' sales data through

18  December of 2010.

19      Fact discovery closed more than a year ago.  Expert

20  discovery closed, as we discussed earlier today, on in March of

21  this year.

22      THE COURT:  It's being extended by three hours.

23      MR. ULWICK:  And is being extended by three hours.

24  The plaintiffs chose to that accept December 2010 as the cutoff

25  for production of defendants documents.

152

1      And until July 23 of this year, plaintiffs have never

2  requested any additional sales data from the defendants.

3      On July 23, a year after the close of discovery, four

4  months after the end of expert discovery, after the dispositive

5  motions deadline and six weeks before trial, they ask us to

6  supply an additional two years worth of sales data to I guess

7  have Dr. Lamb run his regression analysis with respect to this.

8      Of course, that is far too late, which I assume they

9  knew at the time they asked us.  So instead of doing that, they

10  tell us what they're going to do is have Dr. Lamb "estimate,"

11  quote unquote, that's their words, estimate what the damages

12  would be for 2011 and 2012 by simply applying the average

13  overcharge that he computed for a different time period to this

14  time period.

15      It is kind of like if we were going to say, okay, for

16  the decision on the home run contest, we're going to take Chris

17  Davis' stats through the end of July and then we'll just

18  estimate that he has the same frequency of home runs for the

19  rest of the season, and we can declare that he had won the home

20  run contest on that basis.

21      THE COURT:  For the benefit of San Francisco,

22  counsel, we certainly aren't going to inject Barry Bonds into

23  this.

24      (Laughter)

25      MR. SAVERI:  Is the baseball season still going on,

153

1  Your Honor?

2  THE COURT: We're laughing here again. Go ahead.

3  MR. ULWICK: His estimate is just that. It's not

4  scientific. It's not the same way he computed everything else.

5  You can't extend it this way.

6  The case for damages closed at the December 2010.

7  That's what everybody's been going on. That's the end of the

8  period.

9  THE COURT: I understand.

10  Mr. Cramer?

11  MR. CRAMER: Yes, Your Honor. Thank you.

12  So as Your Honor knows, the defendants know, and

13  everyone in this courtroom knows, plaintiffs alleged that the

14  conspiracy is ongoing.

15  Secondly, the class period that Your Honor set, both

16  in today's ruling and in the notice and previously, is through

17  the present.

18  Plaintiffs had always intended to bring the damages

19  up to the present. It's standard in these kind of cases to do

20  so, and we always intended to do so.

21  When we didn't get the data, we projected forward

22  using the exact same model that was used through 2010. And we

23  basically said we'll assume that the sales for 2010 didn't

24  increase, when they likely did, in 2011, didn't increase for

25  2012, again, as they likely did, and we imposed the same

154

1  damages number for 2010, for 2011 and for 2012 and for 11 days

2  in 2013 to bring us to the date of the class notice. It is

3  projecting the same exact model forward conservatively. And

4  that's what we did.

5  THE COURT: Well, let me ask you this, Mr. Cramer,

6  why is it that, apart from my order and my opinion filed today

7  in terms of between February 1, 2003 and the present, that has

8  always been the class period?

9  MR. CRAMER: Yes, Your Honor.

10  THE COURT: The definition of the class only has been

11  adjusted. The class period has always been defined, and

12  correct me if I'm wrong, it's all been defined as being

13  February 1, 2003, to the present?

14  MR. ULWICK: That's correct, Your Honor.

15  THE COURT: Then why is it, then, if that's the case,

16  why would Dr. Lamb, not in his initial report, the present

17  being whenever he was making it, obviously, he can't --

18  whenever the date of his report is, that's his report.

19  Or he can certainly indicate in terms for the present

20  obviously means the present when the jury's in the box and we

21  have a trial.

22  So when you say that this happens in all these cases,

23  I certainly would yield to the expertise of the many learned

24  counsel here in the courtroom, but it would seem to me when an

25  expert is preparing a report that he or she is going to project

155

1  those damages accordingly, meaning that certainly the date of

2  his report is 2012, whenever it was, is going project damages

3  through that date, it seems to me, and not just from 2003 to

4  2010.

5  MR. CRAMER: Well, the reason why we did it through

6  the end of 2010 in the report is, because in order to get the

7  data in the first place, the defendants required us to cut the

8  data off, and request we cut it off at December 31, 2010.

9  And so since that's where we had the data through,

10  that's where we ran the analysis to. But we always intended to

11  bring the data and damages up to date especially since we've

12  alleged the conspiracy is ongoing and the class period goes to

13  the present.

14  So we have purchasers after December 2010.

15  THE COURT: This kind of issue must come up in all

16  antitrust cases, in terms of alleged price fixing, in terms of

17  the continued -- I'm just thinking this through, in terms of

18  any alleged price fixing case, when the class period goes up to

19  the present, it would seem to me that I understand that there's

20  a projection in there, and the gist of the defendants' motion

21  is that it is speculative in terms of the model that's being

22  used to include another three years. That's the thrust of the

23  motion.

24  MR. CRAMER: We understand, Your Honor.

25  THE COURT: Why would an expert not take precautions

156

1  to indicate how he or she's projecting forward?

2  MR. CRAMER: Well, we do indicate how we're

3  projecting forward. We're basically saying the model that

4  applied from 2003 to 2010 is the model that predicted the

5  overcharge flowing from the conspiracy, and we're being

6  conservative because we're applying it to the sales of 2010.

7  THE COURT: I'm not going over it. I'm not crushing

8  the model that Dr. Lamb is projecting. I know your point is --

9  your point has been that defendants can certainly cross-examine

10  on it. The point of the defendants' motion is there's no basis

11  upon which they can cross-examine.

12  It's very much like your point with Dr. Rubinfeld

13  that you haven't had an opportunity to, and you're going to get

14  one now, obviously, to cross-examine, the defendants' counsel

15  is saying they haven't had an opportunity to cross-examine Dr.

16  Lamb as to how he's projecting that the data.

17  2003 to 2010 is fairly fixed, but it's speculative in

18  terms of how he's projecting 11, 12, and 13.

19  MR. CRAMER: So the difference, Your Honor, is that

20  what Dr. Rubinfeld did, he used completely new cost measures

21  and new regression models.

22  What Dr. Lamb does, there's no -- there's no magic

23  to it. He is basically saying that I'm going to just rely upon

24  the overcharge through 2010 for 2011 and 2012. And the

25  defendants -- there's no -- there's no magic modeling that's

157

1 going on.  It's a projection based upon an estimate of what the
2 conspiracy -- what overcharge the conspiracy caused during the
3 conspiracy period, projecting it forward.
4        Defendants now know exactly, and have known for a few
5 weeks, what that model is, what that analysis was, and they can
6 cross-examine Dr. Lamb about it.
7        THE COURT:  Mr. Ulwick, let me hear you further on
8 this.
9        With respect to that, you're free to attack it,
10 attack the logic it, attack whether there's any basis for it or
11 anything else, and even raise issues as to how speculative it
12 may or may not be, correct?
13        MR. ULWICK:  Well, of course.  But we're talking
14 about -- it is supposed to be, at some point, defendants are
15 allowed to have a stationary target.  It can't be we're going
16 keep changing.
17        THE COURT:  What does the class period mean when it
18 goes to the present tell you?  It's always be February 2003 to
19 the present.
20        MR. ULWICK:  That's all it relates to who's bound by
21 the decision.  The point here, the plaintiffs have the burden
22 of proving damages.  They get an expert.  He comes in and says
23 the right way to compute the damages is to input the sales data
24 and then apply my regression analysis with these various
25 variables that all relate to the sales data and relate to

158

1 what's going on at the same time.
2        His producer price index for those years.  The demand
3 figures for those years.
4        And he puts it all together in that ten-year period,
5 and says here is what the overcharge is for this period.
6        They now want to say, having done all of that, and
7 having said that's the right way to do this, we don't need to
8 do this for the next two and a half years, for which, by the
9 way, we're claiming hundreds of millions of dollars of damages,
10 we're just going to rough that out and say it's probably the
11 same.
12        There's no way.
13        THE COURT:  They're saying essentially it's the exact
14 same analysis.
15        MR. ULWICK:  It's not the exact same analysis.  What
16 they're saying is the analysis that they did for that one
17 period, they're now going to apply to a brand new period
18 without any empirical evidence whatsoever, that the former
19 period is the same as the latter period.  None.
20        MR. CRAMER:  Your Honor, this is the subject of
21 cross-examination.  They know the model.  They can make these
22 points with Dr. Lamb on the stand with his own experts.
23 There's nothing --
24        THE COURT:  Let me ask you this, Mr. Ulwick, are the
25 plaintiffs free to project in their argument in terms of what

159

1 the jury can consider the damages are if Dr. Lamb doesn't so
2 testify?
3        MR. ULWICK:  No.  I mean, you have to prove damages.
4 Damages have to be proven in some sort of reliable way.  I
5 don't see how you can -- I don't see how you can do this
6 honestly.
7        It really is like my example.  I mean, you're saying
8 just because it happened this way in the past, I'm going to
9 assume it would happen this way for another period of time.  I
10 don't see how you can do that.
11        It's no different than my coming our coming in and
12 saying, all right, the right prices for this particular period
13 would be A plus 10 percent, because we just picked 10 percent
14 out and said we're going to apply that to the price.
15        I mean, you have to have some sort of logical and
16 scientific way of presenting what the basis is for your damage
17 claim.
18        As you said in the Daubert decision, experts come in
19 here clothed with, and in some respects, the approval of the
20 Court.  Your Honor has accepted this man as an expert.  He's
21 coming in, and he's testifying about economic things and about
22 models.  And he's going to be presenting these numbers to the
23 jury as if there was some sort of scientific basis for it, when
24 there is zero for it.
25        It is just saying take the same figure that I already

160

1 computed for this period and attach it to this period, with no
2 empirical evidence whatsoever to say that the same figures
3 apply.
4        MR. CRAMER:  This seems --
5        MR. ULWICK:  Let me just finish, please.
6        THE COURT:  Go ahead.
7        MR. ULWICK:  At any point prior to July of this year,
8 a few weeks ago, they could have asked us for the sales data.
9        THE COURT:  Could have asked for what?
10        MR. ULWICK:  They could have asked us for additional
11 sales data beyond what they agreed they would accept.  This is
12 not something that was unilaterally decided by the defendants.
13        The defendants and plaintiffs agreed they would cut
14 off the sales data in 2010.  That has a consequence attached to
15 it, which is everybody knew there was going to be a multiple
16 regression analysis.  That's the way it's done.  Everybody new
17 knew the input sales data when they agreed that's going to be
18 the cutoff.  That's the cutoff for the damages period.  It has
19 to be.
20        Now, they come back, a couple weeks, six weeks before
21 the trial, by the way, and want to add several hundred millions
22 of dollars of damages on the basis of this estimate.  It is
23 just way beyond the bounds.
24        If they said in 2011 or 2012, or earlier this year,
25 we want you to supplement it, we could have dealt with it at

161

1 that point in time.

2        And Your Honor could have entertained a motion on

3 that basis to say whether or not the sales data should be

4 supplied.

5        But they never asked until July 23. It's just too

6 late.

7        THE COURT: Mr. Cramer?

8        MR. CRAMER: Your Honor, the points that were just

9 made are very straightforward cross-examination points. A jury

10 can understand them very well.

11        Dr. Lamb will talk about his model and the data

12 through December, 2010, how he projected it forward, and the

13 jury can understand these points very well.

14        THE COURT: What opportunities does the defense have

15 to attack the theory if they haven't deposed him?

16        MR. CRAMER: Well, you've heard the theory attacked,

17 that there's nothing -- what he did is he projected forward.

18 It's the 2010 damages for --

19        THE COURT: I understand.

20        MR. CRAMER: Through 2012.

21        THE COURT: I'm clear as to what he did, Mr. Cramer,

22 but I'm a little mystified, again, given the expertise of

23 everyone here, and particularly in terms of Dr. Lamb in terms

24 of his career, and his role here in this litigation, why it

25 would not be some effort to project in terms of knowing that

162

1 the class period is defined as February 1, 2003, up until the

2 present, why the analysis stops in December 31, 2010, with

3 nothing being proffered until six weeks prior to trial.

4        I mean, I know from your point of view, it's not a

5 big deal. It wasn't a big deal of Dr. Rubinfeld from Mr.

6 Ulwick's point of view. My point is that I don't really see

7 any basis for just saying this is how he's going to testify,

8 and they can certainly challenge it, and how can they challenge

9 it when they don't have the tools to challenge it, because they

10 have not taken his deposition?

11        I know from your point of view it's like the same

12 analysis, but that was not in his report. He didn't have any

13 data to make that analysis.

14        MR. CRAMER: Your Honor, we would submit him, proffer

15 him for a deposition, similar to the way Dr. Rubinfeld has been

16 proffered for a deposition.

17        He's located in Washington, D.C. But we didn't have

18 the data. I mean, we agreed with the defendants.

19        THE COURT: When was the data given to you?

20        MR. CRAMER: The data was given to us very early in

21 the litigation. It was one of first things that was agreed

22 upon in the litigation.

23        THE COURT: My point is when did you get data from

24 January 1, 2011, until --

25        MR. CRAMER: We didn't get the data.

163

1        THE COURT: Never got it?

2        MR. CRAMER: They refused to provide it to us.

3        THE COURT: Consistent with the position they're

4 saying they didn't provide the data?

5        MR. CRAMER: Right. So we -- basically, what

6 happened was we got data through December 2010, because in

7 order to move forward in litigation, the defendants insisted

8 there be a cutoff date, and we wanted to move forward, and that

9 was the negotiated response.

10        THE COURT: But there are implications to that.

11        MR. CRAMER: So we ran the regression using that

12 data. We did what we could do. We produced the report with

13 that data. We don't have data after that, so we projected it

14 forward.

15        As I said, we would proffer Dr. Lamb I think that

16 deposition could happen in 30 minutes, but we could proffer

17 him.

18        THE COURT: I'm going to have to consider this, Mr.

19 Cramer. I'm not inclined to have the jury speculate on this.

20        MR. CRAMER: One other point that my colleague

21 reminds me, in light of today's order, the damages numbers are

22 going to have to be adjusted to remove the sales of those class

23 members who have now been excluded from the class. So there

24 will need to be a revised number similar to the way that the

25 plaintiffs have removed the opt-out sales from the class.

164

1        So we will do that over the next day or two and can

2 submit the revised analysis through the present. And if the

3 defendants feel they need, they can take a deposition of Dr.

4 Lamb for an hour or two, if that's necessary. He's located in

5 D.C.

6        But he's going have to do a revised damages analysis

7 in any event in light of today's ruling.

8        THE COURT: That is actually a very good point, thank

9 you, Mr. Cramer or Mr. Cera actually on that.

10        Mr. Ulwick, if that's the fact of the matter, in

11 light of my ruling, basically this class of 537 is down -- is

12 according to my calculations has gone from a figure of 537, has

13 knocked down by 320 some class members who are now gone.

14        So we're now down to 217, perhaps, whatever the

15 figure is. There is going to have to recalculation of damages.

16        MR. ULWICK: Oh, yeah, absolutely. But that's just a

17 question of removing data and inputs that are already in place.

18 That's just identifying the data that's associated with those

19 plaintiffs, removing it from them, running the regression, and

20 he gets the new number again.

21        It's entirely different than having to produce, which

22 is what we would be required to do, I want to make this very

23 clear, I said it once before, but Mr. Cramer's argument seems

24 to skirt around this issue. The parties reached agreement that

25 this was going to be the cutoff date.

165

1    Not, never, since that date, the parties have reached

2    agreement until July 23 did the plaintiffs ever ask for this

3    additional --

4         THE COURT:  You're really raising what is really the

5    prime issue here to me on this, is that there are a lot of

6    lawyers in this room.  They've spent a lot of time in antitrust

7    work.  And I have to believe that this comes up all the time

8    that there's a definition of the period for damages in terms of

9    producing of data and respective expert analysis of data.

10        There has to be some cutoff line on the date for

11   data, very obvious why, in terms of each side having experts

12   opining as to damages.

13        MR. ULWICK:  Right.

14        THE COURT:  So the notion that, well, the class

15   period goes up until the present, well, of course it does.  My

16   knowledge of antitrust law is such that the class period always

17   goes up essentially to the present.  Almost always.  But that

18   isn't necessarily true in terms of the data that's submitted

19   for analysis of damages.

20        So really the construction of this comes back to when

21   there was an agreement between counsel as to the December 31

22   2010 drop date, finality date as to data for damages.

23        And apparently, there's an agreement between counsel

24   that there was no discussion about other time periods until

25   somewhere down the road on this.  And quite frankly, I can't

166

1    imagine how this wouldn't come up in every antitrust case if

2    there's some dispute over the time period for the damages.

3         So who made the agreement and who was involved in

4    this December 31, 2010 date?  And when was the first time there

5    was a suggestion, well, that's the older period, but we need

6    new information?

7         I need to get some legs to this, because this does

8    not seem to be the type of thing that's particularly unique in

9    an antitrust case.

10        MR. ULWICK:  I don't think it's unique in antitrust

11   or any other kind of case.  The defendants, for due process

12   reasons, always want to know what is the scope of the claim

13   that's being made against us.  How else can we make settlement

14   decisions?  How else could we decide whether or not to go to

15   trial?

16        THE COURT:  Apart from that is the regression

17   analysis in this particular case that I've gotten great

18   familiarity with, obviously involved competing experts

19   analyzing data, and so now here we are.

20        So Mr. Saveri, you want to add in?

21        MR. SAVERI:  Well, I'm rising just to address your

22   question about how this is usually handled in antitrust cases.

23        THE COURT:  This happens all the time?

24        MR. SAVERI:  It happens all the time.  And Your

25   Honor, we never have the data up until the day we're standing

167

1    in the courtroom putting on the evidence in front of the jury.

2         So at some level, we are always projecting forward to

3    whatever the current period, whatever the current date and time

4    is, based on incomplete data.

5         THE COURT:  Let me stop you there, if I can ask a

6    question.  If that's the case, seems to me in antitrust cases,

7    you have a date in which there's data that's provided, both

8    sides have experts who opine on that data.

9         But it would seem to me that if that's the case, that

10   one or both sides has to have some expert testimony as to a

11   basis of a projection with the opposing side having the ability

12   to cross-examine or attack that projection.

13        And I think the crux of Mr. Ulwick's argument is, in

14   Dr. Lamb's initial report, there was not that projection, is

15   that essentially the crux of your argument?

16        MR. ULWICK:  This trial report cuts everything off.

17        THE COURT:  The crux of your argument is there was no

18   projection in his report?

19        MR. ULWICK:  Absolutely not.

20        THE COURT:  I would think, Mr. Saveri, that in some,

21   there are projections, are there not?

22        MR. SAVERI:  In some cases, some are, but just as

23   many in my experience, I can't speak encyclopedically about the

24   dozens of cases that I've been in, it's a combination depending

25   on particular circumstances, when the data has been produced,

168

1    and frankly how long a period of time there is between the time

2    the expert report goes in and the time the trial actually

3    happens.

4         Because these reports that -- the original report

5    that was prepared was done last year.

6         MR. CRAMER:  December of 2012.

7         MR. SAVERI:  So what we ordinarily do, at some point

8    between the time the experts make their initial opinion and the

9    time we go to trial, we bring the data -- damage projections up

10   to date based on some combination of new data production, which

11   is frankly the way it usually happens, Your Honor.

12        We usually don't have this problem because the

13   defendants will give us the sales data to bring us to date.  Or

14   in the absence of that, we do what we did here, which is

15   basically take the last period we had data in and project that

16   number forward.

17        It's an estimate.  It's a reasonable estimate.  And

18   making those kinds of reasonable estimates are entirely

19   consistent with the way antitrust damages are calculated and

20   what you're permitted to do under cases like *Bigelow* or the

21   cases that go back into the 30s and 40s, that's what we've done

22   here.

23        I was not present at the discussion about the

24   December date.

25        THE COURT:  This is a good point I think to take a

169

1  break here, because I think there's a much more fundamental
2  issue. First of all, we're clearly not going to finish today.
3  We're going to continue tomorrow morning and our pretrial
4  conference will continue over time.
5         I think it's an apt point to take a break, because
6  really the crux of this is the agreement or the understanding
7  that was reached between counsel as to a December 31, 2010 date
8  as to data or whether it could have been later and what was the
9  basis of it.
10        I think we need to decide who on the respective teams
11 dealt with that understanding. And I don't know whether before
12 DuPont and Huntsman were involved, I don't know where that was.
13 We're going to take a break now.
14        MR. SAVERI: Excuse me, Your Honor. Before we go to
15 the break, my understanding is that the lawyers for DuPont were
16 intimately involved in our request for the new data, because
17 Mr. Dirksen can speak to this, but I believe what happened is
18 the DuPont lawyers asked us if we were going to bring the
19 damages up to date. And we said yes, of course, because we do
20 it in every case. We asked for the data, and they said no. So
21 I think that's it.
22        THE COURT: Why don't we just go over in terms of --
23 take a deep breath for a minute. Miss Sovich needs a break
24 here. It's not often she has lawyers that can go faster than
25 the Judge up here on the bench. She needs a break.

171

1         MR. ULWICK: What I would represent to Your Honor is
2  I think the discussions are memorialized in a letter that we
3  attached as exhibit A to this motion.
4         THE COURT: All right.
5         MR. ULWICK: Which you should have, which is a May 13
6  2011 letter on Lieff Cabraser letterhead from Mr. Saveri and
7  Mr. Cera and on page -- page 2, here it is.
8         Under the heading scope of discovery, it says after
9  -- this is a quote, "After referring back to our letter to you
10 dated April 13, 2011, which included a detailed list of
11 questions concerning the data, we clarified that plaintiffs'
12 request defendants' transaction level data; i.e., data on a
13 transaction-by-transaction basis at invoice level for sales
14 from January 1, 1999 through December 31, 2010."
15        So this is their letter to us confirming this is what
16 they want, and that's what they got.
17        THE COURT: All right. From your point of view, when
18 was the first time there was any suggestion of information for
19 post December 31, 2010 data?
20        MR. ULWICK: A couple weeks ago.
21        THE COURT: All right. In July?
22        MR. ULWICK: Yes, sir.
23        THE COURT: Can you give a date on it?
24        MR. ULWICK: It was just before July 23, I believe.
25        THE COURT: Is that an exhibit also to your motion?

170

1         But when we come back, because this is really the
2  fundamental question here because two of the four defendants
3  are now out, and understandings that were reached are not
4  necessarily binding now upon two remaining defendants.
5         There's a series of issues involved here in terms of
6  this curtain date on damages, and so we'll take a break.
7         Yes, Mr. Ulwick?
8         MR. ULWICK: Just before you go, so this thought
9  doesn't linger there unanswered just during the break, the
10 discussion they just raised happened in July of this year.
11        THE COURT: Okay.
12        MR. ULWICK: In July.
13        THE COURT: I understand. We need to get our
14 chronologies together here in terms of implications of this.
15 We'll take a break.
16        (Recess)
17        THE COURT: Let's go for another hour and call it for
18 the day.
19        On this motion to exclude evidence after December
20 2010, I am going to withhold ruling on that, but I think we
21 need to focus in on who presented what to whom, that's the
22 underlying issue.
23        Mr. Ulwick, it's your motion. First of all, what is
24 your understanding in terms of the discussions and the damages
25 data through December 31, 2010?

172

1         MS. VICKERS: Exhibit B.
2         MR. ULWICK: Exhibit B I think is the --
3         THE COURT: It's attached to your motion.
4         Miss Vickers, you believe it's attached to the ECF
5  number 494 of the subject motion; is that correct?
6         MS. VICKERS: Yes.
7         THE COURT: All right. Thank you.
8         MR. ULWICK: And I would just note that in Dr. Lamb's
9  original report, his rebuttal -- his original report in October
10 of 2012, and in his rebuttal report of February 2013, he
11 defines what he calls the cartel period, and I'm quoting now
12 from paragraph 157 of his rebuttal report filed in February of
13 this year, he says "I have determined based on an analysis of
14 defendants' transactional data that during the cartel period,
15 which began on February 1, 2003 and continued through December
16 31, 2010, the total volume of commerce --" and goes on to say
17 what his damages are.
18        THE COURT: All right. Mr. Cramer, do you want to
19 tell me -- first of all, is it correct that there was not a
20 request for any post December 31, 2010 data until July of this
21 year?
22        MR. CRAMER: I believe that's correct, Your Honor.
23 With your indulgence, since we all are going to reassemble here
24 tomorrow, the plaintiffs would like to review our records on
25 the issue of the agreement regarding December 2010 and some

173

1  other background information on this and then perhaps address

2  it first thing tomorrow morning.

3        THE COURT:  Fine.  Then I'll hold this sub curia for

4  a while.  We're going to start for a while at quarter after 10.

5  I have a -- we can actually start earlier, but I have to break

6  for a telephone conference for a pro se plaintiff.  They're not

7  easy to find and nail down on telephone calls.

8        MR. ULWICK:  Which is worse, Judge, dealing with us

9  or a pro se plaintiff?

10       (Laughter)

11       THE COURT:  Mr. Ulwick, I hope Ms. Sovich is

12 reflecting some laughter.  I never respond to questions from

13 counsel.  I just say it's a delight and you are all very

14 stimulating.  Yes.

15       MR. SANDLER:  There's a scheduling wrinkle that I'd

16 like to invite your attention.  I don't have do it now.  I can

17 do it at two minutes to five before you adjourn.

18       THE COURT:  What is it?

19       MR. SANDLER:  Unfortunately, for me, I ventured into

20 a civic responsibility.  I'm hosting a luncheon at the Center

21 Club for over a dozen people that's been on the books for

22 weeks.  It's from 12:00 to 1:00.

23       And my issue is, I don't want to be a tail wagging

24 the dog, it's the pretrial conference that I really must be

25 present at.

174

1        THE COURT:  I think given the pace which we're going,

2  I doubt if we're going to have the pretrial conference by noon

3  tomorrow.

4        MR. SANDLER:  So I can slip out and come back, I'll

5  be back by say 1:20 the latest or 2:00?

6        THE COURT:  When you finish taking all the

7  out-of-town lawyers to dinner.

8        MR. SANDLER:  I've already done that.  I'm clear, I'm

9  clear, unfortunately, but I thank the Court.  I raised this

10 with counsel.

11       THE COURT:  Let's go to the next -- to the -- another

12 motion that we have is the defendants' joint motions in limine

13 concerning the alleged spoliation of evidence, paper number

14 477.

15       Essentially, the motion is to exclude evidence

16 concerning any party or non party document retention, perhaps

17 deficiencies in document production.  I think this focuses, I

18 gather, among others, the consultant Jim Fisher not routinely

19 saving documents after completion of a project.

20       The plaintiffs essentially are seeking to admit

21 evidence with respect to not preserving evidence under the

22 spoliation theory, and the defendants are filing a motion in

23 limine concerning any effort in that regard.

24       I believe I've couched that correctly.  Is that

25 correct, Mr. Watts?

175

1        MR. WATTS:  That's correct, Your Honor.

2        THE COURT:  All right.  I'm glad to hear from you.

3        MR. WATTS:  Your Honor, there are really three or

4  four issues with the spoliation, the motions we put under the

5  title spoliation.

6        First, as you noted, it's Mr. Fisher's records, Mr.

7  Fisher's a third-party alleged co-conspirator.  The defendants

8  here have no control over Mr. Fisher, his document retention

9  practices.

10       To be specific, Mr. Fisher testified that he doesn't

11 keep e-mails.  He testified that he only retains steno notepads

12 for a couple of -- for a certain period of time.

13       He testified that he didn't destroy anything that he

14 believed to be relevant to plaintiffs' case.  After he received

15 notice of the lawsuit, nevertheless, plaintiffs appear, based

16 on their deposition designations of Mr. Fisher's testimony, to

17 want to put this at issue, his document retention practices and

18 his -- particularly with respect to his e-mails and his

19 notepads as -- an attempt to argue that Mr. Fisher was

20 concealing the alleged conspiracy by deleting this information.

21       Again, plaintiffs seem to admit that there's no real

22 grounds for a spoliation motion here, but they still seem to

23 attempt to try and get the adverse inference that one would get

24 from a spoliation.

25       THE COURT:  Adverse inference against whom?

176

1        MR. WATTS:  Well, against the defendants.

2        THE COURT:  Mr. Fisher's not a party to this

3  litigation.

4        MR. WATTS:  That's right, Your Honor.

5        THE COURT:  So it's an attack to be launched upon him

6  with respect to his credibility?

7        MR. WATTS:  Well, I don't think that, no.  It would

8  -- the thrust of the issue would be to try and show that Mr.

9  Fisher was concealing something by deleting information.

10       THE COURT:  Well, that may or may not be the thrust

11 of the cross-examination, but the question is whether or not

12 there's some theory that the defendants are liable for Mr.

13 Fisher's, let us say, what one side would contend would be bad

14 judgment.

15       The argument you're essentially making is your

16 clients have no control over Mr. Fisher and what his retention

17 policies are.

18       MR. WATTS:  That's correct.

19       THE COURT:  And you're free to argue that.  The

20 plaintiffs, seem to me, should be free to challenge Mr.

21 Fisher's credibility in terms of what policies he doesn't or

22 does have with respect to his own personal professional

23 business e-mail communications.  That's what it comes down to.

24       MR. WATTS:  I understand, Your Honor.  We feel that

25 under Rule 703 that that evidence is highly prejudicial to the

177

1  defendants because it would be used to get an adverse inference

2  against the defendants in this case.  403.  I'm sorry.

3       THE COURT:  403.  And the argument is that even if

4  it's relevant as to attacking his credibility, it would be

5  prejudicial to the defendants themselves because of his

6  policies?

7       MR. WATTS:  That's right, Your Honor.

8       THE COURT:  All right.  I'll be glad to hear from

9  plaintiffs' counsel on this.

10      MR. DIRKSEN:  Can I ask for a clarification?

11      THE COURT:  Yes.

12      MR. DIRKSEN:  Is this only about Fisher?

13      THE COURT:  We're going to go through them

14  separately.  First, let's go on Fisher.

15      This is Mr. Dirksen, correct?

16      MR. DIRKSEN:  It is.  Pleasure to be here, Your

17  Honor.

18      THE COURT:  Nice to see you.

19      MR. DIRKSEN:  Your Honor said earlier this afternoon

20  that you don't want to sacrifice evidence the jury should hear.

21  We feel very strongly the same way.

22      Mr. Fisher, we would have loved to have him come

23  testify here at the trial.  Unfortunately, he resides more than

24  a hundred miles beyond the courthouse, which is unfortunate.

25  But we plan to show his deposition testimony, and we believe it

178

1  will help our case greatly.

2       That being said, I just want to make one thing clear

3  on the record.  We're not seeking an adverse inference

4  instruction or say sanction for spoliation.

5       Obviously, we have no plan to do so at this point

6  unless the defendants' argument about in that the brief is a

7  red herring.

8       With respect to Mr. Fisher's practices, his document

9  practices, he testified about his retention practices.  And

10  what he specifically said, and I have his testimony here, but

11  what he specifically said was that he did not destroy any

12  documents after learning about the lawsuits, but he also said

13  he didn't save any, either.

14      Actually, his testimony was unequivocal even after he

15  learned about this lawsuit, he didn't bother saving anything,

16  because he said he didn't think it was relevant, even though we

17  specifically told him in a letter to please preserve evidence,

18  and he believed that not to be relevant.

19      At that time, he'd spoken with counsel for DuPont who

20  got him a lawyer.  Apparently, they didn't ask him to preserve

21  e-mail, either, or at least that's what he said.

22      But in any event, Your Honor, we believe that the

23  evidence is obviously highly relevant to the issues of secrecy

24  and concealment.  But that --

25      THE COURT:  Also relates to his credibility; does it

179

1  not?

2       MR. DIRKSEN:  Absolutely, Your Honor.  And you know,

3  correct me if I'm wrong, but I think Mr. Watts said something

4  to the effect that we would argue that the fact that Mr. Fisher

5  didn't preserve certain types of records during the course of

6  the conspiracy period necessarily means that there should be an

7  adverse inference against the defendants.  That's not true.

8       What Mr. Fisher did with his records we think is just

9  relevant generally to what Mr. Fisher did with his records.

10  And the fact is, he didn't preserve emails that he sent to

11  anyone.

12      So like in this case, he actually produced almost no

13  e-mails at all that he sent to anyone at all.  We got them from

14  the defendants, and thankfully, they preserved a number of

15  them.

16      But you know, we don't have -- we're not looking to

17  ask the jury to reach an adverse inference based on Mr.

18  Fisher's lack of document preservation.

19      THE COURT:  Thank you, Mr. Dirksen.

20      On this, I'm going to deny this portion of it.  I'm

21  not going to exclude evidence with respect to Mr. Fisher's

22  retention practices or lack thereof.

23      And it is not -- there's not going to be an adverse

24  inference instruction, but certainly in terms of attacking Mr.

25  Fisher's credibility and whether he does or does not appear is

180

1  a choice of counsel in this case.

2       But it's relevant under Rule 401, and I don't find

3  that its probative value is outweighed.  It's probative as its

4  truthfulness, first of all, in terms of his credibility and any

5  steps to what may or may not have been necessarily secrecy.

6  But that probative value is not outweighed by prejudice or

7  confusion, and I'm not going to grant it.

8       And he will -- the matter of his lack of not saving

9  e-mail will be admissible.  So the second of the three that are

10  under this particular motion, I think, Mr. Watts, is the matter

11  of lack of contemporaneous documents, that there's some missing

12  documents, and specifically that I think the former DuPont

13  employee Ann Edwards' e-mail account was deleted pursuant to

14  routine practice.

15      Is that the one we're dealing with next?

16      MR. WATTS:  That's right, Your Honor.  There are

17  really two within that motion.  One is the DuPont document

18  retention policy that my understanding from plaintiffs'

19  response is they don't intend to bring it up, so perhaps under

20  the Ulwick rule, that portion of our possession is moot.

21      Defendants certainly don't intend to put that at

22  issue.  It's really just an issue relating to DuPont.

23      THE COURT:  Is that still an issue here, Mr. Dirksen?

24      MR. DIRKSEN:  No, sir, Your Honor.  We have no

25  intention.

181

1     THE COURT:  That's moot.  Part of your motion is
2  granted.  Another part is moot.  Another portion is moot.
3     So now I think we're at the third of the three items,
4  and that is the matter of the Millennium employee, Jim Zwicker,
5  in a conversation with Mr. Fisher writing please delete e-mail,
6  which from what I understand so far is an instruction -- isn't
7  an instruction that Mr. Fisher heeded in the first place,
8  apparently, based upon the record here, but apparently, that's
9  what the e-mail says.
10     Is that what we're dealing with, the third of the
11  three?
12     MR. WATTS:  That's right, Your Honor.  Although let
13  me quickly note, we also addressed in our motion plaintiffs'
14  indication they believe certain TDMA minutes were not produced
15  not case.  They note that Millennium --
16     THE COURT:  I'm sorry.  That was another portion.
17     MR. WATTS:  Titanium Dioxide Manufacturing
18  Association Meeting's minutes within the class period.
19  Plaintiffs are seeking to argue that the meetings were poorly
20  documented and were opportunities to conspire.
21     THE COURT:  And your motion in limine would seek to
22  preclude them from doing that?
23     MR. WATTS:  That's right, Your Honor.  We produced
24  all the minutes we had in our files.
25     THE COURT:  That's really a reflection on the matter

182

1  of TDMA minute-keeping or lack thereof, seems to me.  There's
2  probative value in that, and the fact that it's something you
3  preferred did not exist, Mr. Watts, doesn't mean there is a
4  basis to exclude it.
5     I mean, you know, your simple answer is that your
6  clients, Millennium and Kronos, have supplied any and all
7  minutes as to which they have, correct?
8     MR. WATTS:  That's correct, Your Honor.
9     THE COURT:  All right.  Well, that's fine.
10     But to the extent that there are missing minutes
11  within the class period, that's just a reflection upon TDMA,
12  which may or may not hold great weight with the jury, I don't
13  know.  But it's something the jury's entitled to hear.  So that
14  motion will be denied as to that portion of it.
15     Now, we're to Jim Zwicker's advice to Mr. Fisher
16  about quote "please delete e-mail."  That's the precise e-mail
17  that we're talking about.
18     MR. WATTS:  Let me just clarify what the e-mail is.
19  Your Honor, if you'd like, I have a copy.
20     THE COURT:  I've seen it.  I'm familiar with it.
21     MR. WATTS:  The e-mail is from Bruce Zwicker, a
22  former Millennium employee, and the e-mail was sent to a few
23  colleagues at Millennium.
24     THE COURT:  He is a former Millennium employee?
25     MR. WATTS:  That's correct.

183

1     THE COURT:  Okay.
2     MR. WATTS:  Mr. Zwicker in the e-mail apparently
3  recounts a conversation he had with Mr. Fisher.  Plaintiffs
4  allege that obviously at the end of the e-mail, it says please
5  delete e-mail.
6     Plaintiffs are seeking an adverse inference here that
7  Mr. Zwicker, this shows a guilty conscience.  The key, the key
8  to our argument here, Your Honor, why a motion in limine is
9  necessary is that this e-mail is dated September 23, 2000.
10  We've talked about the beginning of this conspiracy period is
11  in February, 2003.
12     We believe this e-mail's irrelevant to any issue in
13  this case.  It will cost us a lot of time to discuss this
14  particular e-mail.
15     We'd also --
16     THE COURT:  Are you suggesting that any and all
17  e-mails or communications prior to February 1, 2003 should not
18  be admissible at this trial?
19     MR. WATTS:  No, Your Honor.
20     THE COURT:  I'm sure your side has documents pre-
21  February 1, 2003 that you seek to introduce; do you not?
22     MR. WATTS:  We do, Your Honor.  We do.
23     THE COURT:  All right.
24     MR. WATTS:  This e-mail has the potential to -- has a
25  potential under Rule 403 to be unduly prejudicial to defendants

184

1  because it has nothing to do with any of the issues in this
2  case.  It does not talk about pricing at all.
3     And plaintiffs have not supported any of this, any of
4  their argument about the fact -- their argument this is
5  confidential information as passed by Mr. Fisher.
6     THE COURT:  But is not the thrust of the plaintiffs'
7  claim that Mr. Fisher acted as some type of conduit at some
8  point in time?
9     MR. WATTS:  Yes, Your Honor.
10     THE COURT:  All right.  To the extent that anyone
11  communicates with Mr. Fisher in any way, because Mr. Fisher was
12  not a direct employee of any of the -- of any of these
13  defendants, was he?
14     MR. WATTS:  Not at the time, no.
15     THE COURT:  He was basically, as I understand it, not
16  only as to Kronos and Millennium, but also as to DuPont and
17  Huntsman, and for that matter Tronox, that he was acting as a
18  consultant, and there is a contention he was acting as a
19  conduit.
20     To the extent there's pattern or practice, it seems
21  to me, Mr. Watts, anyone from any one of these defendants, it
22  turns out in this matter it's one of the two defendants
23  remaining not case, suggested that he destroy a communication
24  or e-mail, again, it goes to the weight, not the admissibility
25  of the evidence.

185

1   You certainly can argue that it is not dispositive of
2   the position that your client took.  He's a former -- Zwicker's
3   now a former employee.  There are all kinds of issues you can
4   raise or positions you can take.
5       The fact that it's perhaps a little painful to your
6   client is no basis to exclude it.  And clearly I have no doubt
7   that both sides are introducing documents that are pre-
8   February 1, 2003.
9       We have another issue, the plaintiffs are seeking to
10  introduce documents that are post December 31, 2010, which is
11  another matter.  So I'm going to deny this motion.  It is
12  basically defendants' joint motion concerning alleged
13  spoliation, paper number 477 is denied with respect to the
14  consultant Jim Fisher.  It is denied with respect to the TDMA
15  meeting minutes or lack thereof.  It's denied with respect to
16  the Zwicker e-mail.  And it is moot with respect to the matter
17  of the e-mail account of Ann Edwards.  So it's essentially
18  denied in part and moot in part.
19      All right.  Hold on one second here.
20      (Pause.)
21      THE COURT:  Okay.  With that, we have the defendants'
22  -- incidentally, Mr. Dirksen, you're not arguing an adverse
23  inference as to all the defendants because of Mr. Zwicker's
24  e-mail, correct?
25      MR. DIRKSEN:  Of course not.

186

1       THE COURT:  That's right.  There's not going to be an
2   instruction as such, it's just a matter of the evidence against
3   the defendants.  All right.
4       So we're now on -- at the defendants' joint motion in
5   limine regarding co-conspirators ECF number 474.  Essentially,
6   there are I think six prongs to this, to exclude evidence of
7   settlement or settlement discussions.  To exclude evidence of
8   previous antitrust investigations.  To exclude evidence
9   references to cartels.  To exclude evidence that any employee
10  was terminated for any reason relevant to this litigation.
11      The fifth, to preclude plaintiffs from suggesting
12  that increased titanium dioxide prices downstream to customers.
13  And six, to exclude argument that the defendants exchanged
14  confidential information because designated -- because
15  defendants' designated documents confidential when they were
16  produced.  So let's just go over these six.
17      First of all, as to the matter of excluding evidence
18  of settlement or settlement discussions --
19      MR. SAVERI:  We have a stipulation on that.
20      THE COURT:  Which stipulation number is that?
21      MS. VICKERS:  That's number 7.
22      THE COURT:  Yes.  I've already dealt with that today.
23  This morning, hold on.  That's out, that's done.  Hold on.
24  It's now moot.
25      All right.  And secondly, to exclude evidence of

187

1   previous antitrust investigations, lawsuits, fines,
2   settlements, the parties agree on that, that evidence of prior
3   antitrust lawsuits or investigations should be excluded.
4       Is there a stipulation as to that?
5       MR. SAVERI:  There is.
6       MS. VICKERS:  Yes, Your Honor.  There's a stipulation
7   on paragraph 2.
8       THE COURT:  All right.  Hold on.
9       Okay.  Then the next topic is to exclude references
10  to cartel, cartel members, co-conspirators, co-conspirator or
11  other pejorative terms.  Essentially, these terms are deemed by
12  the defendants to be highly inflammatory and prejudicial and
13  irrelevant to this case.
14      And I'll be glad to hear -- who's going to argue
15  this, Mr. Coggins?
16      MR. COGGINS:  I am, Your Honor.
17      Yes, sir.  And Your Honor, this is basically we're
18  arguing that we understand the experts are going to able to
19  testify to the extent of saying something is more likely or
20  less likely to be conducive to competition or collusion, that's
21  one thing.  But to allow an expert or any witness to identify a
22  group as either a conspiracy or cartel is unduly prejudicial.
23      Just in the same manner that when the co-conspirator
24  hearsay exception is used, in any case which a conspiracy is
25  ultimately what the jury is being asked to determine whether it

188

1   existed, they don't need to refer to the co-conspirator's
2   exception.
3       So we would ask that they not be allowed to use those
4   words.  They can talk about collusion.  They can talk about
5   competition.  They can talk about what is a cartel.
6       But to identify the defendants as members of a
7   conspiracy or cartel goes to the very heart of what this jury's
8   going to be asked to do and invades the province of the jury.
9       THE COURT:  I'm not sure if I understand this, Mr.
10  Coggins.  If you allege there's a conspiracy, you're suggesting
11  that there can't be reference to the co-conspirators?
12      MR. COGGINS:  I'm saying that they get to argue
13  there's a conspiracy.
14      I'm saying, for example, the experts can't say we
15  identify this as a conspiracy or we identify this as a cartel.
16  That's beyond.  I mean, that invades what the jury is
17  essentially being asked to determine here.  That's underlying
18  what the jury is being asked.
19      And if you look at, for example, the definition of a
20  cartel in Black's Law Dictionary, the definition is a
21  combination of producers or sellers that join together to
22  control a product's production or price.
23      I mean, the term itself cartel and conspiracy are so
24  loaded that they fall within those kind of terms that courts
25  have said you don't need to get in those terms.  You can argue

189

1   them.  Absolutely, they're free argue those terms.  The

2   defendants shouldn't be able to --

3          THE COURT:  You cited some cases, insider trading

4   cases?

5          MR. COGGINS:  Right.

6          THE COURT:  And you cited the matter of calling,

7   referring to a defendant as an insider trader.  And that is in

8   terms of an expert calling the defendant an insider trader.

9          MR. COGGINS:  Right.  Or really any witness shouldn't

10  be allowed to do that.  But I'm particularly focused on the

11  experts here.

12         And I think, like I said, it fits within the earlier

13  scope of our discussions, in which it's talked about that the

14  experts aren't going to be allowed to say this is a Sherman Act

15  violation.  They shouldn't be allowed to say this is a

16  conspiracy, we found a conspiracy.

17         It's the reason one of the defendants' experts I

18  think was not allowed to testify, because that was going to be

19  the gist of his testimony, that I've seen conspiracies and this

20  is one of them.  This fits within that kind of thing, Your

21  Honor.

22         It's unduly prejudicial.  It's loaded with danger for

23  the jury.  And really what we're here is to determine whether

24  or not the arrangement of the defendants was competitive in

25  nature or collusive in nature.

191

1          Similarly, we're proving a conspiracy here, Your

2   Honor, and we should be allowed to refer to the companies that

3   we say, and we're entitled to prove, participated in the

4   conspiracy as co-conspirators.

5          We are certainly comfortable with saying, or using

6   the kind of descriptive terminology alleged, if that's what the

7   issue is.  But we're just trying -- here there are some common

8   English words that are at the core of what we're talking about

9   here, and it would be bizarre and artificial, and it would in

10  fact hurt our ability to put on our case if they were stricken

11  from our vocabulary.

12         We're perfectly fine with the order that says that we

13  can't have an expert or anybody testify on the ultimate issue.

14  But in terms of the terminology, we should be able to use the

15  common terminology for it.

16         THE COURT:  Mr. Coggins, let me just see if I'm clear

17  on what you're asking, is that the lawyers clearly in opening

18  statement can talk about an alleged cartel and who the cartel

19  members were and conspirators.  Your exception is with respect

20  to having an expert say the cartel members did the following

21  things or the co-conspirators did the following things.

22         MR. COGGINS:  Exactly.  We're focused --

23         THE COURT:  You're not trying to keep out the words

24  cartel or cartel members or conspirators or other terms to be

25  used by counsel in their arguments to the jury, but you're

190

1          THE COURT:  Thank you, Mr. Coggins.  I'll be glad to

2   hear from you, Mr. Saveri on this.

3          MR. SAVERI:  Thank you.

4          THE COURT:  I guess the thrust is precluding your

5   experts from referring to individuals as co-conspirators?

6          MR. SAVERI:  Well, a couple things, Your Honor.

7   First of all, I believe it was still today, earlier today,

8   about your order with respect to the testimony of the experts

9   on the ultimate issue.  And we're not -- we don't have any

10  qualms with that.  We agreed to it before, and nothing about

11  that has changed.

12         I think the issue that we have here is something both

13  more extreme than the defendants want and more vague and

14  undefined.

15         I think it's relatively rare, Your Honor, for the

16  Court at this point to proscribe what language the lawyers can

17  use when they talk about what the issues are in this case.

18         In particular, this is a case involving a cartel.

19  The people or the entities that participate in, and we're

20  entitled to try to prove and put on evidence of whether or not

21  there was a cartel.  We have to be able to use that word.

22         And when we refer to the companies or people who were

23  participants in a cartel, it's just common English usage to

24  call them cartelists or some other word like that, that

25  signifies their participation.

192

1   concerned about experts coming up and opining that they're in

2   fact referring to what occurred as a cartel?

3          MR. COGGINS:  That is right, Your Honor.

4          THE COURT:  In terms of what was within the scope of

5   the issue?

6          MR. COGGINS:  If I heard Mr. Saveri correct.

7          THE COURT:  Mr. Saveri, does that mesh with what your

8   anticipation is?

9          MR. SAVERI:  Your Honor, we're going to have our

10  expert offer testimony about what a cartel is, and he's an

11  economist, and that --

12         THE COURT:  He's not going to be able to give his

13  opinion, I understand.

14         MR. SAVERI:  And Your Honor, we're going to be

15  talking about and we're going to have evidence in this case

16  from the economist about whether the defendants in this case

17  were participants in that cartel.  Whether the -- and that's

18  just -- it may not be the most beautiful way of referring to

19  it, but it's accurate and precise and consistent with the use

20  of standard economic terminology.

21         THE COURT:  Mr. Coggins, I'm going to deny your

22  motion as to this.  But I think it's not really in dispute.  I

23  don't think we'll have a problem here.

24         Quite frankly, I don't know how you can have a case

25  alleging cartel activity, price fixing, and a conspiracy and

193

1 not have the terms be used.

2        MR. COGGINS:  The terms can be used, we've agreed

3 their expert's going testify this is what a cartel looks like.

4 He took it a step further, which I thought the Court addressed,

5 I'm going to be able to look at these guys and say they're in a

6 cartel.

7        THE COURT:  No.  Experts are not going to get in my

8 opinion, this is a cartel, Sherman Act, or whatever.  They can

9 define what a cartel is.  They can define what price fixing

10 activity is.

11        MR. COGGINS:  We're in agreement on that.

12        THE COURT:  But as precluding references to cartel,

13 and members, and co-conspirator, I'm going to deny this motion.

14 I don't see any way it's workable, quite frankly, Mr. Coggins.

15 It will be denied.

16        MR. COGGINS:  Can I ask one clarifying question, Your

17 Honor?  In terms of the exception to the hearsay that's called

18 the co-conspirator exception --

19        THE COURT:  801(d)(2)(E).

20        MR. COGGINS:  Right.  Right.  In all the conspiracy

21 cases I've ever --

22        THE COURT:  801(d)(2)(E).

23        MR. COGGINS:  -- had, counsel have been told to refer

24 by the rule number and not say the co-conspirator's exception.

25 I think that is prejudicial in front of the jury.

194

1        THE COURT:  I don't think there's any need to refer

2 to that in front of the jury.

3        MR. SAVERI:  801(d)(2).

4        THE COURT:  (d)(2)(E).

5        MR. SAVERI:  We're fine with using that instead.

6        MR. COGGINS:  We'll do likewise.

7        THE COURT:  I'm sure, fine.  Some of the former

8 federal prosecutors in this courtroom know it's the favorite

9 rule of evidence in all white collar criminal prosecutions.

10        MR. COGGINS:  It used to be.

11        THE COURT:  It's called the great white whale that

12 swallowed up the hearsay rule.

13        MR. SANDLER:  So if we could for clarification,

14 during opening and closings, counsel are able to refer not to

15 the ultimate issue by our experts but certainly --

16        THE COURT:  For which you believe your evidence is

17 going to present.

18        MR. SANDLER:  And they will be asked whether the

19 conduct or behavior they observed was more consistent with

20 collusion or competition.

21        THE COURT:  That's fine.

22        MR. SANDLER:  And they will expound, collusion, and

23 will be cross-examined, 10, 12 hours.

24        THE COURT:  You can certainly stand up and say this is

25 what the evidence is going to indicate.

195

1        MR. SANDLER:  And this is good so we don't slow down

2 the trial.  When we refer to the members -- to the parties that

3 are involved, there will be defendants and co-conspirators who

4 are not here because that's how we refer to them, if that's

5 acceptable.  That's why I'm clarifying.

6        THE COURT:  I don't know how else it would work.

7        MR. SANDLER:  I don't, either.

8        THE COURT:  Your contention is DuPont, Huntsman, and

9 Kronos and Millennium engaged --

10        MR. SANDLER:  I agree, but I wanted --

11        THE COURT:  It's a price fixing conspiracy in

12 violation of Section 1 of the Sherman Act.  That's your

13 allegation.

14        MR. SANDLER:  That's correct.

15        THE COURT:  All right.  Now, the fourth of the six

16 item here within this motion is to exclude evidence that any

17 employee was terminated for any reason relevant to this

18 litigation, and I think this relates to Mr. Luigi Cutrone of

19 Huntsman; is that right?

20        MR. SAVERI:  Your Honor, Luigi Cutrone.

21        THE COURT:  I'm sorry, Cutrone.  Should have known,

22 Luigi, it's got to be Cutrone, he's a Huntsman employee,

23 correct, or was?

24        MR. SAVERI:  And they brought someone named Saveri

25 from San Francisco.  Your Honor, we don't plan on putting in

196

1 evidence regarding --

2        THE COURT:  So that's moot.

3        MR. SAVERI:  Because he worked for Huntsman and

4 Huntsman's out of the case.

5        THE COURT:  That's moot.  I think we're at the fifth

6 of the six, and to preclude plaintiffs from suggesting that

7 increased titanium dioxide prices injured downstream customers,

8 I think I've dealt with that, have we not?

9        We dealt with that already.

10        MR. WATTS:  I think that's right, Your Honor.

11        THE COURT:  Why we don't go back over this again?  I

12 see Mr. Glackin taking great pause at this.  Go ahead, Mr.

13 Glackin.

14        MR. GLACKIN:  I mean, I'll just point out, I mean,

15 Mr. Cooper said that part of the defendants' plan is to

16 introduce price increase announcements to our client, to our

17 client's customers, saying that the customers prices are going

18 up as a result of titanium dioxide prices.

19        THE COURT:  Which we dealt with this morning, and

20 that is going to be admissible evidence.

21        MR. GLACKIN:  Okay.

22        THE COURT:  All right.  So I'm not sure where we are

23 on this in terms of what -- this is a defense motion to

24 preclude the plaintiffs from suggesting that titanium dioxide

25 prices injured downstream customers.

197

1   MR. WATTS:  We think it can be mooted.

2   THE COURT:  You think it's mooted.  I don't know

3   whether it's mooted or not.  I ruled clearly it's going to be a

4   topic that can be addressed for the reasons I indicated

5   earlier.

6   MR. WATTS:  Yes, Your Honor.

7   MR. GLACKIN:  I think that's right, the motion's

8   moot.

9   THE COURT:  Right.  It's out.  You're not seeking to

10  preclude.  I talked already with Mr. Cooper about this morning,

11  and Mr. Glackin, on the nature of what could and could not be

12  introduced in that regard.

13  MR. COOPER:  That's right, Your Honor.  We had a

14  discussion.

15  THE COURT:  In terms of market analysis and what have

16  you, so it's now moot.

17  All right.  We're at the sixth of the six items, and

18  that is to exclude argument that defendants exchanged

19  confidential information because defendants designated

20  documents confidential under the stipulated protective order

21  when they were produced.

22  Essentially, the argument is just because the

23  defendants designated certain documents confidential for

24  discovery does not mean that the documents are confidential at

25  the time they were created pursuant to the Court's protective

198

1   order.

2   Is that the nature of the motion here?

3   MS. VICKERS:  Yes, Your Honor, it is.

4   THE COURT:  And the plaintiffs have argued that if a

5   document is confidential and created and that the defendants

6   are maintaining that all documents marked confidential even if

7   they're introduced at trial should not be made public so the

8   burden is on the producing party to show the confidential

9   designation is justified.

10  I don't understand this.  Again, it may be getting

11  late in the day.  We now have motions in limine that are going

12  six and seven lines here.  So it's getting a little bit

13  tangential, but go ahead, Ms. Vickers.

14  MS. VICKERS:  Okay.  And let me try to boil it down.

15  So what happened based on the ESR stipulation back

16  when the parties agreed to produce documents is that we had a

17  blanket agreement that we could mark documents as confidential

18  so as to save time and money for our document production.

19  THE COURT:  For litigation purposes?

20  MS. VICKERS:  For litigation purposes only, we marked

21  documents as confidential.

22  Through the course of discovery, plaintiffs have used

23  that confidential marking for purposes of litigation to prove

24  and to make the allegations that the defendants were exchanging

25  confidential information.

199

1   So in other words, they're using that marking that

2   was only for the purposes of litigation to now prove an

3   antitrust claim, and it's completely misleading under 403.

4   THE COURT:  All right.  Okay.  Who's going to respond

5   for the plaintiffs on this?

6   MR. SAVERI:  I will, Your Honor.  First of all,

7   defendants kind of have taken lots of positions with respect to

8   the confidentiality of their documents.

9   First of all, with respect to in particular the

10  confidentiality designation in this case, it is true that

11  defendants imposed a blanket confidentiality designation on

12  everything they produced in this case, that's true.

13  But under the terms of the protective order that the

14  Court entered, in order to do that -- and this had to believe,

15  and the designation had to be premised on the fact that these

16  documents were in fact confidential, that they contained

17  commercially sensitive --

18  THE COURT:  Why is that, Mr. Saveri?

19  MR. SAVERI:  Because the order says that, Your Honor.

20  THE COURT:  I don't -- I have to look back at the

21  order.  I don't accept the fact that in discovery when

22  documents are marked confidential by either side that that's

23  some basis that they were confidential for other purposes at an

24  earlier point in time.

25  MR. SAVERI:  Well, Your Honor, the standard for

200

1   designating the documents confidential was -- bless you, was --

2   THE COURT:  Let the record reflect Mr. Saveri's not

3   blessing me, he's blessing the clerk of the court, who sneezed.

4   (Laughter)

5   MR. SAVERI:  In order for them to be designated in

6   the first place as confidential, Your Honor, they had to be --

7   the documents had to contain commercially sensitive

8   information.

9   THE COURT:  That the parties, either party may for

10  whatever reason including commercial purposes want to be so

11  designated.

12  MR. SAVERI:  That's true, Your Honor.  But the

13  predicate of that, of course, is that they contained

14  commercially sensitive information.  If the defendants'

15  contention was that 2010 or 11 when they produced the material

16  that was commercially sensitive, it has to -- it is logically

17  true, or they have to be claiming that it was commercially

18  sensitive at the time that it was produced.

19  THE COURT:  No.  No.  Mr. Saveri, I'll look back at

20  the rules on it.  If that's the import of the local rules,

21  we'll have to have a Bennett exception here with respect to the

22  rules of the Court on that, because that's really not accurate.

23  It is not accurate to say that parties in litigation

24  label documents confidential for sensitive, for commercially

25  sensitive data for purposes of litigation and therefore that is

201

1    binding for or against either side in terms of the context of
2    an earlier point in time, it just remains to be seen.
3          We've already -- we've had a wonderful gentleman
4    who's sitting here in court from the California litigation who
5    has keen interest in this case because of another lawsuit
6    that's filed.
7          So whatever reason people attach to the
8    confidentiality of documents, I don't know that that can be --
9    that is accurate to reflect in terms of the nature of the
10   document at a time earlier.
11         It may or may not be.  You're certainly free to argue
12   that, given the nature of the document, it was confidential.
13   You are certainly free to argue that.
14         But the point is this, to have the stamp on it is
15   confidential under protective order for purposes of discovery
16   in exchange of information under the local rules of this Court
17   should not be taken by either side to mean that either side can
18   then attack the other in commercial litigation in this court as
19   to the fact that, ergo, at an earlier point in time, in a time
20   period that's deemed to be relevant, that that document was
21   necessarily confidential or it was felt that it needed to be
22   confidential.
23         And that applies equally to both sides on that.
24         MR. SAVERI:  I understand, Your Honor.  There are
25   also a subset of documents that contain contemporaneous legends

202

1    that were affixed by --
2          THE COURT:  Totally different issue.
3          MR. SAVERI:  I just wanted --
4          THE COURT:  Totally different issue.  To the extent
5    that there are documents that at the time of the creation of
6    the documents has a confidential notation to it, for whatever
7    reason, that's a separate matter.
8          But now I'm addressing what Miss Vickers has
9    addressed is, to the extent there's a document that's
10   confidential stamped on it as a basis of litigation in terms of
11   transmitting information back and forth during discovery, and
12   particularly with respect to electronically stored information,
13   that's a separate matter.  You all should be able to identify
14   the difference.
15         The documents will speak for themselves.  Either they
16   do or don't have earlier references to being confidential.  And
17   there are other documents that will clearly only have
18   confidential stamped on them in relation to this litigation,
19   seems to me.
20         MR. SAVERI:  I understand, Your Honor.  Tonight I'm
21   going to go back and look at what the protective order says.
22         THE COURT:  Whatever the protective order says is not
23   binding on me in this evidentiary ruling.  That's not the
24   intent of the Court here.  Quite frankly, I don't think it's
25   the intent of our local rules.  If it is, it's not going to be

203

1    my intent.
2          You've advised me.  As far as I'm concerned with
3    respect to electronically stored information and our protective
4    order and confidentiality orders for ease of discovery and ease
5    of transition of information, I routinely sign confidentiality
6    orders so that everyone is satisfied that no one gains
7    competitive advantage, and there are third parties out there
8    observing litigation.
9          That's done routinely, Mr. Saveri.  But to the extent
10   that's deemed to have evidentiary weight in terms of
11   admissibility in court, it's not deemed for that purpose,
12   Certainly not deemed by me for that very purpose.
13         It's very simple, if the document was already itself
14   deemed to be confidential and it so reflects, there's not going
15   to be any redaction of that, and you can certainly note that.
16         To the extent I'm repeating myself, to the extent
17   it's just stamped confidential for the purposes of the
18   protective order and the transmission of discovery material,
19   it's a separate issue, but it's--
20         MR. SAVERI:  You've heard my argument.
21         THE COURT:  I understand.  You've preserved it, but
22   that's the ruling on it.
23         MR. SAVERI:  Thank you, Your Honor.
24         THE COURT:  Okay.  With that, so to that extent, that
25   portion will be granted to exclude any argument with respect to

204

1    a document marked confidential for the transmission of
2    discovery.  It won't apply to the other documents.
3          We're running out of time here.  I think it's
4    probably late in the day.  I think this will probably bring it
5    to conclusion.
6          We're going to start tomorrow with the defendant
7    Kronos motion in limine number 475.  That basically relates to
8    Mr. Howard Simmons and plaintiffs' not opposing that motion,
9    but it does include reference to Kronos compensating Mr.
10   Fisher, and I think we'll probably have to wait on that until
11   tomorrow morning, we'll address that.
12         And we'll be looking forward to further information
13   in terms of the motion in limine concerning damages and the
14   matter of the December 31, 2010 deadline period and the matter
15   of Dr. Lamb projecting 2003 to 2010 data to the 2011-2013 time
16   period, and we'll have more information on that tomorrow.
17         So perhaps we'll start with that tomorrow morning and
18   then go to the matter of Kronos's motion in limine.
19         Anything further from the point of view of the
20   plaintiffs?
21         MR. SAVERI:  All clear.  From the discussion earlier,
22   what time are we starting tomorrow?
23         THE COURT:  I've got a 10:00 telephone conference
24   with a pro se plaintiff that can't be moved.  It's just
25   impossible to schedule people on that basis.  So it should be

205

1  very short.  We could start at 9:30 tomorrow, make sure we get
2  all this work done.  We'll have to stop very quickly after a
3  half hour for me to do this at 10:00.
4          MR. SAVERI:  I haven't consulted with my colleagues.
5  I'm happy to start as early as you want and take a break as
6  needed to accommodate the other matters.
7          THE COURT:  Is 9:30 a good start time, stop for 10
8  minutes around 10:00?
9          MR. COGGINS:  Works for us.
10         MR. SANDLER:  With all due respect, I don't want to
11 impede on the schedule of the Court.  If I were to excuse
12 myself approximately at 10 of 12 and then return approximately
13 1:30, would that be satisfactory so that I would be present for
14 the pretrial conference?
15         THE COURT:  That's fine.  That's fine.
16         MR. SANDLER:  If I learn from my colleagues, who I'm
17 sure would signal me by e-mail, if you adjourn until 2:00, then
18 I'll know not to return until 2.
19         THE COURT:  That's fine.  Good.
20         Anything further from the point of view of the
21 plaintiffs?
22         MR. SAVERI:  No.
23         THE COURT:  Anything further from the point of view
24 of the defendants, Mr. Ulwick?
25         MR. SANDLER:  Your Honor, there's one.

206

1          THE COURT:  Go ahead.  Mr. Sandler, go ahead.
2          MR. SANDLER:  Okay.  We had a letter that actually
3  Mr. Ulwick and I were working on about the documents and you
4  wanted you said by the end of the day Tuesday.  I heard you to
5  say Tuesday being tomorrow.  Others thought maybe it was
6  Tuesday the day before document day.
7          So could you just clarify when you want the letter
8  about our views?
9          THE COURT:  I thought it was tomorrow.
10         MR. ULWICK:  Your Honor, may I suggest that it would
11 probably be more useful to you if we pushed that date back, and
12 I'll tell you why.  We have a meet and confer scheduled later
13 this week on Wednesday with Kronos, and I think Wednesday or
14 Thursday with Millennium, and the plaintiffs, to go through
15 document issues.
16         And so it will be a whole lot more easier if you did
17 --
18         THE COURT:  That's fine.
19         MR. SANDLER:  No, we're happy --
20         THE COURT:  Mr. Ulwick's suggestion, that's fine.
21 That's fine.
22         MR. ULWICK:  Thank you.
23         THE COURT:  Anything else from the point of view of
24 the plaintiffs?
25         Nothing else anything else from the point of view of

207

1  the defendants?
2          MR. ULWICK:  No, thank you.
3          THE COURT:  Thank you all very much, and we'll stand
4  adjourned for the day, and I'll see you here tomorrow at 9:30.
5          (Proceedings adjourned)
6
7          I, Jacqueline Sovich, RPR, CM, do hereby certify
   that the foregoing is a correct transcript from the
8  stenographic record of proceedings in the above-entitled
   matter.
9
10 _____
11 Jacqueline Sovich                    DATE
   Official Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25